# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| | § | CIVIL ACTION NO. 4:16-CV-246 |
| v. | § | JUDGE MAZZANT |
| | § | |
| WILLIAM E. MAPP, III, | § | |
| WARREN K. PAXTON, JR., | § | |
| CALEB J. WHITE, and | § | |
| SERVERGY, INC. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Warren K. Paxton, Jr.'s Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #16). Having considered the relevant pleadings and oral arguments of the parties, the Court finds that the motion should be conditionally granted.

## I. BACKGROUND

Servergy, Inc. ("Servergy") is a computer hardware company that develops secure, cloud-based data storage servers. From November 2009 to September 2013, Servergy raised approximately $26 million in private securities offerings to develop what it claimed was a revolutionary new server. William E. Mapp, III ("Mapp"), Servergy's co-founder and then-CEO, was responsible for the fundraising campaign and had signatory authority over Servergy's bank accounts. As Servergy's primary fundraiser, Mapp identified prospective investors through word-of-mouth referrals and offered compensation to individuals for introducing new investors to the company.

Warren K. Paxton, Jr. ("Paxton") became involved in Servergy's fundraising campaign in the summer of 2011. Paxton currently serves as the Attorney General of Texas. Prior to serving

as Texas's Attorney General, Paxton was a Texas state senator from January 2013 to December 2014 and a Texas state representative from January 2003 to December 2012. Paxton was also registered as an investment advisor representative from July 2003 to December 2004 and from December 2013 to November 2014.

On July 12, 2011, Mapp met Paxton—then a member of the Texas House of Representatives—at Paxton's law office in McKinney, Texas, to discuss Servergy. During their meeting, Mapp offered to pay Paxton a 10% commission for any investors Paxton recruited to invest with Servergy. Following the meeting, Mapp emailed Paxton and reiterated his offer to pay Paxton either with Servergy common stock or a combination of cash and stock. Paxton responded to Mapp's offer via email, stating, "I will get to work."

Paxton actively recruited investors for Servergy between July 11, 2011, and July 31, 2011. Throughout Paxton's recruiting efforts, Paxton told prospective investors that he had met with Servergy's management and determined it was a great company and the investment presented an interesting opportunity. Paxton did not conduct any due diligence into Servergy or reveal to potential investors that he was being compensated to promote Servergy's stock.

On July 22, 2011, Paxton organized and invited at least seven prospective investors to an investment pitch at Servergy's office. Paxton attended that meeting and also introduced Mapp to at least five additional prospective investors by telephone and email the same day. Among the people Paxton recruited were his friends, business associates, law firm clients, and members of an investment group to which he belonged.[1] Based on prior dealings in the investment group, members trusted each other to consider the interest of the group as a whole and not exploit one another for a member's personal benefit. Typically, the member who recommended the

---

[1] At oral argument, the Commission clarified that Paxton was *not* recruiting current law firm clients in his capacity as their attorney.

2

investment would monitor the investment going forward and represent the group's interest. Paxton did not inform the investment group of his compensation arrangement with Servergy.

Following the initial pitch to his investment group, Paxton followed up with one of its members ("Investor 1"), a fellow state representative, to further encourage his investment in Servergy. In early 2013, Paxton organized and attended a meeting with Investor 1 and Mapp, at which Mapp falsely claimed Servergy was flush with purchase orders.

Paxton also followed up with another member of his investment group ("Investor 2") who had initially decided not to invest with Servergy and missed the investment deadline. Paxton placed an unsolicited late night phone call to Investor 2 to change his mind, stating that the offering price would double if he did not invest within the next week. Following the phone call, Investor 2 invested $150,000 with Servergy. Both Investor 1 and Investor 2 would not have invested in Servergy had they known Paxton was being paid to promote the company.

On July 23, 2011, Paxton forwarded one of Mapp's solicitation emails directly to a prospective investor and offered to answer any of the individual's questions. By July 28, 2011, five of the twelve prospective investors Paxton recruited had invested a total of $840,000 in Servergy. On August 5, 2011, Servergy issued a stock certificate to Paxton for 100,000 shares as payment for "services." Servergy issued Paxton a Form-1099 in the amount of $100,000 for the 2011 tax year.

On April 11, 2016, the Securities and Exchange Commission ("Commission") filed a complaint ("Complaint") (Dkt. #1) in this Court against Mapp, Paxton, Servergy, and an additional promoter, Caleb J. White, asserting various violations of federal securities laws. The Commission specifically claims that Paxton violated Sections 17(a) and 17(b) of the Securities Act and Sections 10(b) and 15(a) of the Exchange Act. On June 9, 2016, Paxton filed this Motion

to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #16). On July 5, 2016, the Commission filed its Response in Opposition (Dkt. #25). On July 15, 2016, Paxton filed a Reply (Dkt. #26). On September 9, 2016, the Court held oral argument at the request of the parties.

## II. LEGAL STANDARD

Paxton moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). "The Supreme Court recently expounded upon the *Twombly* standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

4

true, to state a claim to relief that is plausible on its face.'" *Gonzalez*, 577 F.3d at 603 (quoting *Iqbal*, 556 U.S. at 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.*

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In determining whether to grant a motion to dismiss, a district court may generally not "go outside the complaint." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). However, a district court may consider documents attached to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *Id.*

Paxton also moves to dismiss the Commission's claims under Federal Rule of Civil Procedure 9(b). Rule 9(b) "prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009). Rule 9(b) states, "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *Grubbs*, 565 F.3d at 190 (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010) ("'[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim

under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B,

2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*,

78 F.3d 1015, 1017 (5th Cir. 1996)).

### III. DISCUSSION AND ANALYSIS

The Commission alleges that Paxton engaged in fraudulent conduct by promoting

Servergy's stock without disclosing to potential investors that he was being paid to do so. The

central issue in this case is whether Paxton had a duty to disclose his compensation under federal

securities laws. The Court must determine whether the Commission has pleaded sufficient facts

to support a plausible claim against Paxton under federal securities laws.

### A. Fraud Under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act

The Commission alleges that Paxton engaged in fraud in violation of Section 10(b) of the

Securities Act and Rule 10b-5 thereunder because he did not disclose to potential investors that

he was being paid to promote Servergy stock. To survive a motion to dismiss a securities fraud

claim under Rule 10b-5 of the Exchange Act, the Commission must allege facts that, if true,

establish (1) a misstatement or omission (2) of material fact (3) in connection with the purchase

of a sale or security (4) made with scienter. *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Id*.

The elements required to establish a claim under Section 17(a) are essentially the same except

scienter is not required. *See SEC v. Evolution Capital*, 866 F. Supp. 2d 661, 667 (S.D. Tex.

2011). Since the Commission must essentially prove the same elements for Section 17(a) and

Rule 10b-5 violations, the Court will consider these allegations together. *See SEC v. Arcturus*

*Corp.*, No. 3:13-cv-4861-k, 2016 WL 1109255, at *14 (N.D. Tex. Mar. 21, 2016).

### 1. Liability Based upon a Misstatement

A defendant may be liable under Rule 10b-5 and Section 17(a) for either a misstatement or an omission. The Commission first alleges that Paxton made actionable representations. Paxton argues, and the Court agrees, that this is purely an omissions case.[2] But the Court will nonetheless address the Commission's position because they assert that Paxton made several material misstatements. One of these alleged material misstatements includes Paxton's assertion that Servergy was a "great company" that presented an interesting investment opportunity. The Commission also bases its material misrepresentation claim on the fact that Paxton claimed to have personally met with Servergy's management. Finally, the Commission alleges that Paxton created a sense of urgency in informing a potential investor that the share price would double before the potential investor returned from vacation. The Court will address these statements in turn.

### a. Puffing Statements

The first "misrepresentation" offered by the Commission is Paxton's assertion that Servergy was a "great company" that offered an interesting investment opportunity. The Commission offers *Brody v. Transitional Hospitals Corp.* to show that these statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." 280 F.3d 997, 1006 (9th Cir. 2002). But calling something a "great investment" is mere puffery. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (defining puffery as statement of "the vague and optimistic type that cannot support a securities fraud action… and contain no concrete factual or material misrepresentation"); *Carlucci v. Han*, 886 F. Supp. 2d 497, 524 (E.D. Va. 2012) (calling something a "great investment" is "non-actionable" puffery and "the sort of opinion and

---

[2] At oral argument, the Commission would not concede that this was purely an omissions case.

exaggeration that is immaterial as a matter of law"); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. MDL-1530, 2004 WL 5278716, at *9 (E.D. Tex. June 16, 2004) ("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are puffery . . . and are not actionable under federal securities law." (internal quotation marks omitted)).

The Commission offers *SEC v. Curshen* to assert that Paxton's statements amounted to more than mere puffery. 372 F. App'x 872 (10th Cir. 2010). In *Curshen*, the complaint identified several statements made by the defendant regarding the short-, medium-, and long-term plan for the company, relaying information from management concerning the impending growth of the stock and providing information regarding powerful investor relations people becoming involved in the company. *Id.* at 880. But the Commission has failed to allege any statement made by Paxton that "extends beyond mere corporate optimism." *Id.* The Court finds these puffing statements are immaterial as a matter of law and cannot support a securities fraud action under Rule 10b-5 and Section 17(a). *See Southland Sec. Corp.*, 365 F.3d at 372.

b. Other Alleged Misstatements

The other two communications that the Commission bases its misrepresentation claim upon fail because the Complaint does not allege that these representations were false or misleading. The Commission alleges that Paxton told potential investors that he had met with Servergy's management but does not allege facts to show that this truthful statement was misleading. The last alleged "misstatement" is similarly flawed. The Commission claims Paxton told an investor that the offering price would double before the individual returned from vacation, but the Complaint did not allege that the statement was false or misleading. The Court finds that the Commission has not sufficiently pleaded facts that could plausibly support a fraud claim based on a material misstatement.

## 2. Liability Based upon an Omission

The Court has determined that under the facts alleged, Paxton has made no material misrepresentations to support a plausible claim under Rule 10b-5 and Section 17(a). But Paxton could also be liable under a fraudulent omissions theory. The Commission alleges that Paxton violated Rule 10b-5 and Section 17(a) because Paxton had a duty to disclose his compensation yet failed to do so. In a securities fraud omissions case, the defendant must have a duty to speak to be found liable. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." (quoting *Chiarella v. United States*, 445 U.S. 222, 235 (1980))). Paxton argues that the fraud claims under Rule 10b-5 and Section 17(a) should be dismissed because the Commission has failed to adequately allege Paxton had a duty to disclose his compensation to potential investors.

### a. A Duty to Speak

The Commission alleges generally that Paxton had a duty to inform the potential investors that he was being paid by Servergy to promote its stock. The Commission focuses the majority of its argument on the materiality of Paxton's omission. But the issue in this case is determining whether a duty existed, not whether the omission was material.[3] "As the Supreme Court explained in *Matrixx*, whether a defendant owes a duty to disclose turns on whether the omission renders his statement false or misleading, not whether the omitted information was material." *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 802 (S.D. Tex. 2012) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)). While Paxton's compensastion may be

---

[3] The Commission has pleaded facts that show the omission was material because the Complaint alleges the investors would not have invested had they known Paxton was being paid to promote Servergy's stock. *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that a fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision).

material, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 562 U.S. at 44; *see also*, *Kunzweiler v. Zero.Net, Inc.*, Civ. A. No. 3:00-CV-2553-P, 2002 WL 1461732, at *9 (N.D. Tex. July 3, 2002) ("the materiality of the information claimed not to have been disclosed . . . is not enough to make out a sustainable claim of securities fraud. Even if the information is material, there is no liability under Rule 10b-5 unless there was a duty to disclose it."). Thus, to survive this motion to dismiss, the Commission must have pleaded with particularity facts sufficient to show that Paxton had a duty to speak.

### b. The Investment Club

The Commission alleges that Paxton owed a duty to reveal his compensation to his investment club because he was in a relationship of trust. There is a circuit split regarding whether a fiduciary-like relationship can trigger a duty to speak. *Compare United States v. Schiff*, 602 F.3d 152, 162–63 (3d Cir. 2010) (rejecting argument that omissions theory of fraud can be premised on a fiduciary duty to disclose and holding that "[t]his argument reaches too far," "is not supported by the language of § 10(b) and Rule 10b-5," and the "legal support for [the] fiduciary duty theory is also weak"), *with SEC v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009) (alterations in original) (holding that "nondisclosure in breach of a fiduciary duty satisfies § 10(b)'s requirement … [of] a deceptive device or contrivance"). The Fifth Circuit has not addressed this specific issue, but the Court agrees with other courts in this circuit that are of the opinion that a fiduciary relationship triggers a duty to speak. *See, e.g.*, *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, No. CIV.A. 04-0997, 2005 WL 1309153, at *4 (E.D. La. May 19, 2005) ("Generally, a duty to disclose information will not exist absent some confidential,

fiduciary, or other special relationship which, under the circumstances of the case, justifies the imposition of a duty to disclose information.").

The Commission cites a Ninth Circuit case that states a duty of disclosure arises when parties have "a fiduciary or agency relationship, prior dealings or circumstances such that one party has placed trust and confidence in the other." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). The Commission also offers *SEC v. Kirch* to assert that Paxton owed a duty to his investment club to disclose his Servergy compensation. 263 F. Supp. 3d 1144, 1150 (N.D. Ill. 2003). In *Kirch*, the defendant used information gained at a business group meeting to conduct insider trading in violation of "an express policy and understanding that such matters were to indeed be kept confidential." *Id.* at 1147. Unlike *Kirch*, the Complaint does not allege any express policy in Paxton's investment club regarding disclosing compensation when promoting stocks.

Paxton relies on a number of cases to show that he did not have a fiduciary relationship with his investment group. In *Skelly*, the court recognized that the jury charge wrongly "omitted the elements of 'reliance and de facto control and dominance,' which are required to establish a fiduciary relationship." *U.S. v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006); *see also United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) ("[A]t the heart of a fiduciary relationship lies reliance, and de facto control and dominance . . . The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other . . . A fiduciary relationship involves discretionary authority and dependency: One person depends on another— the fiduciary—to serve his interests." (internal quotations omitted)). The Commission does not allege that Paxton had any sort of control or dominance over his investment club members. There are cases from the Fifth Circuit, in a different context, supporting Paxton's position. In *Welk v.*

12

*Simpkins*, the Fifth Circuit held, "Mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship. Businessmen generally do trust one another." 402 F. App'x 15, 20 (5th Cir. 2010). Another court in this circuit found that allegations of "subjective trust" and "personal relationships" are insufficient to establish a fiduciary duty that creates a duty to disclose. *Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-2135-L, 2014 WL 4851558, at *18, *27 (N.D. Tex. Sept. 30, 2014).

The Court finds that under the facts alleged, Paxton did not form a fiduciary relationship with his investment group. Even if the Commission had pleaded facts sufficient to allege a plausible fiduciary relationship, the Complaint is insufficient to survive this motion to dismiss because it does not plead with particularly the nature of the fiduciary-like duty as required by the Fifth Circuit. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("At most, [plaintiffs] have offered conclusory allegations that such a duty existed, and that [defendant] breached it. Even if this were enough to satisfy Rule 12(b)(6), it is certainly not sufficient to satisfy the heightened particularity requirements of Rule 9(b)."). The Complaint alleges prior dealings regarding monitoring various investments *going forward* but fails to explain what these prior dealings were or whether there were any fiduciary-like duties regarding investment *recommendations*. The Commission makes only conclusory allegations regarding Paxton's duty to tell his investment club members that he was being paid when he recommended Servergy's stock. Since the Complaint has neither pleaded facts sufficient to support a fiduciary relationship, nor a specific duty under the alleged relationship, the Court finds that a securities fraud claim based on a fiduciary duty theory is not plausible.

c. A General Duty to Disclose Compensation

The Commission argues more generally that Paxton had a duty to disclose his compensation because not doing so would be misleading. At oral argument, the Court asked the Commission to identify a case that stood for the proposition that a non-broker has a duty to reveal his compensation. The Commission was unable to do so, but offered *U.S. v. Nouri* for analysis. 711 F.3d 129 (2d Cir. 2013). In *Nouri*, a registered broker was bribed by the issuer of a security to get his customers to buy that security. *Id.* The court found that the broker had a duty to reveal the fact that he was bribed because not doing so would be misleading to the investors. *Id.* at 142. *Nouri* is distinguishable in that the underlying omitted information—the existence of a bribe—was in itself illegal. Here, the omitted information—the receipt of a sales commission—is not in itself illegal. *Nouri* cannot be read to require disclosure of the receipt of an alleged sales commission.

The Commission also pointed to an administrative opinion to support the assertion that Paxton should have disclosed his compensation. *See In re Scholander*, Exchange Act Release No. 34-77492, 2016 WL 1255596 (Mar. 31, 2016). In *Scholander*, a registered broker entered into an agreement with a Chinese issuer that completed reverse mergers into U.S.-listed public shell companies in violation of federal securities laws. *Id.* at *2. The defendant broker recommended the issuer's securities without informing their registered brokerage firm or any customers of a $350,000 arrangement with the issuer. *Id.* at *3. The Commission's review board found that the broker should have disclosed this arrangement, stating, "When a broker-dealer has a self-interest (other than the regular expectation of a commission) . . . it should be disclosed." *Id.* at *5. The situation in *Scholander* is distinguishable because Paxton did not defraud his employer, have a self-interest "other than the regular expectation of commission," or actually

14

effect securities transactions for the account of others. *Id.* As in *Nouri*, *Scholander* cannot be read to require a non-broker to disclose an alleged sales commission.

At oral argument, the Commission offered *SEC v. Torr*, which held that when "free-lance brokers" take initiative in recommending a stock, they become "volunteer fiduciaries." 22 F. Supp. 602, 606 (S.D.N.Y. 1938). This opinion, released in 1938, is contrary to Second Circuit precedent and insufficient to base a Section 17(b) claim upon. *See United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006) ("There is no general fiduciary duty inherent in an ordinary broker/customer relationship . . . ."). Further, no court since the *Torr* decision has held a stock promoter liable as a volunteer fiduciary. Thus the Court finds that the Commission has failed to plead facts sufficient to show Paxton had a duty to reveal his compensation.

### 3. Liability Based upon a Half-Truth

The Commission has not sufficiently pleaded facts alleging that Paxton had a duty to disclose his compensation from Servergy. But the analysis does not end there. Absent an independent duty to disclose, omissions are actionable when the defendant elects to disclose some material facts, but fails to speak the whole truth. *See First Va. Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977). In *First Virginia Bankshares*, the Fifth Circuit recognized that certain statements made will be materially misleading if the defendant has concealed the fact that he has been compensated for promoting securities. *Id.* The Commission uses the holding in *First Virginia Bankshares* to take the position that every statement Paxton made encouraging others to invest was a materially misleading half-truth. But the rule of disclosure is "not as absolute as one might gather after reading *First Virginia Bankshares*. The Fifth Circuit most likely would agree that a more precise statement of the rule is that a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject*."

*McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396, 416 (E.D. Tex. 1999) (emphasis in original).

To survive a motion to dismiss under this theory, the Commission would have to identify a statement made by Paxton *regarding his compensation* that was materially misleading. *See id.*; *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) ("Where a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information *with respect to the subjects on which he undertakes to speak*." (emphasis added)); *Kunzweiler*, 2002 WL 1461732, at *11 ("[T]he Court must determine whether the alleged material omissions could have rendered any *identified* affirmative statement or statements made by the defendants misleading under any set of facts." (emphasis added)).

The Commission offers *SEC v. Huttoe*, where the defendant was found liable under Rule 10b-5 in connection with publishing a stocks newsletter. No. Civ.A. 96-2543, 1998 WL 34078092 (D.D.C. Sept. 14, 1998). The newsletter read that the defendant "may own shares" and "may act as" a paid consultant but in reality was being paid directly with stock for his promotional efforts. *Id.* at *5. The court found the statement a misleading half-truth because the statements were not equivalent to a full disclosure. *Id.* This is a prototypical half-truth scenario. Once a defendant makes a statement regarding their compensation, the defendant triggers a duty to speak the whole truth. To survive a motion to dismiss, the Commission would need to "identify which specific statements made by [Paxton] would qualify as misleading half-truths such that the bonus commissions would constitute a material omission under subsection (b)." *U.S. v. Laurienti*, 611 F.3d 530 (9th Cir. 2010); *see McNamara*, 57 F. Supp. 2d at 416. Since the Commission has not alleged that Paxton made a representation regarding his compensation from

Servergy, the half-truth argument may not serve as a basis for liability under Rule 10b-5 or Section 17(a).[4]

## B. Fraud Under Section 17(b) of the Securities Act

The Commission alleges that Paxton defrauded investors under Section 17(b) of the Securities Act by circulating communications describing securities without disclosing his compensation arrangement. Section 17(b) provides:

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77(q). Paxton argues that the Commission's Section 17(b) claim fails because Paxton did not receive consideration for publishing, publicizing, or circulating any communications describing securities. The Complaint identifies two communications that require analysis under Section 17(b).[5] The Court will analyze these communications in turn.

### 1. The Promotional Email

The Commission first alleges that Paxton violated Section 17(b) by forwarding one of Mapp's promotional emails to a potential investor on July 23, 2011.

---

[4] The Commission broadly alleges that Paxton's conduct constituted a fraudulent scheme under Sections 17(a)(1), (3) and Rules 10b-5(a), (c). This theory fails because under a scheme liability omissions case, there still must be a duty to disclose. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008) (rejecting scheme liability theory because the Fifth Circuit "limited the reach of § 10(b) and Rule 10b-5 to a material representation or omission where there is a recognized duty to disclose").

[5] The Commission argues that a third communication, a face to face meeting with Investor 1, could serve as a basis for liability under Section 17(b). The plain language of the statute does not support this theory. 15 U.S.C. §77(q) ("[B]y the use of any means . . . of interstate commerce").

a. *Quid Pro Quo*

Paxton argues the claim fails as to the email because the potential investor did not invest, and therefore Paxton did not earn a sales commission for that communication. Section 17(b) requires disclosure of compensation from an issuer only if that compensation is received (i) as a *quid pro quo* (ii) for a communication describing a security (iii) that is published or circulated by the means of interstate commerce. *United States v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971). The Commission argues that the *quid pro quo* was the 100,000 shares Paxton received for his recruiting efforts. But the Complaint only alleges that Paxton was paid for his successful recruiting efforts.[6] Thus there was no *quid pro quo* for the communication identified, as the email recipient never invested with Servergy. *See Amick*, 439 F.2d at 365 (finding violation where defendant "published the article *in return for* the promise of payment" (emphasis added)).

The Commission offers *SEC v. Gagnon* to assert that the Commission is not required to prove that Paxton successfully secured investments for Servergy; rather, that Paxton needed only to have an agreement to receive consideration to be liable under Section 17(b). No. 10-cv-11891, 2012 WL 994892 (E.D. Mich. Mar. 22, 2012). The Commission's briefing purports that the court based its holding solely on the fact that the defendant had a compensation agreement with an issuer. Yet the court found the defendant liable for not fully disclosing the nature of his agreement after electing to disclose on his website that he would "earn commissions on the money that I bring in, but I will hardly get rich." *Id.* at *11. In reality, he received over $3 million for his promotional efforts and the court held the defendant liable for not "*fully disclos[ing]*" the nature of his arrangement. *Id.* (emphasis in original). The Complaint does not

---

[6] At oral argument, the Commission argued that the statute calls for consideration "received or to be received," but the Complaint does not allege that Paxton received or would ever receive any compensation for his unsuccessful attempt to recruit the email recipient.

allege that Paxton elected to publicly disclose his compensation agreement, so *Gagnon* is inapplicable. The July 23, 2011, email cannot serve as a basis for a fraud claim because the Commission did not allege Paxton was ever paid—or ever would be paid—for sending the email.

### b. Due Diligence

The Complaint alleges that Paxton failed to conduct due diligence on Servergy's claims before forwarding the promotional email, but does not allege that Paxton had a duty to do so. Even if the Commission had alleged such a duty, courts have held that failure to conduct due diligence on a promoted stock does not give rise to liability. *See SEC v. Tambone*, 597 F.3d 436, 488 (1st Cir. 2010) (en banc) ("[W]e reject the SEC's notion that a breach of a duty to investigate, without more, is a breach of a duty to disclose."); *United States v. Schiff*, 602 F.3d 152, 167 (3d. Cir. 2010) ("[T]he plain language of § 10(b) and Rule 10b-5 do not contemplate the general failure to rectify misstatements of others"); *Brown v. J.P. Turner & Co.*, No. 1:09-CV-2649-JEC, 2011 WL 1882522, at *4 (N.D. Ga. May 17, 2011) (dismissing Section 10(b) claim, observing that "Plaintiffs do not cite any authority to suggest that a broker has the duty . . . to ensure the accuracy of investment materials"). The Court finds that the Commission has not sufficiently pleaded facts to support that Paxton had a duty to conduct due diligence with respect to the veracity of the promotional email. More importantly, the Court has determined that the email may not serve as a plausible basis for liability under Section 17(b) because the Complaint does not allege facts indicating that Paxton was paid or will be paid for his unsuccessful attempt to solicit the email recipient. [7]

---

[7] The Commission offers *SEC v. Liberty Capital Group, Inc.* to assert that Paxton did not have to be *directly* compensated for the email to be found liable under Section 17(b). 75 F. Supp. 2d 1160 (1999). But the Complaint does not allege facts to show that Paxton received or ever would receive compensation for his unsuccessful attempt, so the method in which he would receive payment is irrelevant to the analysis.

## 2. The Phone Call with Investor 2

The other communication upon which the Commission bases its Section 17(b) allegation is Paxton's phone call with Investor 2. Paxton argues that the Complaint fails because there was no broad dissemination of the communication and the communication was not recorded. Paxton supports his position by pointing out that there are no cases holding a defendant liable under Section 17(b) for placing phone calls to potential investors, but this fact is not dispositive. The Commission argues that any oral communication is sufficient to allege a Section 17(b) violation and that broad dissemination is not required.

### a. Recorded Communication

Because there are no cases under Section 17(b) regarding phone calls, the Court must look to the text of the statute. Paxton's position is that Section 17(b) is limited to the publication or circulation of recorded communications because "communication" is found at the end of a list of recorded communications. Paxton cites the Supreme Court's reliance upon the *noscitur a sociis* canon of statutory interpretation as a basis for his argument. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (stating courts must rely on the "principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (internal quotation marks omitted)). Paxton argues that under this canon, "communication" should be interpreted narrowly because it accompanies a list of recorded communications.[8]

---

[8] Paxton also points to the legislative history of the Securities Act to show that Section 17(b) was not drafted to prohibit oral communications. Committee on Interstate & Foreign Commerce, H.R. Rep. No. 73–85, at 24 (1933) (explaining that Section 17(b) was "particularly designed to meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion."). However, this approach is unnecessary and inappropriate for the Court because "[o]nly after we apply principles of statutory construction, including the canons of

The Commission does not offer any canons of statutory interpretation but argues that "communication" should be interpreted broadly to include any oral communications. *See Communication*, Black's Law Dictionary (7th ed. 1999) (defining communication as "the expression or exchange of information by speech, writing, or gestures."). But words in statutes should not be interpreted in isolation, ignoring important contextual information. *Deal v. United States,* 508 U.S. 129, 132 (1993) (recognizing the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

The Commission bolsters its position by pointing to a case in which the court found liability under Section 17(b) for communications that included an oral statement. The Commission cites *United States v. Wenger*, where the Tenth Circuit held the defendant liable for publicizing a stock by newsletter and orally through a radio program. 427 F.3d 840, 850 (10th Cir. 2005). The court found the defendant liable because "investors—such as the listeners to [defendant's] radio program and readers of his newsletter who testified in this case—base their decisions whether to buy a stock in part on whether various opinions about the product are self-serving or not." *Id.* Because the court did not indicate whether the radio program alone was sufficient for liability, the Commission cannot use this case to demonstrate that an unrecorded single phone call is sufficient to trigger liability under Section 17(b).

The Court agrees with Paxton's interpretation of Section 17(b) but utilizes an additional, more specific contextual canon—*ejusdem generis*. The Supreme Court has recognized the utility of the principle of *ejusdem generis* and explained, "When a general term follows a specific one,

---

construction, and conclude that the statute is ambiguous, may we consult legislative history." *In re Amy Unknown*, 701 F.3d 749, 759–60 (5th Cir. 2012) (citing *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 518–19 (5th Cir. 2004)). The statute is not ambiguous after applying principles of statutory construction.

the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991). Here, the term "communication" follows a list of tangible media, including circulars, advertisements, newspapers, articles, and letters. Thus, the term "communication" should not be interpreted so broadly as to include all unrecorded forms of communication. To hold otherwise would be contrary to longstanding Supreme Court and Fifth Circuit precedent regarding this established canon of statutory interpretation. *See McBoyle v. United States*, 283 U.S. 25, 25–27 (1931) (utilizing the *ejusdem generis* principle in determining that "automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" did not apply to an airplane); *United States v. Kaluza*, 780 F.3d 647, 657 (5th Cir. 2015) (utilizing the *ejusdem generis* principle in determining that "[e]very captain, engineer, pilot, or *other person* employed on any steamboat or vessel" only applied to other persons conducting "marine" employment functions). Finally, had the legislature intended the statute to cover all unrecorded communications, it could have drafted the statute more broadly. *See* 15 U.S.C. § 77(w) (providing it is unlawful "to make…*any representation*"); 15 U.S.C. § 77(x) (providing it is unlawful if a person "makes *any untrue statement*"); 15 U.S.C. § 77l(a)(2) (providing it is unlawful to offer or sell securities "by means of a[n]…*oral* communication, which includes an untrue statement") (emphasis added). The Court finds that the phone call was not a recorded communication as required under the federal securities laws. Thus, the Commission has failed to allege facts that could plausibly support a violation of Section 17(b) based on the phone call to Investor 1.

b. Broad Dissemination

The Court has found that Commission has failed to allege facts that could plausibly support a violation of Section 17(b) based on either the promotional email or the phone call to Investor 1. But the parties spent a considerable portion of their briefings on arguing whether a communication must be broadly disseminated to serve as a basis for liability under Section 17(b). It is clear that the phone call to Investor 2 was not broadly disseminated—Paxton called a single potential investor. Since the Fifth Circuit has not expressly ruled on whether broad dissemination is required, the Court must look to the text of the statute. The statute provides that it shall be unlawful for any person, "by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication" describing a security without disclosing compensation. 15 U.S.C. §77(q). The ordinary, contemporary, common meanings of the words "publish," "give publicity to," and "circulate" do not connote a private, singular communication with one intended recipient. *See Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 880 (quoting *Williams v. Taylor,* 529 U.S. 420, 432 (2000)) ("It is of course a truism that statutory construction begins with the 'ordinary, contemporary, common meaning' of the words of the statute."). "Publish" is defined, "To distribute copies (or a work) to the public." *Publish*, BLACK'S LAW DICTIONARY (9th ed. 2009). Similarly, "publicity" is defined as "public attention; notoriety." *Publicity*, BLACK'S LAW DICTIONARY (9th ed. 2009). The plain language of the statute does not lend itself to application to a single phone call because the publicity element is absent.[9] Black's does not define

---

[9] At oral argument, the Commission argued that the Court would have to draw a line regarding how broadly a communication must be disseminated to trigger liability under Section 17(b). But the Court does not have to draw such a line because the communications alleged—a single phone call and a single email—are clearly not broadly disseminated.

"circulate" but Webster's defines it as "to pass from person to person" or "to come into the hands of readers." WEBSTER'S NEW COLLEGIATE DICTIONARY (1st ed. 1977). No one in common parlance refers to a single, person-to-person telephone call as "circulating" a communication. *See Bond v. United States*, 134 S. Ct. 2077, 2090 (2014) (rejecting government's statutory interpretation, reasoning that "no speaker in natural parlance" would use the statutory term at issue to describe the defendant's conduct).

Importantly, all of the cases in other circuits holding a defendant liable under Section 17(b) have involved broadly disseminated and recurring publications. *See Amick*, 439 F.2d at 365 (finding violation where a defendant published a weekly article, Indiana Investor and Business News, that was frequented by numerous Indiana investors); *SEC v. Liberty Capital Grp., Inc.*, 75 F. Supp. 2d 1160, 1161–62 (W.D. Wash. 1999) (finding SEC adequately pleaded violation where it claimed that defendant violated Section 17(b) "by publishing favorable accounts of publicly-traded companies in a newsletter and on the Internet" over a period of two years); *Ginsburg v. Agora, Inc.*, 915 F. Supp. 733, 736-37 (D. Md. 1995) (noting that Defendants, as authors and publishers of an investment newsletter "marketed to the general public and, in May of 1993, was sent to between 6,800 and 7,200 subscribers" are "certainly within the class of persons potentially liable" under Section 17(b)). While the Court need not determine how broadly a communication must be disseminated to trigger liability under Section 17(b), the Court finds that it is too far a stretch to apply Section 17(b) to a single phone call to one investor. The same reasoning may be applied to the single-recipient promotional email.

The Commission has failed to allege that Paxton published, gave publicity or circulated any recorded communication describing a security. The promotional email allegation is deficient because the Complaint did not allege that Paxton was paid or would be paid for his unsuccessful

recruiting effort, and the phone call allegation is deficient because the call was not a recorded communication.[10] Thus the Court finds the Complaint does not allege facts to support a plausible claim under Section 17(b).

### C. Failing to Register Under Section 15(a) of the Exchange Act

The Complaint's final allegation against Paxton is that he was required to register as a broker but failed to do so. Section 15(a)(1) provides that it shall be unlawful to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker is registered. 15 U.S.C. § 78(o). The Exchange Act defines a broker as a person "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Paxton claims that he was not acting as a broker as defined under the Exchange Act and thus did not have to register with the Commission.

Paxton argues that the Section 15(a) claim should be dismissed because the Commission fails to allege that Paxton effected transactions in securities for the account of others. Specifically, Paxton argues that he did not actually handle securities, enter trades, or otherwise exert any authority over anyone's account. The Commission claims it does not have to allege that Paxton had actual authority or control over his clients' accounts or assets. The Commission believes that control over accounts is merely a factor in determining whether a person is acting as a broker.[11] Paxton argues that control is an essential element under the statutory definition of "broker."

---

[10] Neither communication was broadly disseminated, but this is not the basis for the Court's holding.

[11] The Commission offers *SEC v. Benger* to assert that control over clients' accounts is a non-dispositive factor rather than an element for determining broker status. 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010). But the court did not reach this holding or state that control over a client's

The Exchange Act does not define what is required to "engage in the business of effecting transactions" in securities "for the account of others." The Fifth Circuit has not interpreted the specific language either, but the language of the statute indicates that more activity is required than simply recommending a stock or introducing a potential investor to company's fundraiser. Paxton provides several cases to support his interpretation of the statute. In *SEC v. Kramer*, the Commission alleged that the defendant acted as an unregistered broker in violation of Section 15(a) where he received transaction-based commissions for actively soliciting "intimate friends and family" over a period of two years. 778 F. Supp. 2d 1320 (M.D. Fla. 2011). The court determined that the defendant had acted as a facilitator rather than a broker because his conduct "consisted of nothing more than bringing together the parties to a transaction" and the Commission presented no evidence of the defendant possessing "authority over the accounts of others." *Id.* at 1339.

Similarly, in *SEC v. M&A West, Inc.*, the court was unwilling to classify the defendant as an unregistered broker where he was paid to facilitate securities transactions without actually controlling the accounts of others. No. C-01-3376 VRW, 2005 WL 1514101, at *9 (N.D. Cal. June 20, 2005). The court concluded, "In particular, no assets were entrusted to [defendant], and the Commission identifies no evidence that he was authorized to transact 'for the account of others'…Although [defendant] was in the business of *facilitating* securities transactions *among other persons*, the Commission cites no authority for the proposition that this equates to '*effecting* transactions in securities *for the account of others*.'" *Id.* at *9.

---

account is not required. The court found that the SEC sufficiently alleged that the defendant was "effecting transactions in securities for the account of others" because he received transaction-based compensation, *collected the investors' funds*, and processed securities documents. *Id.* (emphasis added).

The *Kramer* and *M&A West* cases suggest that control over the account of others is an element rather than a factor. The Commission offers a case that does not rely on control of accounts as dispositive; rather, it utilizes a fact-intensive broker versus finder distinction to determine whether an individual must register with the Commission. *See SEC v. Offill*, No. 3:07-cv-1643-D, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012). In *Offil,* the court noted the "distinction drawn between the broker and finder or middleman is that the latter bring[s] the parties together with no involvement on [his] part in negotiating the price or any other terms of the transaction . . . A finder, however, will be performing the functions of the broker-dealer, triggering registration requirements, if activities include: analyzing the financial needs of an issuer, recommending or designing financial methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities." *Id.* at *7.

The Commission also offers *SEC v. Helms*, in which the court found the defendant did more than simply introduce the investor to sellers, triggering a registration requirement. No. A-13-CV-01036, 2015 WL 6438872 (W.D. Tex. Oct. 20, 2015). In *Helms*, the "[investor] and [defendant] exchanged multiple email communications concerning the [] investment" and "[the defendant] conveyed [the investor's] questions about the investment to Sellers." *Id.* The Commission offers a similar case in which the defendant was involved in negotiations, made investment recommendations, and gave advice in connection with securities investments. *See Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009). During oral argument, the Court asked the Commission if Paxton had performed any of the functions identified in these cases, such as answering any investors' questions or otherwise doing more than introducing the investors to

Mapp. The Commission stated that Paxton had not, but asserted that *offering* to answer potential investors' questions was sufficient to trigger a registration requirement under *Helms* and *Apex Global Partners, Inc*.

The Court adopts the reasoning in *Kramer* and *M&A West* and finds that Paxton was merely *facilitating* securities transactions rather than performing the functions of a broker. *See M&A West*, 2005 WL 1514101, at *9. Paxton's conduct did not amount to effecting transactions for the account of others. Here, as in *Kramer*, the Commission presented no evidence of Paxton's possessing "authority over the accounts of others." *See Kramer*, 778 F. Supp. 2d at 1339. The Commission failed to allege that assets were entrusted to Paxton or that he was authorized to transact for the account of others. *See M&A West*, 2005 WL 1514101, at *9. Further, Paxton did not transcend his role as a finder because he did not perform the functions identified in *Offill*. 2012 WL 246061, at *8. Paxton was neither involved in negotiating the price or terms of the transaction, nor was he performing any of the other functions of the broker-dealer. *See id*. Although Paxton had prior involvement in the sale of securities during his tenure as a registered broker, this factor alone is not enough to classify Paxton as a broker-dealer rather than a finder. *See id*. The Court finds that the Complaint has not pleaded facts sufficient to support a plausible claim under Section 15(a) of the Exchange Act.

## IV. CONCLUSION

This case is not about whether Paxton had a moral obligation to disclose his financial arrangement with Servergy to potential investors. This case is also not about whether Paxton had some general obligation to disclose his financial arrangement to his investor group. The only issue before the Court is to determine whether the facts as pleaded give rise to a plausible claim under federal securities laws. With that limitation in mind, the Court has determined that under

the facts pleaded by the Commission, Paxton did not have a legal obligation to disclose his financial arrangement.

The Court finds that the Complaint has not alleged facts sufficient to support a plausible claim under Sections 17(a) and 17(b) of the Securities Act or Sections 10(b) and 15(a) of the Exchange Act.

In its Response (Dkt. #25), the Commission requests that the Court grant it leave to amend its Complaint. While this request does not satisfy the requirements of Federal Rule of Civil Procedure 15, the Court is inclined to allow the Commission to plead additional facts, if any, before it grants the motion and dismisses the Commission's claims against Paxton.

It is therefore **ORDERED** that: (1) Respondent Warren K. Paxton, Jr.'s Motion to Dismiss (Dkt. #16) is **CONDITIONALLY GRANTED** pending the Court's review of the Commission's submission of additional facts and (2) the Commission is **GRANTED** leave to amend its allegations against Paxton to the extent that it has additional facts that might support a claim under the statutes alleged in the Complaint.

It is further **ORDERED** that: (1) any such amendment must be filed within fourteen (14) days of the issuance of this order and (2) the Commission must place any new facts not previously alleged in the original Complaint in bold typeface.

**SIGNED this 7th day of October, 2016.**

_Amos Mazzant_

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE