**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

———————————————————————

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 4:16-cv-00246 |
| | ) | |
| WILLIAM E. MAPP, III, | ) | JURY TRIAL DEMANDED |
| WARREN K. PAXTON, JR., | ) | |
| CALEB J. WHITE, and | ) | |
| SERVERGY, INC. | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

**FIRST AMENDED COMPLAINT**

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges:

**NATURE OF THE ACTION**

1.      From November 2009 to September 2013 ("Relevant Period"), McKinney, Texas-based technology company Servergy, Inc. ("Servergy") raised approximately $26 million in private securities offerings to develop what it claimed was a revolutionary new server, the Cleantech-1000 ("CTS-1000").

2.       In oral and written communications with prospective investors, and in Servergy's February 2013 Private Placement Memorandum ("PPM"), Servergy's co-founder and then-CEO and Chairman William E. Mapp, III ("Mapp") led investors to believe that the CTS-1000 was in high demand by falsely claiming notable companies like Amazon.com and Freescale Semiconductors had pre-ordered the product.

3.      In addition, Mapp claimed the CTS-1000 consumed up to 80% less power than other servers and that it was positioned to compete with servers from industry leaders like

Hewlett Packard, IBM, and Dell for use in large data centers.  Mapp had no reasonable basis for these claims and failed to disclose that, in reality, the CTS-1000 was based on outdated technology that was being phased out of the industry.

4.     As part of its fundraising efforts, Servergy paid Caleb J. White ("White") and Warren K. Paxton, Jr. ("Paxton") commissions to promote the company to potential investors. Neither White nor Paxton disclosed their arrangements to prospective investors.

### DEFENDANTS

5.     **Servergy, Inc.** is incorporated in Nevada.  At all relevant times, Servergy's principal place of business was in McKinney, Texas.  The company raised approximately $26 million between its founding in August 2009 and September 2013.  During that period, Servergy claimed to be a computer hardware company with a single product, the CTS-1000.  In 2014, Servergy rebranded itself under the leadership of a new CEO and reconstituted board of directors and is now generating revenue using the CTS-1000 to sell secure, cloud-based data storage services.

6.     **William E. Mapp, III**, age 56, resides in McKinney, Texas.  Mapp co-founded Servergy and served as its CEO from August 2009 to September 2014, its President from August 2009 to July 2014, and Chairman of its board of directors from April 2009 to May 2015.  Mapp was responsible for Servergy's fundraising from August 2009 to February 2013 and had signatory authority over Servergy's bank accounts while CEO.

7.     **Warren K. Paxton, Jr.**, age 53, resides in McKinney, Texas.  Paxton has served as Texas's Attorney General since January 2015.  He was a Texas state senator from January 2013 to December 2014, and a Texas state representative from January 2003 to December 2012. Paxton received 100,000 shares of Servergy stock for soliciting investors for Servergy between

July 11, 2011 and July 31, 2011. Paxton was an investment adviser representative of Mowery Capital Management ("MCM") from December 2013 to November 2014, and MCM's predecessor firm from July 2003 to December 2004.  On May 2, 2014, the Texas State Securities Board ("TSSB") fined Paxton $1,000 after he admitted soliciting clients for MCM without being registered as an investment adviser representative of the firm.   According to the TSSB's disciplinary order, Paxton did not personally disclose to clients that he would be paid 30% of the asset management fees MCM collected.  On July 28, 2015, a Collin County, Texas grand jury indicted Paxton on two counts of first degree state securities fraud and one third degree felony count for failing to register as an investment adviser representative for the same conduct underlying the TSSB's disciplinary order.  *State of Texas v. Warren Kenneth Paxton, Jr.* in the 416th Judicial District Court of Collin County, Texas, No. 416-81913-2015, 416-82148-2015, and 416-82149-2015.

8.     **Caleb White**, age 36, resides in Tyler, Texas.   White received approximately $66,000 in commissions for recruiting investors to Servergy from April 2010 to April 2012.  He also served as a purported independent director on Servergy's board between September 2011 and September 2015.  White owns an insurance sales firm focusing on Medicare, property and casualty insurance, and life insurance.

## JURISDICTION AND VENUE

9.     The SEC brings this action pursuant to authority conferred upon it by Section 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78(u)(e)].

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

11.     Venue is proper in this district because at all relevant times Servergy maintained an office here, all individual Defendants except White reside here, and the acts, transactions, and courses of business constituting violations of law alleged in this Complaint occurred here.

12.     In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## FACTUAL ALLEGATIONS

### I.     SERVERGY MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS ABOUT THE CTS-1000 TO RAISE $26 MILLION BETWEEN 2009 AND 2013 SELLING UNREGISTERED SECURITIES.

13.     Servergy funded its operations, namely development of the CTS-1000, by raising $26 million between November 2009 and September 2013 without a registration statement being filed or in effect and when no exemption from registration applied.

### A.     Mapp led Servergy's fundraising efforts between November 2009 and January 2013 and raised more than $6 million.

14.     From November 2009 through January 2013, Mapp acted not only as Servergy's co-founder, CEO, and Chairman; he was also its primary fundraiser.  During that time, he raised over $6 million for Servergy through word-of-mouth referrals that led to sales of common stock to 135 investors across ten states.

15.     Mapp identified prospective investors through referrals and offered to pay 10% commissions to individuals for introducing new investors to the company.

16.     Once prospective investors were identified, Mapp hosted presentations, in person and virtually through webinars, pitching opportunities to invest in Servergy.   During those presentations, he made materially misleading claims about the state of Servergy's technology and its business prospects, and conducted a live demonstration juxtaposing the CTS-1000's power efficiency with a Dell server that Mapp falsely claimed was a comparable product.

17.     In addition to his in-person and virtual presentations, Mapp provided prospective investors offering documents including a Confidential Information Memorandum ("CIM") and subscription agreement.  Mapp helped draft these documents and was ultimately responsible for their contents.

18.     Mapp's investor presentations and Servergy's CIM contained material misrepresentations and omissions about the state of Servergy's technology and business prospects, as described below.

**B.     WFG Investments, Inc. raised $20 Million for Servergy between February and September 2013.**

19.     Between February 2013 and September 2013, Servergy engaged broker-dealer WFG Investments, Inc. ("WFG") to raise an additional $20 million for the company by offering up to 10,000,000 shares of Servergy common stock at a price of $2.00 per share.

20.     In connection with the WFG offering, Mapp conducted a live investor presentation on or about February 14, 2013 ("WFG Presentation"), which was audio recorded and later made available to prospective investors across the country via email.

21.     In addition to Mapp's recorded presentation, prospective investors identified in connection with the WFG offering also received Servergy's private placement memorandum ("PPM"), a marketing PowerPoint presentation, an executive summary, and a subscription agreement.  Mapp participated in drafting the PPM and was ultimately responsible for approving

the statements made in it, large portions of which were copied from Servergy's earlier CIM. According to the PPM, investment funds would be used to develop necessary software, manufacture the CTS-1000, and market the server to customers.

22.    Both the investor presentation and PPM contained material misrepresentations and omissions about the state of Servergy's technology and business prospects, as described below.

## II.    MAPP AND SERVERGY MISLED INVESTORS WITH FALSE CLAIMS OF ALLEGED ORDERS.

### A.    Servergy falsely claimed customers had committed to purchasing the CTS-1000.

23.    When soliciting investments throughout the Relevant Period, Servergy and Mapp knowingly misled investors to believe that customers were committed to purchasing the CTS-1000.

24.    To demonstrate market demand for the CTS-1000, Mapp implemented a pre-order program in August 2012 requiring customers to pay a 50% deposit to pre-order the CTS-1000.

25.    When no potential customers were willing to pay a deposit to reserve a CTS-1000, Mapp changed the program in October 2012, dropping the deposit requirement and merely calling for a customer to sign a non-binding pre-order form.  Even though the new pre-order form was non-binding and required no financial deposit, only one potential customer, Koerr, Inc. ("Koerr") was willing to sign it.

26.    In order to create the false appearance that Servergy had received more than one pre-order, Mapp's son, William E. Mapp, IV ("Will Mapp"), published a "pre-order" form on Servergy's website, which allowed visitors to the site to express interest in the CTS-1000 by

submitting basic information such as a name and company affiliation.  Such pre-orders did not obligate website visitors to purchase Servergy's server.

27.     By January 2013, in order to further falsely inflate the number of pre-orders, Mapp began to use the term pre-order to refer to *any* instance in which a prospective customer indicated, either orally, via email, or on Servergy's online pre-order form that it would *consider* buying the CTS-1000 when it ultimately became available in the market.

28.     With Mapp's counterintuitive definition of "pre-order" as its basis, a section of Servergy's PPM titled "pre-orders" falsely claimed the company had received "25 orders totaling over 1,500 units with planned delivery in late 2013."

29.     During the WFG Presentation, Mapp falsely claimed that Servergy had received pre-orders for over 2,000 CTS-1000 units and the company would begin to turn a profit after selling only 600 units.  At that same gathering, Mapp failed to correct a WFG representative who claimed investors' money would be "protected in a very short fashion" because Servergy had "orders on the books."

30.     Despite changing the meaning of the term "pre-order" to suit his needs over time, Mapp told investors that Servergy's pre-order program was the same model used by Tesla and Apple.  This was untrue because, during the Relevant Period, Tesla and Apple each required customers to make cash deposits, or payment in full, when pre-ordering products.

31.     When these statements were made in the PPM and orally by Mapp, he knew that Servergy had not received orders for the CTS-1000.  Instead, Mapp had simply invented his own misleading definition for the term "pre-order" to disguise the fact that Servergy had neither actual product orders nor binding legal or financial commitments from customers to purchase the CTS-1000.

**B.**     **Servergy maintained a pipeline report tracking supposed sales leads.**

32.     Servergy utilized an Opportunity Pipeline Report ("Pipeline Report") to internally track sales leads.  Will Mapp, who generated potential customer leads at trade shows and monitored online pre-orders, was primarily responsible for maintaining and updating the Pipeline Report, which Bill Mapp received and discussed with other members of management.

33.     The Pipeline Report (a) identified companies Servergy believed were interested in the CTS-1000; and (b) estimated the likelihood a sale would actually occur.  For instance, Servergy's Pipeline Report assigned a 50% likelihood that Disney and Netflix would each order the CTS-1000 despite no substantive discussions with those companies or indicia that the companies seriously considered purchasing Servergy's server.

34.     The Pipeline Report also continued to identify potential customer orders long after those supposed sales opportunities – to companies such as Freescale Semiconductor, Inc. ("Freescale"), discussed below – ceased to exist.

35.     Hence, the Pipeline Report presented an overstated version of Servergy's business prospects and consequent financial outlook and overall sustainability.

**C.**     **Mapp touted orders that never existed.**

     *1.*     *The alleged Freescale order*

36.     In late July 2012, when Servergy was low on operating funds, the company pitched a possible sale to Freescale.  While Servergy's management was optimistic about the opportunity, Mapp alone began falsely referring to it as an actual purchase order.  Indeed, Mapp began touting an order from Freescale when soliciting prospective investors and communicating with Servergy's promoters, including Paxton.

37.     On July 26, 2012 and July 30, 2012, Mapp touted the alleged Freescale order in emails to an investor. In the emails, Mapp knowingly and falsely claimed that Servergy had received an order from Freescale with a potential value of $34 million. Shortly after receiving Mapp's second email, the investor wired $40,000 to Servergy. Before receiving the investment, Servergy had just over $5,000 in its bank account but, after receiving the investor's $40,000, was able to meet its rent and payroll obligations for the month.

38.     Ultimately, Freescale never purchased or ordered a single CTS-1000.

2.     *The alleged Amazon order*

39.     When Servergy was again low on operating funds in early 2013, Mapp falsely told prospective investors that the company had received an order from Amazon. In reality, an employee of Amazon had merely contacted Servergy because he wanted to test the CTS-1000 in his free time and for his personal use.

40.     On December 25, 2012, the Amazon employee filled out Servergy's online pre-order form and typed "Amazon" into the field requiring a company name. The following day, Will Mapp received the online pre-order and immediately forwarded it to Mapp. Without any additional information, and before contacting Amazon or the individual for verification, Mapp sent a congratulatory email to the Servergy executive team claiming the company had received an order from Amazon.

41.     On December 31, 2012, the Amazon employee explained to Will Mapp that he was simply inquiring about the CTS-1000 in his personal capacity and did not act on behalf of Amazon.

42.     By January 9, 2013, Servergy's engineers were aware there was no order from Amazon and the individual's pre-order never even appeared in the Pipeline Report.

43.     Notwithstanding (a) the lack of indicia in the online pre-order form of an enterprise-level interest at Amazon in the CTS-1000; (b) the fact that the pre-order only indicated an interest in a single server; and (c) the individual's prompt clarification that he was not inquiring on behalf of Amazon, Mapp knowingly or recklessly represented to investors and promoters, including White and Paxton, that Servergy had received an order from Amazon until at least February 4, 2013.

44.     Indeed, on January 16, 2013, eleven months before Servergy had commercial units of the CTS-1000 available for purchase, Mapp sent an email telling a prospective investor that Servergy was preparing to ship its first unit to Amazon.  At the time, Servergy had just over $1,000 in its bank accounts and no commercial units available to ship.  On February 28, 2013, the investor wired Servergy $100,000.

### 3.     *The alleged Koerr order*

45.     Servergy's PPM falsely claimed that the company had received "25 orders totaling over 1,500 units."  Notwithstanding Servergy's misleading use of the term "pre-order," this statement was false and Mapp knew it was false by at least March 10, 2013.  Nonetheless, the claim remained in the PPM until the offering closed on September 30, 2013.

46.     Servergy attributed the bulk of the supposed 1,500 units ordered to a purported purchase order by Koerr.

47.     In October 2012, Will Mapp met Koerr's then-Chief Technology Officer ("CTO"), at a trade show, where the CTO agreed to consider the CTS-1000 for Koerr's server-purchasing needs.  Shortly thereafter, the CTO signed a Servergy pre-order form for 1,000 units, but, as was the case with all Servergy pre-orders, did not make any payment or obligate Koerr to purchase any units.

48.    On November 21, 2012, Servergy agreed to send Koerr two CTS-1000 prototypes for evaluation free of charge.  Although Koerr's CTO signed a "purchase" order covering those two units, Koerr returned the units to Servergy after completing its testing.

49.    On March 10, 2013, Koerr's CTO informed Servergy that Koerr had purchased its servers from Dell because it needed a server with a 64-bit processor, not the 32-bit processor of the CTS-1000.  Mapp was informed of this the same day.

50.    Servergy's false claim that it had received "25 orders totaling over 1,500 units," based largely on the Koerr pre-order, remained in the company's PPM until the WFG offering closed in September 30, 2013.  In fact, when Servergy supplemented the PPM in July 2013, Mapp knowingly or recklessly failed to remove the claim or otherwise inform investors that the claim was untrue, and instead distributed the material misrepresentation to additional prospective investors.

## III.    MAPP AND SERVERGY MISREPRESENTED THE CTS-1000's CAPABILITIES

### A.  Mapp and Servergy failed to disclose that the CTS-1000 utilized an obsolete 32-bit processor.

51.    Servergy's PPM claimed the CTS-1000 was a revolutionary new server that could replace the "power-hungry" servers found in top data centers.  Mapp, who touted his technical savvy and invited investors to rely on his claimed expertise, made similar claims in oral and written communications with investors throughout the Relevant Period.  In truth, Servergy's technology was outdated by the time the WFG offering launched in February 2013.

52.    According to the PPM, the CTS-1000 was an enterprise-grade general purpose server that would directly compete with top server makers like IBM, Dell, and Hewlett Packard.  However, neither Mapp nor Servergy informed investors that while those companies had moved to manufacturing high performance servers with 64-bit processors, the CTS-1000 had a less

powerful 32-bit processor, and, thus, the CTS-1000 would not directly compete with the servers listed in the PPM.

53.     Neither Mapp nor Servergy disclosed the differences between the CTS-1000's 32-bit and 64-bit servers and consequent discrepancies in the CTS-1000's performance capabilities in comparison to market leading 64-bit servers.  For instance, Servergy failed to inform investors that many software programs simply could not operate on the CTS-1000's 32-bit processor or that a 64-bit processor allows for more efficient computation of complex data than a 32-bit processor.

54.     Mapp and Servergy knew, or were severely reckless in failing to know, that the CTS-1000's technology was outdated, incomparable to other servers they claimed it could compete against, and undesirable to at least certain of its prospective customers.  Indeed, after Mapp permitted Koerr to test the CTS-1000, Koerr reported in March 2013 – a mere two months into the WFG offering – that it was only interested in 64-bit servers.  Facebook gave Servergy the same feedback in the summer of 2013.

55.     Notably, Servergy no longer markets the CTS-1000 as a general purpose server intended to compete with servers manufactured by market leaders but rather is generating revenue using the device to offer secure, cloud-based data storage and other services.

**B.     Mapp and Servergy misrepresented the CTS-1000's power consumption and thermal output.**

56.     Mapp and Servergy claimed that CTS-1000s "literally help[ed] pay for themselves by consuming up to 80% less power [and] cooling" than other servers.  An early iteration of this claim appeared in Servergy's CIM in 2009 and was repeatedly asserted by Mapp in oral and written communications with investors and in Servergy's PPM.  However, as Mapp knew, Servergy only tested the CTS-1000 against one other, non-comparable Dell server

released nearly four years before the WFG offering launched.  Hence, there was no basis for the claim that the CTS-1000 consumed less power or produced less thermal output than other, comparable servers.

57.     Not only were Mapp's and Servergy's power and thermal output claims baseless and false, but they also falsely represented to investors that an independent lab confirmed the claims.  In reality, the lab they touted did not conduct comparable testing pitting the CTS-1000 against other servers.  Instead, in October 2010, the lab merely tested the power consumption and thermal output of an early CTS-1000 prototype board *in isolation* rather than in comparison to any other server.

58.     To support the false claim that the CTS-1000 consumed up to 80% less power than other servers, Servergy included the following deceptive chart in its PPM:

| Model | Servergy CTS100 | IBM PS701 | Cisco B200 M2 | Dell PowerEdge M160X | HP ProLiant BL420 |
|---|---|---|---|---|---|
| CPU | 8-Core | 8-Core | 8-Core | 8-Core | 8-Core |
| Hard Drive | 4 x ITB | 1 x 300GB | 2 x 146GB | 1 x 1TB | 2 x 1TB |
| RAM | 32GB | 32GB | 192GB | 96GB | 32GB |
| Power Supply Quantity x Watts / server(s) = Watts per server | 130W for each server = 130W/server | 4 x 2980W / 14 servers = 851W/server | 4 x 2500W / 8 servers = 1250W/server | 6 x 2700W / 16 servers = 1012W/server | 6 x 2400W / 8 servers = 1800W/server |
| Dimensions | 8.75 in W x 1.75 in H x 14.00 in D | 9.65 in W x 1.14 in H x 17.55 in D | 16.5 in W x 1.95 in H x 24.40 in D | 15.2 in W x 2.00 in H x 19.20 in D | 7.11 in W x 2.18 in H x 20.37 in D |
| U Size | 1/4 of 1U | 9U | 6U | 10U | 10U |
| Weight | 9.0lbs | 9.6lbs | 25.0lbs | 24.5lbs | 14.0lbs |
| Ethernet | 2 x 10 Gb 2 x 1 Gb | Dual Port 1GbE | Dual Port 10GbE | Dual Port 1GbE | Dual Port 1GbE |
| Price | Up To $9,500 no enclosure required | Up $13,000 + enclosure | $13,000 + enclosure | $12,000 + enclosure | $30,000 + Enclosure |
| Enclosure Price | Not required. $0 | Up To $10,779 | Up To $8,000 | Up To $5,000 | Up To $30,517 |

59.     Without any technical qualifications or a college degree, and having been most recently employed as a truck driver, Will Mapp – not Servergy's engineers – created the chart at

Mapp's direction.  Mapp – again, not Servergy's engineers – reviewed and edited the chart and ultimately approved its inclusion in the PPM and investor presentations.

60.     The chart was inherently misleading because it attempted to compare the CTS-1000, a 32-bit *rack* server, to 64-bit *blade* servers.  Although not disclosed in the PPM or elsewhere, Servergy's comparisons were meaningless absent additional, material information identifying the differences in capabilities between the CTS-1000 and more powerful blade servers – differences Mapp and Servergy either knew or were reckless in not knowing but did not disclose.

61.     Furthermore, Servergy had no way of knowing how much power the IBM, Cisco, Dell, or Hewlett-Packard blade servers actually consumed because Servergy had not (a) performed or commissioned testing required to determine power consumption under varied workload conditions; (b) made use of publicly available tools to estimate power consumption of such blade servers under varied software configurations and workloads; or (c) considered that the blade servers in the chart all featured redundant power supplies in case of power failure, while the CTS-1000 did not.  Instead, Will Mapp prepared the chart simply by using the blade servers' power supply ratings to represent their power consumption even though a server's power supply rating is not a useful comparison metric because a server may operate at less than half of its maximum output capacity.

## IV.     WHITE PROMOTED SERVERGY'S STOCK IN EXCHANGE FOR UNDISCLOSED COMMISSIONS, SOLICITED UNACCREDITED INVESTORS, AND ULTIMATELY JOINED THE COMPANY'S BOARD OF DIRECTORS

62.     From April 2010 through April 2012, White raised more than $1.4 million from over 150 individuals who invested with Servergy, many of whom were unaccredited.  In return, Mapp paid White approximately $66,000 in commissions.

**A.      White failed to disclose that he was being paid to recruit new investors.**

63.      After meeting Mapp in November 2009, White agreed to solicit his friends, family, and insurance firm clients to invest in Servergy through three joint ventures he formed and managed, Dominion Joint Venture Group 1, 2, and 3, respectively (collectively, "Dominion JVs"), in exchange for cash commissions Mapp offered him.

64.      In hundreds of emails soliciting investors, White parroted many of Mapp's false and misleading statements, such as claiming that Servergy was on the cusp of taking orders and that Servergy's technology had been validated by an independent laboratory.  Yet while he made material statements to prospective investors regarding investments with Servergy, including distributing Mapp's promotional materials, White failed to tell investors that he was being paid to promote Servergy, despite an obligation to do so.

65.      Although White regularly solicited over 150 investors to purchase Servergy securities through the Dominion JVs from April 2010 through April 2012 for which Servergy paid him approximately $66,000 in commissions, White was not registered with the Commission as a broker.

**B.      Mapp and White knew that Dominion JV investors were unaccredited.**

66.      Certain securities that are exempt from registration with the Commission may only be offered to, or purchased by, persons who are accredited investors. Generally, an accredited investor is someone who meets certain thresholds of income or net worth such that he or she may be identified as a sophisticated person who can bear the economic risk of investing in unregistered securities.

67.     Some Dominion JV investors were unaccredited and unsophisticated, as Mapp and White each knew.  As a preliminary matter, White himself was unaccredited yet he invested his own money in a Dominion JV before he was appointed to Servergy's Board.

68.     Further, White required investors to sign separate subscription agreements with the Dominion JVs, some of which indicated that investors were unaccredited and had never invested in a private company.

69.     In addition, White's email communications with investors indicated that he knew they were unsophisticated and could not afford a risky investment.  For example, he knew some investors had $2,000 or less to invest, and he was explicitly informed that one nineteen-year old investor had no investment experience.

70.     Based on communications with White, Mapp knew at least some Dominion JV investors were not accredited and that certain investors could only invest $1,000 or $2,000.

71.     For instance, when White informed Mapp that he had recruited investors who wanted to invest directly in Servergy – as opposed to investing through the Dominion JVs – Mapp informed White that Servergy could only accept direct investments from accredited investors.

72.     Similarly, an unaccredited investor from whom Servergy refused a direct investment informed Mapp via email that he intended to invest through a Dominion JV.

**C.      White continued to recruit investors as an independent member of Servergy's board of directors.**

73.     In addition to paying White to recruit new Servergy investors, Mapp enlisted him to join Servergy's board of directors.  White accepted, and joined Servergy's board in September 2011.  Yet, despite his new title as a purportedly independent director of the company, White

continued to recruit new investors in exchange for undisclosed commissions until April 2012. White resigned from Servergy's board in September 2015.

## V. PAXTON SOLICITED INVESTMENTS IN SERVERGY IN EXCHANGE FOR UNDISCLOSED COMMISSIONS

74.     In July 2011, Paxton raised $840,000 for Servergy—32% of all investment funds raised by Servergy in 2011—by promoting the company and soliciting investors in exchange for undisclosed transaction-based compensation in the form of 100,000 shares of Servergy common stock.  Paxton characterized this payment at various times as an investment for which he paid $100,000, as compensation for legal services, and as a gift in order to disguise or conceal its true nature from the investors that he recruited, from federal regulators, and from the public.  In reality, Paxton's undisclosed arrangement with Servergy violated the explicit expectations of some investors and a duty he owed to others he solicited.

### A.     Paxton's Investment Experience and Investment Groups

75.     Paxton was an investment adviser representative of Mowery Capital Management ("MCM"), a Texas-registered investment adviser, from December 2013 to November 2014 and of MCM's predecessor firm from July 2003 to December 2004.  From November 6, 2008 to June 25, 2012, MCM was registered with the Commission as an investment adviser.  Although Paxton was not an MCM investment adviser representative from January 2005 to November 2013, he at times solicited clients on MCM's behalf without disclosing an arrangement whereby MCM paid him 30% of the asset management fees it collected.  The State of Texas charged Paxton, in July 2015, with knowingly and intentionally rendering services as an investment adviser representative for MCM without being registered to do so.  In 2011, the period relevant to Paxton in this Complaint, Paxton reported income from MCM as legal services.

76.     In addition to serving as an investment professional, Paxton is, and has been, an active investor on his own account, participating in deals centered in North Texas and elsewhere.

77.     Paxton has also participated in investment groups, one of which included Investors 1, 2, 3, and 4, who shared investment opportunities with each other.  Investor 1 has been involved in that group over the last 25 years along with Investors 2, 3, and 4.  Participants in the group routinely bring investment opportunities to other members for their consideration and participation.  Over these years, through participation in several shared investment opportunities, Investors 1, 2, 3, and 4 have operated under the established policy and expectation that members participating in an investment deal do so on what Investor 1 calls an "equal dollar-for-dollar basis," in which everyone takes the same risk and receives the same benefit and that no one member makes money or otherwise benefits off of the investment of another member.  Hence, there was an expectation that if one member of the group was going to benefit from a deal, he would disclose that benefit.  According to Investor 1, in addition to the known policy against personal benefit, the group also has a known and established pattern of conduct in which the member who recommends an investment typically monitors the deal going forward and represents the interests of the members who have invested.

78.     Investor 1 and Paxton have a personal and professional relationship dating back to Paxton's first service in the Texas House of Representatives in 2003.  During that time, Paxton accepted Investor 1's invitation to reside in Investor 1's apartment while in Austin on House business.  As their relationship developed, Paxton also served as Investor 1's attorney, setting up entities for Investor 1's family and certain business ventures.  Paxton began to participate in investments with the investment group several years before ultimately soliciting them to invest in Servergy in 2011.  Investor 1 informed Paxton of the investment group's established purpose,

policies, and practices, and expressly told Paxton that members participating in an investment deal take the same risk and receive the same benefit; that the member who introduces an investment opportunity typically acts as point person for that opportunity going forward; and that no one member makes money or otherwise benefits off of the investment of another member.

79.     Paxton also learned, and has testified that he knew, that bringing an investment opportunity to Investor 1 would result in consideration of the investment by Investors 2, 3, and 4. Knowing these express policies of the group, Paxton participated in several investments with the group years before introducing Servergy, and brought potential investments to the group himself, including an investment in a law enforcement video technology company and an energy industry opportunity investment opportunity, prior to introducing the Servergy investment.   Indeed, Paxton still invests in some of these companies alongside others in the investment group.

80.     To Investors 1, 2, 3, and 4's knowledge, before Servergy, Paxton did not receive any compensation in the form of commissions or other payments for investments he brought to the investment group.   He did, however, agree to provide legal services in exchange for shares on at least one investment made through the investment group.   This fact was disclosed to other members of the investment group.

81.     Paxton performed legal services for members of the investment group and for entities in which the group invested.  In December 2002, he formed a Texas corporation related to an investment in which members of the group subsequently invested.  Paxton is currently listed as the registered agent for another entity in which members of the investment group invested, having first assumed the role in June 2010, at which time Investor 1 was also named the company's manager using Paxton's law office address.  Paxton's title company conducted transactions and collected fees in connection with this company in late 2010 and early 2011.  In

addition, Paxton formed a family limited partnership for Investor 1's family in or around February 2008, and served as its registered agent until December 2014.  He also formed a non-profit foundation for Investor 1 in or around March 2008, for which he still serves as registered agent.  Furthermore, until January 2015 Paxton served as the registered agent of a limited partnership entity through which Investor 1 invested in Servergy.

82.     Under the known policies, understandings, and expectations of the investment group that he shared with Investors 1, 2, 3, and 4, Paxton knew he was required to disclose any compensation he was receiving or expected to receive for recommending investment in Servergy to the group.  Indeed, Paxton's conduct established his awareness of the group's practices and expectations, as he informed Mapp that he intended to act as the group's point person in connection with Servergy.  Additionally, because of the investment group's express policies, which Paxton knew, as well as their shared understanding and expectations, the members of the investment group, including Paxton, formed a formal fiduciary relationship, by agreement or otherwise, and an informal fiduciary relationship of trust and confidence.  As a result, the members of the investment group owed each other the duty of good faith and fair dealing, at least as to personal benefit, and were obliged to disclose when one member would personally benefit from the investment of other members.

83.     Paxton also participated in investment opportunities with a separate group of investors, which Paxton and others have called the "S3 Group," including people who were long-time legal clients of his.  Paxton performed legal services for S3 during the relevant period. For instance, Paxton formed two entities, S3 Sleep Investments, LLC and Simple Sleep Services, LLC, in July 2011.  He communicated with a member of the S3 Group on July 27, 2011, and stated "I have a couple of tweaks I want to discuss before we send these documents to investors

and I thought of tonight as I was finishing these.  I am almost done with the other documents …

and [will] finish tomorrow morning so that I can make sure I am thinking clearly."  Paxton is an

investor in S3 Sleep Investments, LLC.  In addition, he is or was, individually or through his

family living trust, a member or managing member of both entities, and currently serves as the

registered agent of each.  Since June 2011, he has served as the registered agent of a third S3

Group entity, S3 Management Group, LLC.

### B.    Paxton Agrees to Solicit Investors for Servergy

84.    On July 12, 2011, Mapp met Paxton—then a member of the Texas House of

Representatives—for the first time to discuss Servergy.  Paxton, along with a key aide, met

Mapp at Paxton's law office in McKinney, Texas. Emails show that, during that meeting, Mapp

offered to pay Paxton a 10% commission on any investments Paxton helped secure for Servergy.

In a follow-up email Mapp sent to Paxton just before midnight on the same day of their meeting,

he repeated his offer to pay Paxton compensation based on investment transactions Paxton

secured for Servergy, stating:

> As discussed, any investors you bring to the table for Series B $1/share round
> before we close it out here very shortly, I will give you 5% cash and 5% shares in
> consulting fees of any money received that you helped bring to the table for the
> Series B $1/share round.  Additionally, you can take all your consulting fees in
> shares if you would prefer, which is what most people have been doing, but again,
> it's entirely your preference either way.  Moreover, I will also give you 2.5% cash
> and 2.5% shares in consulting fees for any monies received that you help bring to
> the table for the Series C $2/share $3M "Production Ready" round or the
> institutional $10-$20M "Production" funding Series D round.  Clearly, anyone
> that you decide to invite to this very unique global opportunity we have, I know
> will be good people and I would certainly be excited to talk with and have join us.

> Clearly your timing couldn't be more perfect to get ownership in Servergy with
> the 2X bump in share price you would be getting here as soon as we open the
> Series B $2/share $3M "Production ready" round to start firming up pre-orders;
> and start teeing up our $10-$20M Series D "production round" with institutional
> investors…

85. At 10:35 the following morning, Paxton accepted Mapp's offer in an email stating, "Thanks Bill. It was a pleasure to meet you. I will get to work. Ken[.]"

86. Also on July 13, 2011, Mapp emailed Paxton to express his excitement to team with Paxton to "get you additional significant cash/shares as we set up investor meetings/roadshow[s]" to share the Servergy investment opportunity with potential investors "that you feel good about inviting to join us on this play." That afternoon, Paxton responded that he was "looking forward to introducing this to others."

### C.     Paxton Begins Soliciting Investors

87. Immediately after accepting Mapp's offer, Paxton did "get to work" "introducing this to others." On or around July 13, 2011, he recommended Servergy to Investor 1, knowing and intending that if Investor 1 invested with Servergy, then Investors 2, 3, and 4 likely would invest as well. Paxton admits that he brought the Servergy opportunity to his investment group, though he never personally invested, and has stated "I was trying to find people that could help me look at it and people that I have worked with in the past that I respected and that could – we could decide together whether this was something worthy of, you know, our time and money."

88. Within ten days of meeting with Mapp, Paxton solicited multiple additional investors for Servergy. Among the people Paxton solicited were other members of his investment group, members of the S3 Group, friends, law firm clients, and at least two individuals who were recent acquaintances. Despite having a duty to disclose his compensation based on his formal and informal fiduciary relationships and an obligation to tell the entire truth when he undertook to solicit investments in Servergy, Paxton knowingly or recklessly failed to disclose that he was being compensated to induce investments in Servergy. Moreover, Paxton's

failure to disclose his compensation to Investors 1, 2, 3, and 4 was misleading in light of the policies and established practices of the investment group.

89.     Paxton organized and invited at least seven prospective investors to a July 22, 2011 investment pitch at Servergy's office including Investor 1 and members of the S3 Group. Paxton attended that meeting along with the prospective investors he invited in order to lend his support and credibility to the investment opportunity.  Paxton also introduced Mapp to at least five additional prospective investors by telephone and email on July 22, 2011, including other members of the S3 Group.

90.     When recommending investment in Servergy, Paxton told prospective investors that he had met with Servergy's management and determined that it was a "great company" and the investment presented an "interesting opportunity."   Paxton's representations were misleading, especially in light of the circumstances in which they were made—to his friends, trusted co-investors, law firm clients, and new acquaintances that knew him as an elected official—because they implied that he had undertaken some level of diligence, or at least had some factual basis for his opinions, when in fact he had none.  Paxton also forwarded, and was included on, emails to his prospective investor contacts that advanced materially false claims regarding the nature of Servergy's technology and business prospects.

91.     Paxton conducted no research, inquiry, investigation, or due diligence to verify Servergy's claims that he chose to share with his personal contacts to induce them to invest, though he later characterized the claims, in testimony, as "crazy stuff that Bill [Mapp] was talking about."  Paxton thus recklessly disregarded whether any of Servergy's claims were true.

**D.     Paxton Violates the Known Practices of His Investment Group for His Own Secret Benefit**

92.     The known policies, understandings, and expectations of Paxton's investment group—as expressly told to him by Investor 1—created a duty of good faith and fair dealing, at least as to personal benefit, that required Paxton to disclose his secret compensation agreement with Servergy and a reasonable expectation of such disclosure.   Nevertheless, contrary to everything that Paxton had seen, experienced, and been told, he failed to inform Investors 1, 2, 3, or 4, that he had a secret agreement with Mapp under which he was being compensated by Servergy for soliciting their investments.   Hence, when Paxton's contacts invested with Servergy, they did so with the mistaken understanding that Paxton's recommendation was not based on any hidden personal benefit.

93.     After initially recommending Servergy to Investor 1 on or around July 13, 2011, and then introducing him to Mapp at the investor presentation Paxton attended along with other prospects on July 22, 2011, Paxton followed up with Investor 1 to further encourage his investment in Servergy.   When Paxton learned on July 24, 2011, that Investor 1 had chosen to invest, he told Mapp "That is good news.  More will be coming."  Investor 1 believed Paxton was also investing in Servergy in light of the fact that Paxton brought the investment opportunity to the group.  In fact, Paxton testified that:

> I knew that if Investor 1 were investing that means his whole group probably agreed to invest.  And that meant that very likely I was investing, too.

But Paxton never did invest, nor did he tell the investment group that, as he claims, Mapp did not permit him to invest.

94.     Paxton knew that, given the policy and established practice of the investment group—which was told to him by Investor 1— his failure to disclose the commission agreement

led Investor 1 to believe that Paxton was not personally benefitting from his investment. Paxton's conduct, practice, and course of business in concealing his compensation arrangement operated as a fraud and deceit on Investor 1 and the investment group.

95.     Paxton knew that once Investor 1 invested with Servergy it likely meant the entire investment group would also invest.  But when he learned that Investor 2, also a member of the group, was not planning to invest in Servergy, Paxton contacted him to pressure him to invest.

96.     Specifically, due to a travel-related scheduling conflict that prevented him from meeting an investment deadline, Investor 2 did not initially intend to invest with Servergy.  But Paxton placed an unscheduled and unsolicited late night call to him on July 22, 2011, to change his mind.  During the call, Paxton discussed the details of Investor 2's investment, convincing Investor 2 to invest by claiming Servergy presented a great investment opportunity for which the offering price would double if Investor 2 did not invest by July 30, 2011.

97.     The investment price was about to increase; however, Paxton did not disclose to Investor 2 that he would receive a 10% commission on Investor 2's investment or that his commission would only be 5% if Investor 2 invested at a later date.  Based on his conversation with Paxton, Investor 2 changed his mind and decided to immediately invest $150,000 with Servergy and unwittingly ensured a 10% commission for Paxton.  Thus, Paxton led Investor 2 to believe that his recommendation to make an immediate investment in Servergy was for the sole benefit of Investor 2, while intentionally failing to disclose that Investor 2's immediate investment in Servergy served Paxton's hidden financial motive for making the recommendation to invest immediately.

98.     Investor 2 understood and believed, based on explicit conversations with others in the group over the years, that members of the investment group who shared recommendations

and opportunities with one another would not make money or otherwise benefit from the investment of another member. Investor 2 would not have invested had he known Paxton was being paid to promote the company in violation of the investment group's established policies, practices, and expectations.  Paxton's conduct, practice, and course of business operated as a fraud and deceit on Investor 2.

99.    Investors 3 and 4 were also members of the investment group and also invested in Servergy in July 2011.  Consistent with the established practice of the investment group, which Paxton knew, Investor 1 passed along the Servergy investment opportunity to Investors 3 and 4. Investors 3 and 4 knew that the opportunity to invest with Servergy originated with Paxton and, based on the policy and practice of the investment group, likewise believed that Paxton would not personally benefit from their investments.  According to Investor 3, Paxton's failure to disclose the personal benefit he stood to, and did, receive from Servergy misled him into believing that no such compensation plan was in place.  Likewise, Investor 4 did not know Paxton was being compensated by Servergy for any other investors he brought to the table. If Investor 4 had known of the secret commission agreement, he would have been skeptical of the proposed Servergy investment and would have questioned Paxton's motive for bringing the investment opportunity into the group. Paxton's conduct, practice, and course of business operated as a fraud and deceit on Investors 3 and 4.

100.    Because he was expressly told about the group's established policy and practice to refrain from obtaining personal benefits off the investment of others, Paxton knew that Investors 1, 2, 3, and 4 believed he was not personally benefitting from their investments. Paxton's conduct, practice, and course of business in concealing his compensation arrangement operated as a fraud and deceit on Investors 1, 2, 3, and 4.

### E.     Paxton Solicited Individuals Outside of the Investment Group As Well

101.   Paxton did not limit his recruitment efforts solely to the trusting members of his investment group and other friends, but also solicited S3 Group members for whom he was at the time also performing legal services and with whom he was co-investing.  Despite the special circumstances of that relationship, Paxton also failed to disclose his commission arrangement to the S3 Group members.

102.   Paxton also solicited new acquaintances and contacts.  In April 2011, a mutual friend introduced Paxton to a new acquaintance.  Paxton and the individual arranged to meet for lunch on July 18, 2011.  According to Paxton's personal calendar, he arranged a meeting between Mapp and this acquaintance at Servergy's headquarters on July 29, 2011—the day before a Servergy investment deadline.  On September 24, 2011, Mapp emailed Paxton and identified this new acquaintance as someone Paxton had solicited and whom Mapp wanted help following up with.

103.   On or about July 23, 2011, Paxton forwarded one of Mapp's solicitation emails directly to a contact that he had previously introduced to Mapp, and personally offered to answer any of his contact's questions. In the underlying communication that Paxton forwarded, Mapp pressured the prospective investor to purchase Servergy common stock within a week and falsely claimed that Servergy's technology was "3rd party validated by world class testing lab" and resulted in "80% savings for power, cooling and space costs."  Paxton recklessly disregarded whether those claims, which he chose to forward to a potential investor, were true, and lent his credibility to the solicitation attempt by serving as the conduit for information.

104.   Paxton's involvement with Servergy investors did not end after he solicited them to invest with Servergy.  In fact, Paxton informed Mapp that he intended to act as point person

for his investment group.   In addition, he personally followed up with investors after his initial solicitations to ensure they invested.    Moreover, Mapp included Paxton—Mapp's sole connection to certain prospective investors—on email communications soliciting the individuals Paxton recruited, including, but not limited to, providing them the Confidential Information Memorandum and other materials.   In other words, even after Mapp established an independent relationship with investors, he continued to use Paxton's presence and involvement to lend credibility to his communications.

**F.       Paxton Receives His Commission and Continues Soliciting**

105.    By July 28, 2011—just two weeks after first meeting Mapp and less than a week after Paxton invited some of his contacts to the Servergy investment presentation he also attended—five of the twelve prospective investors he had already solicited had invested a total of $840,000 in Servergy—a sum that would ultimately represent 32% of all investment funds raised by Servergy in 2011.

106.    Of the $840,000 Paxton raised for Servergy, $640,000 came just from the investments of Investors 1, 2, 3, and 4—nearly 25% of all investment funds Servergy obtained in 2011.   Paxton also raised $100,000 from two members of the S3 Group, though he solicited four members of that group.   Paxton raised the remaining $100,000 from another personal contact he admits he introduced the Servergy opportunity to and with whom he has participated in other investments.

107.    As payment for his successful efforts inducing investment in Servergy, Servergy paid Paxton transaction-based compensation, in the form of a stock certificate for 100,000 shares dated August 5, 2011.   Thus, Paxton elected to have his entire compensation—per his agreement with Mapp—paid in shares.

108.    Following Paxton's success in helping Servergy raise $840,000 in less than a month after first agreeing to "get to work" "bringing investors to the table," Mapp emailed Paxton on September 12, 2011, and again on October 4, 2011, to renew his offer to continue paying Paxton to solicit investors.  For instance, on October 4, 2011, Mapp offered to

> [H]elp you with some quick cash – for any new money you help bring to the table just by making an introduction, I'll be more than glad to honor our original agreement from the last round and give you 10% (5% cash + 5% stock) in consulting fees…Please let me know if you would like to do another private in-person conference in the Servergy board room, just like we did the last time and get everybody at once, which seemed to work really well for everybody.

109.    Following Mapp's reiteration of his intent to continue paying Paxton commissions in exchange for leveraging his influence and credibility to gain access to a new pool of willing investors, Paxton continued to market Servergy in both oral and written communications to prospective investors until at least November 8, 2011.

110.    On September 12, 2011, Paxton updated Mapp that two individuals he was putting in touch with him "could make investments if they like the deal."

111.    Also on September 12, 2011, Mapp informed Paxton that "your $100,000 certificate is now worth $200,000" and provided Paxton, at Paxton's request, a list of the potential investors Paxton had already solicited and whether, and in what amounts, they had invested in Servergy, bolding the names of Paxton's prospective investors who had not invested:

| Name[1] | Amount |
|---|---|
| Investor 1 | $150,000[2] |
| Investor 2 | $150,000 |
| Investor 4 | $100,000 |
| **Other** | **$0** |
| **Other** | **$0** |
| **S3 Member** | **$0** |

---

[1] Individual's names appearing in the email are omitted and anonymously characterized herein.
[2] Mapp's email was incorrect in that Investor 1 and his wife had invested another $150,000, bringing the total raised by Paxton to $840,000.

| | |
|---|---|
| **S3 Member** | **$0** |
| S3 Member | $50,000 |
| **Relative of S3 Member** | **$0** |
| **S3 Member** | **$0** |
| **Other** | **$0** |
| S3 Member | $50,000 |
| Other | $100,000 |
| Investor 3 | $90,000 |
| **Other** | **$0** |
| Total Invested as of 7/29/11 | $690,000 |

112.    When he received the list, Paxton reiterated his excitement about the company and told Mapp that he had scheduled a lunch meeting for later that day with a possible investor with whom "[h]opefully, I can generate some interest."

113.    Two weeks later, on September 24, 2011, Mapp emailed Paxton and provided another list of Paxton's contacts he wanted to follow up with and inquired "what I can do to help you (again, the same deal holds as last time for your kind help in bringing people to the table of 5% cash + 5% shares; or an option to take all 10% in shares, your choice)." In addition, Mapp informed Paxton in the email that he would be hosting a live webinar on September 29, 2011, and encouraged him to invite "Family or Friends Accredited Investors."

114.    The very next day, Paxton emailed a potential investor about attending the "private and limited," "by invitation only" webinar and informed the individual that "this is the company that I told you I found very interesting.  Let me know if you have any desire to participate."  The invitation Paxton forwarded the individual identified the security as the "SERIES-C $2/SHARE, $3M 'PRODUCTION READY' ROUND INVESTMENT" and noted that the webinar was private, required an executed non-disclosure agreement, and was intended only for accredited investors.

115.    On September 27, 2011, Paxton invited another individual, by email, to participate in the webinar.  Because the webinar was invitation only, Paxton was a necessary conduit to facilitate the inclusion and participation of those he solicited to attend and invest.

116.    On November 8, 2011, Paxton reported his progress in soliciting another investor in an email to Mapp advising that he had spoken with a potential investor, one of his law firm client's, who was interested in speaking with Mapp about investing in Servergy.

117.    Although Paxton regularly solicited investors on Servergy's behalf from at least July 12, 2011, to November 8, 2011, and was paid a commission in the form of 100,000 shares of Servergy's common stock in exchange for raising $840,000, he was not registered with the Commission as a broker, or associated with a Commission-registered broker-dealer, and during this time never identified himself in any way to those he recruited as acting as an unregistered broker.

118.    After the initial July 12 meeting, Paxton's aide also began soliciting investments in Servergy stock, and operated under the same arrangement as Paxton: 10% commissions on investments raised for Servergy.  But unlike Paxton, he expressly informed investors that he would receive such a commission.  Ultimately, Paxton's aide raised more than $50,000 for Servergy, during which time Paxton offered to assist him with the solicitation of an investor into his joint venture.

### G.    Paxton Coordinates with Mapp to Lull Investors

119.    After investing with Servergy based on Paxton's solicitation, members of the investment group became concerned about the quality of their investments and began emailing Mapp, requesting more current information about Servergy's operations and status.   In the fall

of 2012 and the spring of 2013, unknown to Investors 1, 2, 3, and 4, Paxton and Mapp discussed ways to quell these concerns.

120.    In early 2013, Paxton—having informed Mapp that he wanted to serve as point person for the investment group—organized and attended a meeting with Investor 1 and Mapp, during which Mapp falsely told Investor 1 that the company was flush with purchase orders. Paxton lent credibility to Mapp through his organization of and attendance at this meeting, despite having conducted no inquiry or taken any steps to verify Mapp's claims, the truth or falsity of which Paxton recklessly disregarded.

121.    On February 4, 2013, Mapp emailed Paxton, providing a "Q1'13 Update" on Servergy's capital raising efforts, pre-order status, and other topics.  At 10:38 pm the same day, Paxton responded, "hopefully this will keep them calm."  Two minutes later, Paxton separately forwarded Mapp's update to Investor 1 and told Investor 1 "Bill [Mapp] and [I] spoke a few times.  I asked for a written summary of progress.  The following is what he provided.  I will check back to see how his fundraising is going under the first point.  30 to 45 days is not far away."  When Investor 1 thanked Paxton and asked him to "keep checking on [Mapp] to make sure he does what he says he will do," Paxton replied "That is my plan as much as possible during session."

122.    On February 10, 2013, Paxton informed Mapp that "[Investor 1] seemed satisfied with my last report.  I think if I can check in once a month on progress that will help you and them.  If I don't check in maybe you can help me remember especially when I am in session."

123.    On March 28, 2013, Mapp again contacted Paxton about Investor 1's concerns, and told Paxton "I thought I would let you follow up with [Investor 1] since you said that he said he wanted you to and you said that you wanted to be point for the investment group."  As the

designated point-person for the investment group, and based on the group's established practices and expectations known to Paxton, when Paxton spoke to investors about Servergy he was holding himself out as protecting and advancing their interests and his failure to disclose his secret commission arrangement misled Investors 1, 2, 3, and 4.

### H.  Paxton Continues to Conceal His Servergy Payments

124.  Paxton falsely characterized, omitted key information, or refused to disclose information about his receipt of Servergy stock on at least four separate occasions: (a) to his investment group; (b) in his tax filings; (c) in his mandated political disclosures; and (d) in testimony before the Commission.  His actions demonstrate that he knew this information would be of crucial importance to the members of his investment group and others and would materially affect decisions to invest in Servergy because a reasonable investor would have weighed Paxton's financial motivations against his recommendations about Servergy.

125.  Paxton received 100,000 shares of Servergy stock in exchange for successfully soliciting investors.  Servergy recorded the stock issuance to Paxton as payment for "services" and issued Paxton a Form-1099 in the amount of $100,000 for the 2011 tax year, characterizing the payment as non-employment compensation.  Paxton claimed the shares as income related to legal services on his 2011 Form 1040.  Paxton also claimed legal services income from MCM in 2011.

126.  On August 23, 2011, Paxton completed and signed a subscription agreement in which he claimed he had paid $100,000 in exchange for the shares he received in Servergy, though his stock certificate is dated August 5, 2011 and he has admitted that he never invested money in Servergy.  On October 28, 2011, Mapp sent Paxton a revised subscription agreement indicating that Paxton was receiving his shares as a Servergy service provider rather than for

cash consideration.  Though he said he would, Paxton never executed the corrected subscription agreement.

127.    Upon being told by Servergy management that Paxton had entered into an agreement with Servergy to solicit investments in the company's stock, an attorney representing Investors 1, 2, 3, and 40—all members of Paxton's investment group—sent a letter to Paxton on August 12, 2014, requesting information about his arrangement with Servergy:

> We have learned that you or an entity that you control or are affiliated with acquired 100,000 shares of Servergy, Inc. stock in exchange for working for Servergy in an "advisory" capacity.  We would like to obtain a copy of the agreement or agreements pursuant to which you acquired your stock in Servergy.

Paxton never responded to this request.

128.    Three months later, the attorney for Investors 1, 2, 3, and 4 again asked Paxton, this time via certified mail with returned receipt, to reveal any agreement under which he acquired his stock in Servergy.  Paxton continued to ignore these requests, and though he admits receiving them, has never responded to the efforts of Investors 1, 2, 3, and 4 to understand the nature of his relationship with Servergy.

129.    As an elected official, Paxton was at all times required by Texas Government Code § 572.001 to disclose beneficial interests, income, and gifts.  Paxton was required in 2011, 2012, and years since to disclose, among other things, sources of occupational income; the name, category, and number of shares of stock held in any business entity; and gifts over $250.  On his Personal Financial Statement for the year 2011, filed with the Texas Ethics Commission on April 23, 2012, Paxton disclosed his ownership of Servergy stock in the "Stock" section, but did not identify the shares in either the "Sources of Occupational Income" or "Gift" sections.

130.    During the Commission's investigation, Paxton claimed he received the shares as a gift from Mapp.  According to Paxton, he met Mapp at a Dairy Queen restaurant in McKinney,

Texas in July or August 2011, intending to invest $100,000 of his own money in Servergy.  But, according to Paxton, Mapp refused his investment and stated, "I can't take your money.  God doesn't want me to take your money."  Consequently, Paxton claims, he later accepted the shares as a gift.

131.    As evidenced by the contemporaneous tax filings of both Servergy and Paxton, the shares were not a gift.

132.    Paxton's conduct and practices in variously characterizing the true nature of his compensation—commissions paid by Servergy in exchange for effecting transactions in or inducing or attempting to induce the purchase or sale of its securities—operated as a fraud or deceit upon purchasers and potential purchasers of Servergy stock.

133.    Investors 1, 2, 3, and 4 reasonably expected Paxton to disclose his compensation when he solicited their investments in Servergy, and his failure to do so violated the established practices and expectations of the group, which Paxton was expressly aware of, and operated as a fraud or deceit. Investors 1, 2, 3, and 4 were owed a duty of good faith and fair dealing, at least as to personal benefit, as a result of their formal fiduciary relationships, informal fiduciary relationships, and special relationships of trust and confidence.  Moreover, Paxton was obliged to disclose his commission agreement to the S3 group and other potential investors when he recommended and solicited investments in Servergy, in order to make his solicitations not misleading under the circumstances.  Not only did Paxton withhold the material fact of his secret commission arrangement, he actively concealed it from his investor group, other investors and prospective investors, and the public through his filings with the Texas Ethics Commission and the IRS, his subscription agreement with Servergy, by ignoring the repeated requests of the

investment group to describe his arrangement with Servergy, and in calling the payment a gift when confronted by the Commission.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act
### (Against Mapp, Paxton, White and Servergy)

134.    The SEC incorporates the allegations in paragraphs 1-133 as if fully set forth herein.

135.    Mapp, Paxton, White, and Servergy, in the offer or sale of securities, employed devices, schemes, or artifices to defraud, obtained money or property by means of untrue statements or omissions, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit, in violation of Section 17(a) of the Securities Act.

136.    Mapp, Paxton, White, and Servergy violated, and unless restrained and enjoined, they will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Fraud in Connection with the Purchase or Sale of Securities
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Against Mapp, Paxton, White and Servergy)

137.    The SEC incorporates the allegations in paragraphs 1-133 as if fully set forth herein.

138.    Mapp, Paxton, White, and Servergy employed a device, scheme, or artifice to defraud, made untrue statements or omissions of material facts, and engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

139.     Mapp, Paxton, White, and Servergy violated, and unless restrained and enjoined, they will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Offers and Sales of Unregistered Securities
### Violation of Section 5(a) and (c) of the Securities Act
### (Against Mapp, White and Servergy)

140.     The SEC incorporates the allegations in paragraphs 1-133 as if fully set forth herein.

141.     Mapp, White, and Servergy, directly or indirectly, sold securities when no registration statement was in effect with the SEC as to such securities, and offered to sell securities when no registration statement had been filed with the SEC as to such securities. There were no applicable exemptions from registration with regard to Mapp's, White's, and Servergy's sales and offers to sell securities.

142.     Mapp, White and Servergy have violated, and unless restrained and enjoined, they will continue to violate Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

### FOURTH CLAIM FOR RELIEF
### Anti-Touting Violation of Section 17(b) of the Securities Act
### (Against White and Paxton)

143.     The SEC incorporates the allegations in paragraphs 1-133 as if fully set forth herein.

144.     White and Paxton, by use or means or instrumentalities of interstate commerce or of the mails, published, gave publicity to, and circulated communications describing a security for consideration received or to be received, directly or indirectly, from an issuer, without fully disclosing the receipt of such consideration and the amount thereof in violation of Section 17(b) of the Securities Act.

145.    White and Paxton violated, and unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## FIFTH CLAIM FOR RELIEF
### Offers and Sales of Securities by an Unregistered Broker
### Violation of Section 15(a)(1) of the Exchange Act
### (Against White and Paxton)

146.    The SEC incorporates the allegations in paragraphs 1-133 as if fully set forth herein.

147.    White and Paxton while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a)(1) of the Exchange Act.

148.    White and Paxton violated, and unless restrained and enjoined will in the future violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

### I.

Finding that each of the Defendants committed the violations alleged in this Complaint;

### II.

Permanently enjoining pursuant to Rule 65(d) of the Federal Rules of Civil Procedure the following Defendants, their agents, servants, employees, attorneys, and all persons in active concern or participation with them, from directly or indirectly violating the following laws:

A.      Mapp from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)];

B.      White from further violations of Sections 17(a) and (b) of the Securities Act [15 U.S.C. § 77q(a) and (b)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(d)];

C.      Paxton from further violations of Sections 17(a) and (b) of the Securities Act [15 U.S.C. § 77q(a) and (b)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(d)]; and

D.      Servergy from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)];

III.

Ordering Mapp, White, and Paxton to disgorge any ill-gotten gains or unjust enrichment realized by each of them resulting from the conduct alleged in this Complaint, plus prejudgment interest thereon;

IV.

Ordering each of the Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

VI.

Granting such other and further relief as this Court deems just and appropriate.


Dated:  October 21, 2016

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION


/s/Matthew J. Gulde
Matthew J. Gulde
Illinois Bar No. 6272325
Jessica B. Magee
Texas Bar No. 24037757
Timothy L. Evans
Texas Bar No. 24065211
Samantha S. Martin
Texas Bar No. 24065090
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff United States*
*Securities and Exchange Commission*