# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

_____

SECURITIES AND EXCHANGE COMMISSION, )

      Plaintiff,

    v.

WILLIAM E. MAPP, III,
WARREN K. PAXTON, JR.,
CALEB J. WHITE, and
SERVERGY, INC.

      Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: 4:16-cv-00246

JURY TRIAL DEMANDED

## PLAINTIFF'S RESPONSE IN OPPOSITION TO RESPONDENT
## WARREN K. PAXTON, JR.'S MOTION TO DISMISS

Dated:  November 18, 2016.

Respectfully submitted,

MATTHEW J. GULDE
Illinois Bar No. 6272325
Timothy L. Evans
Texas Bar No. 24065211
Jessica B. Magee
Texas Bar No. 24037757
Samantha S. Martin
Texas Bar No. 24065090
U.S. Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-1410
(817) 978-4927 (fax)
guldem@sec.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ....................................................................... ii-vi

INTRODUCTION .......................................................................................... 1

DISCUSSION AND AUTHORITY ............................................................... 3

I.      Paxton's Conduct Operated as a Fraud ........................................... 3

II.     Paxton's Failure to Disclose His Compensation violated the Antifraud Provision
        Because His Investment Recommendations Were Misleading Half-Truths And
        Because He Had a Duty to Disclose .................................................. 6

        A.      Paxton's Failure to Disclose His Compensation Made His Recommendations to
                Invest Misleading Half-Truths ................................................ 8

                1.      Statements Need Not Explicitly Discuss Compensation to Be
                        Misleading .................................................................... 9

                2.      The Amended Complaint Includes Sufficient Facts to Show that Paxton's
                        Statements Were Not Puffery ....................................... 12

        B.      Paxton Had a Duty to Disclose His Compensation Because of His Relationships
                With the Investors .................................................................. 15

                1.      Paxton Had a Duty to Disclose All Information Material to The
                        Relationship of Trust and Confidence With His Investment Group .......... 15

                2.      Paxton Had a Duty to Disclose All Information Material to His
                        Representation of the S3 Group .................................... 19

III.    The Amended Complaint Pleads Facts Sufficient to Support a Credible Claim
        Under Section 15(a) of the Exchange Act ....................................... 20

        A.      Paxton Acted as a Broker ...................................................... 20

        B.      There Is No Requirement that an Individual Have "Authority Over the Accounts
                of Others" to Be a Broker ...................................................... 23

CONCLUSION………. ................................................................................ 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Affiliated Ute Citizens of Utah v. United States*,
     406 U.S. 128 (1972).................................................................................................3

*Alexander v. Martin*,
     2010 U.S. Dist. LEXIS 97755 (E.D. Tex. Aug. 20, 2010) .........................................16

*Alpine Bank v. Hubbell*,
     555 F.3d 1097 (10th Cir. 2009) .................................................................................12

*Associate Indemnity Corp. v. CAT Contracting, Inc.*,
     964 S.W.2d 276 (Tex. 1998).......................................................................................16

*Aubrey v. Barlin*,
     159 F. Supp.  3d 752 (W.D.Tex. Feb. 1, 2016)..........................................................15

*Bricklayers & Masons Local Union Number 5 Ohio Pension Fund v.*
*Transocean Ltd.*,
     866 F. Supp. 2d 223 (S.D.N.Y.2012)..........................................................................12

*Casella v. Webb*,
     883 F.2d 805 (9th Cir. 1989) .....................................................................................13

*Chiarella v. US*,
     445 U.S. 222 (1980)......................................................................................................5

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
     399 F.3d 651 (6th Cir. 2005) .....................................................................................13

*Consolidated Gas & Eq. Co. of America*,
     405 S.W.2d 333 (Tex. 1966).......................................................................................16

*Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*,
     2006 WL 2620985 (D.Neb. 2006) ..............................................................................21

*DeHuff v. Digital Ally, Inc.*,
     2009 WL 4908581 (S.D.Miss. 2009)...........................................................................21

*Eastside Church of Christ v. National Plan, Inc.*,
     391 F.2d 357 (5th Cir. 1968) .....................................................................................24

*In re Enron Corp. Sec., Derivative & ERISA Litigation*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ..........................................................5

*G&M, Inc. v. Newbern*,
  488 F.2d 742 (9th Cir. 1973) ....................................................................13

*In re Global Crossing, Ltd. Sec. Litigation*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004).........................................................4

*Holland v. Lesesne*,
  350 S.W.2d 859 (Tex. Civ. App. 1961) ......................................................16

*Horton v. Robinson*,
  776 S.W.2d 260 (Tex. App. 1989)..............................................................16

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981) ....................................................................13

*Insurance Co. of N. America v. Morris*,
  981 S.W.2d 667 (Tex. 1998).................................................................16, 19

*In the Matter of Dennis J. Malouf*,
  *SEC Release Number 4463 (July 27, 2016)*, 2016 WL 4035575...................4

*Mass. Finance Serv., Inc. v. Sec. Investment Prot. Corp.*,
  411 F. Supp. 411 (D. Mass. 1976) ............................................................20

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) ................................................12

*McNamara v. Bre-X Minerals, Ltd.*,
  57 F. Supp. 2d 396 (E.D. Tex. 1999)................................................9, 10, 11

*Meyer v. Cathey*,
  167 S.W.3d 327 (Tex. 2005).....................................................................15

*Mia Reed & Co. v. United Fire & Casualty Co.*,
  2012 U.S. Dist. LEXIS 89412 (S.D. Tex. June 27, 2012) .....................16, 17

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014).......................................................12

*N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Intern., Inc.*,
  107 F. Supp. 3d 620 (N.D. Tex. 2015) .......................................................15

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................13

*Regents of the University of Cal. v. Credit Suisse First Bos. (USA) Inc.*,
482 F.3d 372 (5th Cir. 2007) ......................................................................5

*SEC v. Arcturus Corp.*,
171 F. Supp. 3d 512 (N.D. Tex. 2016) ......................................................24

*SEC v. Benger*,
697 F. Supp. 2d 932 (N.D. Ill. 2010) ........................................................21

*SEC v. Century Investment Transfer Corporation*,
1971 WL 297 (S.D.N.Y. Oct. 5, 1971) ......................................................20

*SEC v. Cochran*,
214 F.3d 1261 (10th Cir. 2000) .................................................................15

*SEC v. Cuban*,
620 F.3d 551 (5th Cir. 2010) .....................................................................17

*SEC v. Gabelli*,
653 F.3d 49 (2d Cir. 2011)...........................................................................8

*SEC v. Hansen*,
1984 WL 2413 (S.D.N.Y. 1984).................................................................20

*SEC v. Helms*,
2015 WL 6438872 (W.D. Tex. Oct. 20, 2015)..............................15, 22, 24

*SEC v. Kirch*,
263 F. Supp. 3d 1144 (N.D. Ill. 2003) .......................................................19

*SEC v. Kramer*,
778 F. Supp. 2d 1320 (M.D. Fla. Apr. 1, 2011)..........................................24

*SEC v. M&A West, Inc.*,
2005 WL 1514101 (N.D. Cal. 2005) ..........................................................24

*SEC v. Margolin*,
1992 U.S. Dist. LEXIS 14872 (S.D.N.Y. Sept. 30, 1992)..........................20

*SEC v. National Exec. Planners, Ltd.*,
503 F. Supp. 1066 (M.D.N.C. 1980) ..........................................................20

*SEC v. Offill,*
2012 WL 246061 (N.D. Tex. Jan. 26, 2012) .................................................22, 23, 24

*SEC v. Sky Way Global, LLC*,
2010 WL 5058509 (M.D.Fla. 2010) ........................................................21

*SMWNPF Holdings, Inc. v. Devore*,
165 F.3d 360 (5th Cir. 1999) ................................................................19

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)............................................................................4

*Shapiro v. UJB Finance Corp.*,
964 F.2d 272 (3d Cir. 1992)................................................................13

*In re Smith Barney Transfer Agent Litigation*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012)....................................................4

*In re Spiegel, Inc. Sec. Litigation*,
382 F. Supp. 2d 989 (N.D.Ill.2004) ......................................................12

*Sun River Energy, Inc. v. Nelson*,
2013 WL 1222391 (D. Col. 2013)..........................................................21

*Tex. Bank & Trust Co. v. Moore*,
595 S.W.2d 502 (Tex. 1980)................................................................16

*Thigpen v. Locke*,
363 S.W.2d 247 (Tex. 1962)................................................................16

*Universal Health Services, Inc. v. U.S.*,
136 S. Ct. 1989 (2016)......................................................................10

*In re Vivendi, S.A. Securities Litigation*,
838 F.3d 223 (2d Cir. 2016)................................................................7

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ................................................................13

*Willis v. Maverick*,
760 S.W.2d 642 (Tex. 1988)................................................................19

*VanCook v. SEC*,
653 F.3d 130 (2d Cir. 2011)................................................................5

# FEDERAL STATUTES

Section 17 of the Securities Act of 1933,
    [15 U.S.C. § 77q] ................................................................................................ 8

Section 17(a)(1) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(1)] ........................................................................................4

Section 17(a)(2) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(2)] ...................................................................................4, 7, 8

Section 17(a)(3) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(3)] ........................................................................................3

Section 3(a)(4)(A) of the Exchange Act of 1934,
    [15 U.S.C. § 78c(a)(4)(A)].................................................................................20, 24

Section 3(a)(5)(A) of the Exchange Act of 1934,
    [15 U.S.C. § 78c(a)(5)(A)].................................................................................24

Rule 10b-5(a) of the Exchange Act of 1934,
    [17 C.F.R. § 240.10b-5(a)].................................................................................3

Rule 10b-5(a) of the Exchange Act of 1934,
    [17 C.F.R. § 240.10b-5(b)] ...............................................................................4, 7, 8

Rule 10b-5(c) of the Exchange Act of 1934,
    [17 C.F.R. § 240.10b-5(c)]..................................................................................3

Plaintiff Securities and Exchange Commission ("Commission") asks the Court to deny Defendant Paxton's Motion to Dismiss [Doc. 44] and respectfully shows the following:[1]

## **INTRODUCTION**

The Court must deny Paxton's motion to dismiss unless it finds no plausible basis for the Commission's claims.[2]  As to the Commission's fraud claims, this means that the Court should not dismiss the Amended Complaint if it finds any plausible argument that Paxton defrauded, deceived, or misled any investor under the six separate provisions of Section 17(a) and Rule 10b-5.  This extremely high standard is not met here, where the Commission's First Amended Complaint (Doc. 40)—alleging that Paxton recommended investments in Servergy without disclosing to potential investors that he would receive commissions from their investments—supports violations under all six subparts of the antifraud provisions.

This is most apparent with regard to Paxton's longstanding involvement with his investment group.  Indeed, the Amended Complaint describes in great detail Paxton's introduction to, and participation with, the investment group several years before he recommended Servergy; the relationship between its members; the policies under which the group operated; the express communication of those policies to Paxton; Paxton's participation with the group consistent with those policies prior to the Servergy recommendation; his solicitation of investment group members to invest in Servergy, including his successful efforts to convince Investor 2 to invest after he initially decided not to; his conformity to the group's expectation that he would act as its point person for the Servergy investment; his coordination

---

[1] The Commission incorporates, as though fully set forth herein, all arguments made in its Response in Opposition to Warren K. Paxton, Jr.'s Motion to Dismiss (Doc. 25).

[2] In the context of a Rule 12(b)(6) motion, the Court must consider the factual allegations of the complaint as true and determine if they plausibly suggest an entitlement to relief.  *Ashcroft v. Iqbal*, 556 US 662, 678-79 (2009).  "This standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *Morgan v. Hubert*, 335 F. App'x. 466, 470 (5th Cir. 2009).

with Mapp to lull the investment group members' concerns about their investments in Servergy; and his efforts to conceal his commissions from the investment group.

These facts draw into sharper relief how Paxton's conduct deceived the investment group in violation of the antifraud provisions.  At this stage, Paxton and the Court must take as true the allegations that the investment group had definitive and reasonable expectations, based on express policies, that Paxton himself would invest in Servergy and that he would not be paid for soliciting their investments; that Paxton knew of these policies and had acted in accordance with them; that he intentionally violated these policies; that he tried to conceal his violations of these policies; and that the investors were deceived and defrauded by his direct violation of these policies.

Moreover, these facts, specifically the existence of an express policy that members of the investment group would not benefit off of the investment of another member, show that the statements Paxton made when he recommended Servergy to the investment group were—absent disclosure of his commission—misleading half-truths under Securities Act Section 17(a)(2) and Exchange Act Rule 10(b) and Rule 10b-5(b).  Further, they establish the plausible existence of a special relationship of trust and confidence between Paxton and the other members of the investment group, as recognized under federal and Texas law, which imposed a duty on Paxton to disclose the material fact that he was compensated to solicit their investments.

In addition to the investment group, the Amended Complaint also includes facts that plausibly allege that Paxton was in an attorney-client relationship with the S3 Group.  As such, Paxton owed these client-investors fiduciary duties, and was required to disclose that he would be compensated for their investments.

The Amended Complaint also details various conduct supporting the Commission's claim that Paxton acted as an unregistered broker in violation of Exchange Act Section 15(a).  As pleaded, Paxton actively participated in the solicitation of investors; made investment recommendations supporting Servergy; advised investors about the security, including the timing of an upcoming increase in the stock price; facilitated meetings; inserted himself into negotiations between Servergy and at least one investor, convincing him to change his mind and invest; and, importantly, received transaction-based compensation for these efforts.  These facts satisfy numerous factors courts have routinely considered when determining whether someone acted as a broker.

Finally, the Commission believes that the Complaint and Amended Complaint both allege violations of Section 17(b) of the Securities Act.  The Commission acknowledges, however, that the additional allegations of the Amended Complaint do not add facts on the issues the Court viewed as determinative regarding its 17(b) claim.  For the reasons presented in its response to the original motion to dismiss (Doc. 25), the Commission respectfully requests the Court deny the motion as to its 17(b) claim.

## <u>DISCUSSION AND AUTHORITY</u>

### I.      Paxton's Conduct Operated as a Fraud.

The antifraud provisions proscribe, among other things, the use of "any device, scheme, or artifice to defraud" and "any act" or "any transaction, practice, or course of business which" would operate as a fraud or deceit on an investor.  15 U.S.C. § 77q(a)(1) and (3); 17 C.F.R § 240.10b-5(a) and (c).  The Supreme Court has noted that this language is to be interpreted "broadly" and "flexibly" not "technically and restrictively." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972).

Indeed, courts have held that because "[c]onduct itself can be deceptive," a defendant can commit securities fraud without making or using any "oral or written statement." *See generally Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 160 (S.D.N.Y. 2012); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) ("[A] cause of action exists under [Rule 10b-5] subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.").

Hence, a person's acts give rise to fraud liability where they operate to deceive others, because liability under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) encompass a broader spectrum of conduct than liability for specific misrepresentations and omissions under Section 17(a)(2) and Rule 10b-5(b). Indeed, for example, Section 17(a)(1) "proscribes all scienter-based fraud, whereas Section 17(a)(2) prohibits negligent misrepresentations that deprive investors of money or property." *In the Matter of Dennis J. Malouf*, SEC Release No. 4463 (July 27, 2016), 2016 WL 4035575.

The Amended Complaint pleads facts establishing that Paxton engaged in deceptive conduct, alleging that he and Investors 1-4 were involved in an investment group in which participants were governed by express policies that gave rise to specific expectations:

> Investor 1 informed Paxton of the investment group's established purpose, policies, and practices, and expressly told Paxton that members participating in an investment deal take the same risk and receive the same benefit; that the member who introduces an investment opportunity typically acts as point person for that opportunity going forward; and that no one member makes money or otherwise benefits off of the investment of another member.

(Am. Compl. ¶ 78).

After having participated in the investment group for several years (*Id.*) during which he was expressly informed about and acted in accordance with the group's policies and expectations

prohibiting personal benefit (*Id.* ¶¶ 78-79), Paxton knowingly and intentionally recommended investment in Servergy (*Id.* ¶¶ 87, 90, 93, 97); acted as the investment group's point person with Servergy, as the group expected (*Id.* ¶¶ 78, 82);[3] failed to invest in Servergy himself despite knowing the group expected that he was investing (*Id.* ¶ 93); sought and accepted payment of commissions stemming from his recommendations (*Id.* ¶ 107); coordinated with Mapp to lull concerns by Investors 1-4 about their investments (*Id.* ¶¶ 119-123); and repeatedly concealed his receipt of commissions (*Id.* ¶¶ 124-132) even after members of the group expressly asked about them (*Id.* ¶¶ 127-128).   These acts and practices deceived members of the investment group, whose express expectations and trust Paxton intentionally betrayed.   *See VanCook v. SEC*, 653 F.3d 130, 140-141 (2d Cir. 2011) (holding that a broker's submission of orders received after 4:00 p.m. constituted a deceptive scheme because such act violated the express requirement that submitted orders be received by 4:00 p.m.).   This deception was designed to hide the fact that Paxton's recommendations were colored by his personal interest, and thereby convince the group's members to invest in Servergy.   And Paxton's deception was successful—he raised $640,000 from the group (nearly 25% of all investment funds Servergy received in 2011), whose members were misled and would not have invested had they known the truth (Am. Compl. ¶¶ 98, 99).

Paxton has argued, citing *In re Enron,* that he cannot be held liable for fraud under 17(a)(1) and (3) and Rule 10b-5(a) and (c) absent a showing that he had a duty to disclose.   (Doc. 39, p. 17 n.4); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008).   In his latest motion, Paxton also relies on *Chiarella v. US*, 445 U.S. 222 (1980), and *Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA) Inc.*, 482 F.3d 372, 384 (5th Cir.

---

[3] While Paxton has argued he was not a member of the investment group, the pleaded facts expressly allege otherwise, and Paxton's own statements to Mapp indicated that he was a member. (Am. Compl. ¶¶ 104, 123).

2007), for the same point.  But these three cases considered fraud only under Section 10(b); hence they have no bearing on and do not require dismissal of the Commission's claims under Section 17(a).  Regardless, the Amended Complaint plainly alleges that he did have such a duty, as discussed below at Section II.

In sum, Paxton deceived investment group members by secretly enriching himself off of their investments when he knew of, but nevertheless knowingly violated, the group's polices expressly prohibiting such personal benefit.  Paxton's conduct was all the more deceptive considering that (1) he previously operated in accordance with the group's policies when the fact of his payment for services in shares was disclosed; and (2) he conformed to one of the policies by acting as the group's point person for the Servergy investment. Hence, regardless of the content of his *statements*, Paxton's *conduct* in violating the group's policies and seeking and accepting commissions and then concealing them supports a plausible claim for fraud under at least Sections 17(a)(1) and (3), particularly as to the investment group, and a flexible and inclusive interpretation of the antifraud provisions militates against a dismissal of these claims.

## II.     Paxton's Failure to Disclose His Compensation Violated the Antifraud Provisions Because His Investment Recommendations Were Misleading Half-Truths And Because He Had a Duty to Disclose.

The briefing in this case has repeatedly noted that silence is generally not actionable as a fraud under the securities laws.  But the Commission has never alleged that Paxton was *silent* about investing in Servergy.  Instead, the Commission alleges that Paxton voluntarily and proactively recommended investment in Servergy, and advised those he solicited about his opinion of the company and the advantages of investing before an upcoming price increase. (Am. Compl. ¶¶ 87, 90, 93, 96, 97)  Accordingly, this is not a matter of non-disclosure, but one

of half-truth, because Paxton made statements that were misleading as a result of his failure to state that he was paid to solicit investments.

When considering the half-truth provisions of Section 17(a)(2) and Rule 10b-5(b), the Court need not find any pre-existing duty to disclose. *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 258 (2d Cir. 2016). Rather, the speaker's decision to speak requires him to state all material information necessary to make what he said not misleading under the circumstances. 15 U.S.C. § 77q; 17 C.F.R § 240.10b-5. Here, because Paxton chose to recommend investment in Servergy, he was required to tell investors all the material information necessary to allow them to fully consider the recommendation under the circumstances in which they received it. This Court has already acknowledged the materiality of Paxton being compensated to solicit investments in Servergy. (Doc. 39, p. 10, n.3). It was also misleading for him not to disclose that material information, especially as to the members of his investment group, who reasonably believed that he was not being paid for their investments.

Even if the Court finds that Paxton uttered no half-truth, he nevertheless violated the antifraud provisions by failing to disclose his compensation despite a *duty* to do so. In non-disclosure or "pure omission" cases, there is no requirement that an individual have said anything at all. *In re Vivendi*, 838 F.3d at 239-40. Instead, because of the nature of certain relationships, an individual has a duty to disclose all information material to that relationship or a related transaction. *Id.* The Amended Complaint shows that such a duty arose, or plausibly could arise, from the special relationship of trust and confidence Paxton previously formed with the members of the investment group and his attorney-client relationship with the S3 Group members.

### A.  Paxton's Failure to Disclose His Compensation Made His Recommendations to Invest Misleading Half-Truths.

Section 17(a)(2) of the Securities Act and Rule 10b-5(b) of the Exchange Act prohibit the omission of material facts necessary to make statements, "in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q; 17 C.F.R § 240.10b-5.  To violate these provisions, the uttered statements need not be false themselves, but merely misleading because of omitted information.  *Id.*; *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216 (2013) ("[t]he law is well settled . . . that so-called 'half-truths'— literally true statements that create a materially misleading impression—will support claims for securities fraud.").

Under the circumstances alleged in the Amended Complaint, Paxton's statements and recommendations were rendered misleading by his failure to disclose his compensation. From his previous participation with the group for several years prior to recommending Servergy, Paxton knew that by soliciting Investor 1, he could also introduce the investment to Investors 2, 3, and 4 and probably secure their investments – and commissions thereon.  (Am. Compl. ¶¶ 79, 93)  In violation of the express policy prohibiting personal benefit, Paxton made statements recommending an investment in Servergy, but failed to disclose his compensation.  Thus, knowing that Investors 1- 4 believed that he was not personally benefitting "off of" their investments, Paxton chose to do exactly that.[4]  Paxton's statements soliciting Investor 1, following up with him to further encourage investment, and urging last-minute investment by Investor 2 were all rendered misleading by the fact that he knew he would be secretly paid under the table by Servergy.  (*Id.* ¶ 93, 96).  Moreover, Paxton recommended investment and gave the

---

[4] Notably, when faced with a similar decision, Paxton's own legislative aide decided to disclose his commission to the group of investors he recruited to Servergy.  (Am. Compl. ¶ 118).

impression of personal investment without ever revealing that he was not even investing himself. (*Id.*).

Because he was expressly informed that personal side deals were forbidden, and continued to participate with the group and abide by its policies, Paxton's recommendations to the investment group carried the unspoken assurance and implicit representation that he was not profiting from the investments of other members.  Given the circumstances here—most notably the group's express policy, known to Paxton—his recommendation and solicitation of investment in Servergy was rendered misleading.[5]  These misleading half-truths violated Sections 17(a) and 10(b).

### 1.  Statements Need Not Explicitly Discuss Compensation to Be Misleading.

At this stage, the Court must take as true the allegations that Paxton recommended investment in Servergy.  Paxton argues that because these recommendations did not explicitly discuss his compensation, he cannot be liable for misleading half-truths. In support of this argument, he has cited *McNamara v. Bre-X Minerals, Ltd.*, in which the court held that "the Fifth Circuit most likely would agree that . . . a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject*."  57 F. Supp. 2d 396, 416 (E.D. Tex. 1999) (emphasis in original).  This case stands for the unremarkable proposition that an omission must have a logical connection to the statements that were made before it can give rise to an actionable half-truth.  Here, there is a logical connection between Paxton's statements recommending investment in Servergy and the omission of his compensation.  This is so, not only because disclosure of his compensation would have revealed

---

[5] The Court has found that Paxton's omissions were material.  (Order, p. 10 n.3).  Because this materiality depends on the fact that certain investors would not have invested had they known about the commissions, a finding of materiality is tantamount to a finding of fraud *under the circumstances* of this case.  This separates Paxton's case from cases like *McNamara*, where material information was withheld under circumstances that were not misleading.

his personal interest in the recommendation he made, but also because it would have revealed that he was acting in violation of the investment group's express policy prohibiting such compensation.

Paxton's interpretation of *McNamara* is that he had to speak *directly* on his compensation before his omission could become misleading.  This cannot be so.  This interpretation is inappropriate because *any* discussion of a previously undisclosed compensation arrangement would necessarily reveal its existence.  In other words, Paxton promotes an impossible rule under which he could only be liable for failing to disclose his compensation if he first disclosed his compensation.  This nonsensical result must yield to the more reasonable likelihood that there are circumstances outside of an express discussion of compensation that could render Paxton's hidden payments misleading.  To be clear, under the circumstances of this case, Paxton's statements of praise and recommendation were rendered misleading when he failed to disclose the *existence* of his compensation arrangement.

Regardless, *McNamara* does not stand for the broad proposition that Paxton urges.  In that case, two Canadian mining companies, Barrick and Bre-X, had been negotiating a potential joint venture to exploit mineral interests Bre-X held in Indonesia.  *McNamara*, 57 F. Supp. 2d at 411-413.  After negotiations collapsed, and after Bre-X's shareholders discovered there was no gold in Bre-X's Indonesian holdings, the shareholders sued several entities, including Barrick. *Id.* at 402.  Shareholders complained that Barrick's public descriptions of its negotiations with Bre-X never disclosed that Barrick's own testing revealed the absence of gold in Bre-X's relevant locations.  *Id.* at 415.  The *McNamara* court held that because Barrick never undertook to speak on the presence or absence of gold in its public statements—not addressed to Bre-X

shareholders in any particular way—the company owed no duty to reveal its knowledge that there was no gold in Bre-X's Indonesian holdings.  *Id.*

These circumstances are strikingly different from Paxton's.  Barrick's statements were not directed to investors as Paxton's were; Barrick made no recommendation of Bre-X or its holdings as Paxton did for Servergy; and Barrick did not receive hidden payments from Bre-X as Paxton did.  *Id.*  Barrick simply knew a negative fact about Bre-X that Bre-X's shareholders would have wanted to know.  In contrast, Paxton knew a negative—and material—fact about the recommendation he was making that reasonable investors he solicited would have wanted to know.  *McNamara* is silent on what Barrick's duty would have been had it actually recommended investment in Bre-X's Indonesian holdings that Barrick knew to be barren.  The reasoning of the *McNamara* court, and the plain text of Rule 10b-5, suggest that such a hypothetical recommendation would have been tainted, and rendered misleading—even without any overt statement about the presence of gold—by the circumstances of Barrick's undisclosed knowledge.  So much more so in Paxton's case, where his statements of recommendation were specifically directed to his friends and associates who expected that he was not acting for his own secret benefit.

Consider Paxton's urgent recommendations to Investor 2, in which he convinced Investor 2 to invest by claiming that Servergy presented a great investment opportunity for which the offering price would soon double.  (Am. Compl. ¶ 96).  Even if Paxton believed these statements to be true (although he had no basis for believing Servergy presented a great investment opportunity), each was rendered misleading because Paxton concealed his self-interested purpose for talking to Investor 2 about Servergy in the first place and prevented him from making an

informed investment decision.   Paxton's recommendations were only half-true and rendered misleading by his omission to speak the whole truth: that he was paid to make them.

### 2.   The Amended Complaint Includes Sufficient Facts to Show that Paxton's Statements Were Not Puffery.

Paxton argues that his statements to potential investors were mere puffery and could not form the basis for a fraud claim. But he fails to consider his statements in the context in which they were made.  "In determining whether a statement is puffery, the context matters." *Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. 2009) (in a fraudulent misrepresentation case, the court also noted that "[w]hat is said to a particular person may take on meaning that would not be present if made to a large group.").  Indeed, "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule."  *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1212 (M.D. Fla. 2014).  Rather, the determination of whether a statement is material is "inherently fact-specific" and requires consideration of a statement in its proper context. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011).

This is particularly relevant at the motion to dismiss stage: "In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution."  *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,* 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012); *see also In re Spiegel, Inc. Sec. Litig.,* 382 F. Supp. 2d 989, 1028 (N. D. Ill. 2004) (declining to hold that statements were puffery at the motion to dismiss stage because materiality involves "delicate assessments of the inferences a reasonable shareholder would draw").  Hence, "[o]nly where the facts are so obviously important (or unimportant) to an investor that reasonable minds cannot differ on the question of materiality may the ultimate

materiality issue properly be resolved as a matter of law." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 n.14 (5th Cir. 1981) *aff'd. in relevant part*, 459 U.S. 375 (1983).

Statements that might be considered puffery in one context can be actionable in another, especially when defendants allegedly knew or recklessly disregarded facts contradicting their statements. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (defendants' statement that "the inventory situation was 'in good shape' or 'under control'" was not puffery when "they allegedly knew that the contrary was true"); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statement that company was doing "fine" when defendants knew that revenues were slowing may, when taken in context, be actionable); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (statement that management practices were "adequate," "conservative," and "cautious,"—when defendants intentionally or recklessly omitted facts contradicting the representations—held to be actionable); *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) (finding statements referring to tires as "safe" were actionable). *See also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) (holding that statement that investment in partnership was "sure thing" may have been an actionable misrepresentation under the Securities Act of 1933); *G&M, Inc. v. Newbern*, 488 F.2d 742, 746 (9th Cir. 1973) ("[C]onsidering the gross disparity between prediction and fact, and also considering [defendant's] other misrepresentations and failure to disclose, which were relevant to the accuracy of his prediction, we have no difficulty in finding this 'prediction' to be actionable.").

In considering the Amended Complaint in light of Rule 12(b)(6), Paxton's statements should not be disregarded as mere puffery.  This is especially true when considering Paxton's relationship with members of the investment group. Paxton and Investors 1-4 operated under a

policy in which those participating in an investment opportunity took "the same risk and receive[d] the same benefit and that no one member ma[de] money or otherwise benefit[ed] off of the investment of another member" and that "if one member of the group was going to benefit from a deal, he would disclose that benefit."  (Am. Compl. ¶ 77).  Paxton learned of the group's policies and expectations several years before he solicited members to invest in Servergy, knew Investors 1-4 believed he would not profit from their investments, and knew they believed he too would invest.  (*Id.* ¶¶ 78-79, 93).  Indeed, as far as Investors 1-4 were aware, Paxton operated in accordance with the group's policies both *before* recommending Servergy, when he received service shares (*Id.* ¶ 80) and, in part, *while* recommending Servergy when he acted as the group's point person (*Id.* ¶¶ 104, 123).  Thus, Paxton's statements to Investors 1 and 2, for instance, mattered to them (indeed they changed Investor 2's mind and persuaded him to invest) because they were accustomed to sharing and acting on investment recommendations within their group. Investors 1 and 2 would not even have *known about,* much less invested in Servergy but for Paxton's recommendations and his facilitation of introductions, negotiations, meetings, and the distribution of information about the security. Thus, the Commission has pleaded statements made misleading by Paxton's omission that cannot reasonably be determined to have been "obviously unimportant" under the circumstances under which they were made.

### B.  Paxton Had a Duty to Disclose His Compensation Because of His Relationships With Investors.

Even if the Court concludes that Paxton's solicitations were not rendered misleading by his failure to disclose the compensation arrangement, it should determine that the Amended Complaint pleads facts plausibly suggesting he had a duty to disclose his compensation, at least to his investment group, based on their special relationship of trust and confidence, and the S3 Group, based on their attorney-client relationship.[6]

### 1.  Paxton Had a Duty to Disclose All Information Material to The Relationship of Trust and Confidence With His Investment Group.

Separate and apart from any formally defined fiduciary relationship, federal and Texas state law recognize a duty to disclose exists between parties who have a special relationship of trust and confidence, and that such a relationship may arise from moral, social, domestic, or even purely personal relationships.  *SEC v. Cochran*, 214 F.3d 1261, 1265 (10th Cir. 2000); *Aubrey v. Barlin*, No. 1:10-CV-00076 (W.D. Tex. Feb. 1, 2016) (recognizing the existence of informal fiduciary relationships based on trust and confidence but declining to find such a relationship existed on the facts presented); *N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Intern.*, Inc., 107 F. Supp. 3d 620, 637 (N.D. Tex. 2015) (same); *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005); *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). To trigger such a duty, the relationship must have existed prior to, and apart from, the issue in

---

[6] In addition to these relationships, which give rise to a duty, another federal district court in Texas has found that unregistered brokers like Paxton owe a fiduciary duty to disclose compensation to every investor they solicit.  In *SEC v. Helms*, No. A-13-CV-01036, 2015 WL 6438872 (W.D. Tex. Oct. 20, 2015), the court found that Roland Barrera acted as a broker when he solicited one friend to invest in another friend's company.  When the investor asked whether Barrera would be receiving any compensation for soliciting the investment, Barrera responded only that the issuer "was going to take care of [him]."  *Id.* at *4.  The court found that this failure to disclose his compensation was a violation of a fiduciary duty that he held as a broker:  "as a broker—even an unregistered broker— [Barrera] had a fiduciary duty to the investor to disclose material facts . . . [and] Barrera's conduct in withholding information about the structure and amount of his compensation, even after [the investor] asked him a direct question about it, amounts to an intentional breach of this fiduciary duty."  *Id.*

dispute—here, Paxton's recommendation to invest in Servergy. *Mia Reed & Co. v. United Fire & Cas. Co.*, 2012 U.S. Dist. LEXIS 89412 (S.D. Tex. June 27, 2012); *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d at 287.

The Texas Supreme Court has held that this relationship "exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing confidence." *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). "The existence of [such a] relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). Indeed, such relationships arise when "the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Hence, unlike a formal fiduciary duty, dominance is not required to establish a special relationship of trust and confidence. *See, e.g., Horton v. Robinson,* 776 S.W.2d 260, 265 (Tex. App. 1989) (holding that a confidential relationship arose between two parties after 24 years of friendship); *Consol. Gas & Eq. Co. of Am.,* 405 S.W.2d 333, 337 (Tex. 1966) (reasoning that such a relationship could arise when "over a long period of time, the parties . . . worked together for the joint acquisition and development of property previous to the particular agreement sought to be enforced"); *Holland v. Lesesne*, 350 S.W.2d 859, 861–62 (Tex. Civ. App. 1961) (holding a relationship arose when "for some years before the transaction, [the parties], as well as their respective families, had been warm, personal friends, . . . had visited each other regularly, . . . dined together, and . . . vacationed together").

In recent years, federal courts across Texas have recognized the existence of special relationships of trust and confidence in a variety of circumstances. For example, In *Alexander v.*

*Martin,* the Eastern District of Texas denied a motion for summary judgment in light of a fact issue concerning the existence of a special relationship trust and confidence between an uncle and his niece where he *previously* acted as her trustee, and the two shared a long history of reliance and trust stemming from that relationship. 2010 U.S. Dist. LEXIS 97755 (E.D. Tex. Aug. 20, 2010).

In *Mia Reed & Co. v. United Fire & Cas. Co*., the Southern District of Texas denied a Rule 12(b)(6) motion to dismiss because the plaintiff "arguably" alleged a special relationship of trust and confidence by virtue of the defendant's established business relationship as the plaintiff's insurance broker.  2012 U.S. Dist. LEXIS 89412, 17-18 (S.D. Tex. June 27, 2012). The court reached this holding notwithstanding the absence of a prior case finding that "any kind of fiduciary duty relationship between insurer and insured existed," concluding that "it does not follow that an informal fiduciary duty relationship could not exist …." *Id.* (emphasis added).

In addition to these decisions, the Fifth Circuit vacated a district court judgment dismissing the Commission's fraud action in *SEC v. Cuban*, "[g]iven the paucity of jurisprudence on the question of what constitutes a relationship of 'trust and confidence' and the inherently fact-bound nature of determining whether such a duty exists . . . ."  620 F.3d 551, 558 (5th Cir. 2010).

Paxton's relationship with the investment group was one of trust and confidence.  As the Amended Complaint makes clear, Investors 1-4 did not simply subjectively trust Paxton.  Nor is it the case that Paxton was not part of, or new to, the group when he recommended investment in Servergy, and hence someone with whom the group had only an arm's length business relationship under which no duties arose.  Rather, Paxton was a member of the group for several years before he recommended that Investors 1-4 invest in Servergy (Am. Compl. ¶ 78).  During

his lengthy tenure, he knew the group observed established policies and practices—expressly

told to him—under which (1) members participating in an investment opportunity took the same

risk and received the same benefit; (2) the member who introduced an investment opportunity

typically acted as point person for that opportunity going forward; and (3) that no one member

would make money or otherwise benefit off of the investment of another member. (*Id.* ¶ 78).

Aware of the established practices and expectations in the group, Paxton recommended

investment opportunities to the group prior to Servergy, including investments in the energy

industry and in a law enforcement video technology company.  (*Id.* ¶ 79).  And in conformity

with these practices and expectations, Paxton previously received shares in a group investment in

exchange for services—rather than for purchase—and his compensation was disclosed to the

group.  (*Id.* ¶ 80).

In addition, Paxton acted on behalf of the group and its members, and held personal

relationships of trust and confidence with members before, and apart from, his 2011 Servergy

recommendation, including:

- Preparing the paperwork to form and register an entity in connection with a group investment in 2002;

- Living with Investor 1 beginning in 2003, when the two were in session in the Texas House of Representatives;

- Forming a family limited partnership for Investor 1 in 2008 and serving as its registered agent until 2014;

- Forming a foundation for Investor 1 in 2008, for which he continues to serve as registered agent; and

- Beginning in 2010, serving as the registered agent of an entity in which the group invested, and then providing title work for that entity in 2010 and 2011.

(*Id.* ¶¶ 78, 81).

Given the circumstances and nature of the group, the Amended Complaint pleads a plausible relationship of trust and confidence which existed before and apart from Servergy. Accordingly, Paxton owed the investment group the duty to disclose his compensation arrangement with Servergy.  *See SEC v. Kirch*, 263 F. Supp. 2d 1144, 1150 (N.D. Ill. 2003) (holding that a defendant had a duty arising from express policies and understandings).  In breaching that duty, he committed securities fraud.

### 2. Paxton Had a Duty to Disclose All Information Material to His Representation of the S3 Group.

The Amended Complaint also credibly alleges that Paxton had a duty to disclose all information material to his representation of the S3 Group based on the fiduciary duties he owed them as their attorney.  The Amended Complaint pleads facts indicating that Paxton was acting as an attorney for the members of the S3 Group.  Specifically, the Amended Complaint alleges that Paxton acted as an attorney for the group's members by forming two entities, S3 Sleep Investments, LLC and Simple Sleep Services, LLC in July 2011, the same month he began soliciting their investment in Servergy.  (Am. Compl. ¶ 83).  Further, a July 27, 2011 email from Paxton to an S3 Group member could reasonably be read to suggest he was acting as their attorney, where Paxton stated "I have a couple of tweaks I want to discuss before we send these documents to investors and I thought of tonight as I was finishing these.  I am almost done with the other documents …and [will] finish tomorrow morning so that I can make sure I am thinking clearly."  (*Id.*)

As their attorney, Paxton would be in a fiduciary relationship with the S3 Group members.  *SMWNPF Holdings, Inc. v. Devore*, 165 F.3d 360, 365 (5th Cir. 1999) (*citing Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)).  And this type of fiduciary relationship gives rise to a duty to disclose.  *See Ins. Co. of No. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

Because Paxton solicited the S3 Group members while he was also serving as their attorney in connection with a separate investment, it is plausible that Paxton's compensation for soliciting Servergy's investors would be material to that representation.  Accordingly, the Amended Complaint pleads sufficient facts to make a viable claim that Paxton failed to disclose information material to his attorney-client relationship with the S3 Group members.

### III.   The Amended Complaint Pleads Facts Sufficient to Support a Credible Claim Under Section 15(a) of the Exchange Act.

Because Paxton solicited investments in Servergy while not registered as a broker, he violated Section 15(a) of the Exchange Act.  Although the Exchange Act defines a "broker" generally as a "person engaged in the business of effecting transactions in securities for the account of others," the component parts of the definition are not statutorily defined.  Exchange Act § 3(a)(4)(A).  A person may be found to be acting as a broker if he participates in securities transactions "at key points in the chain of distribution."  *Mass. Fin. Serv., Inc. v. Sec. Inv. Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976); *see also SEC v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

#### A.  Paxton Acted as a Broker.

Courts typically consider a number of factors to determine whether a person acted as a broker.  Commonly cited factors for determining whether someone was acting as a broker are found in *SEC v. Hansen*, 1984 WL 2413 (S.D.N.Y. 1984).  There are six *Hansen* factors: whether the purported broker (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, or previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of the investment or gives advice; and (6) is an active rather than passive finder of

investors. *Id.*, at *10. The factors listed above are not exclusive, and not all of them, or any particular number of them, must be satisfied for a person to be a broker. *See SEC v. Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010) (explaining that the *Hansen* factors "were not designed to be exclusive").

As applied to the facts here, these factors support a 15(a) claim. First, Paxton, who was not an employee of Servergy, received transaction-based compensation, in the form of Servergy shares, for his efforts soliciting investors. Thus, the first two factors support a 15(a) claim. Notably, Paxton ignores the repeated allegations that he received transaction-based compensation, which some courts identify as the hallmark of broker conduct. *See Sun River Energy, Inc. v. Nelson*, 2013 WL 1222391, at *5 (D. Col. 2013); *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, at *6 (D. Neb. 2006); *S.E.C. v. Sky Way Global, LLC*, 2010 WL 5058509, *2 (M.D. Fla. 2010); *DeHuff v. Digital Ally, Inc.*, 2009 WL 4908581, at *3 (S.D. Miss. 2009).

Factors 4 and 5—involvement in negotiations, providing valuations, and advice on the merits of an investment—are best illustrated in Paxton's interactions with Investor 2. (Am. Compl. ¶¶ 95-99). Upon hearing that Investor 2 did not intend to invest in Servergy, Paxton made an unsolicited late night call to him, inserting himself into the negotiations between Servergy and Investor 2. In the call, Paxton not only recommended Servergy as an investment, but he also advised Investor 2 that he should invest before the offering price doubled. (*Id.* ¶ 96) Based on Paxton's active involvement negotiating whether and when Investor 2 would invest, he successfully changed Investor 2's *no* to *yes*. (*Id.* ¶ 96) In effect, Paxton closed the deal for Servergy with Investor 2. Thus he was involved in negotiations, made valuations as to the merits

of the investment, and gave advice on the investment.  Factors 4 and 5 therefore favor a finding

that the Commission has adequately pleaded its Section 15(a) claim.

Finally, Paxton actively found investors for Servergy and did not wait for an opportunity

to share the Servergy investment to present itself.  Indeed, he brought in 32% of all investment

funds raised by Servergy in 2011, just two weeks after Mapp's initial offer.  (Am. Compl. ¶ 105).

Further, Paxton arranged and sat in on sales pitches, to give credibility to Mapp's solicitation (*Id.*

¶¶ 89, 120), offered to answer questions (*Id.* ¶ 103), followed up with a late night call to Investor

2 (*Id.* ¶ 96), and served as the contact person between Servergy and the investment group (*Id.* ¶¶

104, 120, 123).  Additionally, Paxton actively followed up with the investors who he

recommended invest in Servergy.  Paxton requested, and was provided, a list of the potential

investors he had already solicited.  (*Id.* ¶ 111).  After receiving the list, Paxton noted that he had

a lunch meeting with another possible investor with whom he hoped he could "generate some

interest."  *(Id. ¶* 112).  And just two weeks later, Mapp provided Paxton yet another list of

pending investors.  In short, he was not simply referring investors to Mapp and deferring to him

all the work to solicit investors.  Thus the final factor also weighs in favor of a 15(a) claim

against Paxton.

In addition to *Hansen*, Paxton's conduct also satisfies the analysis by the courts in *SEC v.*

*Helms*, No. A-13-CV-01036, 2015 WL 6438872 (W.D. Tex. Oct. 20, 2015), and *SEC v. Offill,*

No. 3:07-cv-1643-D, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012).  In *Helms*, the Western

District of Texas found that Roland Barrera was liable for failing to register as a broker when he

solicited a single person—his friend—to invest in another friend's company.  *Helms*, 2015 WL

6438872 at *3.  When determining that Barrera's conduct qualified him as a broker, the court

noted that Barrera, "set up and attended the meeting introducing" his friend to the offering.  *Id.* at

*3.  The court also noted that Barrera exchanged multiple email communications concerning the investment and conveyed questions about the investment to the issuer.  *Id.*  The Amended Complaint alleges conduct by Paxton that exceeds Barrera's: Paxton set up and attended meetings between investors and Servergy (Am. Compl. ¶ 89); he communicated with potential investors via phone, email, and in-person meetings (*Id.* ¶¶ 89-90); and he provided critical information to investors himself, including about the timing of the increase in the stock price (*Id.* at ¶¶ 96-97).

In *Offill* the Northern District of Texas noted that someone acts as a broker when their conduct includes "analyzing the financial needs of an issuer, recommending or designing financial methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities."  *Offill*, 2012 WL 246061, at *7.  These factors closely resemble the *Hansen* factors, and as discussed above, the Amended Complaint includes factual allegations consistent with these factors: Paxton involved himself in the negotiations of whether and when Investor 2 would invest; he discussed the details of Servergy's security, including the date that the price would increase; and he recommended investment in Servergy to multiple investors.

### B.  There Is No Requirement that an Individual Have "Authority Over the Accounts of Others" to Be a Broker.

Paxton argues that "control" or "authority over the accounts of others" is an element required to find that someone acted as a broker, rather than a factor to be considered when making that determination.  (Doc. 44, at p. 26).  This position does not comport with the law. This conception of a broker ignores the varied instances when someone who does not have any authority over the accounts of others has been found to violate Section 15(a).  Indeed, federal courts in Texas have found 15(a) violations without a finding of authority over the accounts of

others.  *Helms*, 2015 WL 6438872, at *3; *Offill*, 2012 WL 246061; *SEC v. Arcturus Corp.*, 171 F. Supp. 3d 512, 533 (N.D. Tex. 2016) (holding that multiple defendants had violated 15(a) although only one of the defendants had authority over any account).

Although the phrase "for the accounts of others" appears in the definition of broker,[7] it has a different meaning than *authority over* "the accounts of others."  Paxton has not cited any case holding that "authority over the accounts of others" is an element of the definition of a broker.  Although he cites *SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. Apr. 1, 2011), and *SEC v. M&A West,* No. C-01-3376 VRW, 2005 WL 1514101 (N.D. Cal. June 20, 2005), these cases do not support this proposition.  In *M&A West*, the court presents "authority over the accounts of others" as a fact that could have been pleaded by the Commission that would have supported a finding that the person there was a broker.  *M&A West, Inc.*, 2005 WL 1514101, at *9.  But it does not say that such an allegation was *required*.  Similarly, in *Kramer*, the court briefly mentions "authority over the accounts of others" as one factor among many factors that it found were not sufficiently alleged.  *Kramer,* 778 F. Supp. 2d at 1339.

The Commission does not contend that authority over the accounts of others is irrelevant to the determination of whether someone is a broker.  Indeed, it can be strong indicia that someone is a broker.  But its absence is not dispositive, especially where other factors are present.  Thus, to require a showing of "authority over the accounts of others" is inconsistent with the law.  For these reasons, the Commission has pleaded a colorable claim under Section 15(a) of the Exchange Act, and Paxton's motion should be denied.

---

[7] By including the phrase "for the accounts of others" in the definition of broker, the Exchange Act distinguished brokers from dealers, who purchase securities "for such person's own account."  Exchange Act §§ 3(a)(4)(A) and 3(a)(5)(A); *see Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 361 (5th Cir. 1968).

## CONCLUSION

For all of the foregoing reasons, Plaintiff Securities and Exchange Commission respectfully requests an order from this Court denying Paxton's Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 9(b).


Dated:  November 18, 2016.                    Respectfully submitted,


                                              s/ Matthew J. Gulde
                                              MATTHEW J. GULDE
                                              Illinois Bar No. 6272325
                                              Timothy L. Evans
                                              Texas Bar No. 24065211
                                              Jessica B. Magee
                                              Texas Bar No. 24037757
                                              Samantha S. Martin
                                              Texas Bar No. 24065090
                                              U.S. Securities and Exchange Commission
                                              Fort Worth Regional Office
                                              Burnett Plaza, Suite 1900
                                              801 Cherry Street, Unit #18
                                              Fort Worth, TX 76102-6882
                                              (817) 978-1410
                                              (817) 978-4927 (fax)
                                              guldem@sec.gov


## CERTIFICATE OF SERVICE

I certify that on November 18, 2016, I electronically filed the foregoing **Plaintiff's Response In Opposition to Respondent Warren K. Paxton, Jr.'s Motion to Dismiss**, with the Clerk of the Court for the Eastern District of Texas, Sherman Division, using the CM/ECF system.  The electronic case filing system will send a "Notice of Electronic Filing" to all counsel of record who has consented in writing to accept service of this document by electronic means.

                                              /s/ Matthew J. Gulde
                                              Matthew J. Gulde