# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| | § | CIVIL ACTION NO. 4:16-CV-246 |
| v. | § | JUDGE MAZZANT |
| | § | |
| WILLIAM E. MAPP, III, | § | |
| WARREN K. PAXTON, JR., | § | |
| CALEB J. WHITE, and | § | |
| SERVERGY, INC. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Warren K. Paxton, Jr.'s Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #44). Having considered the relevant pleadings, the Court finds that the motion should be granted.

## I. BACKGROUND

This motion comes before the Court following the Court's conditional dismissal of Warren K. Paxton, Jr. ("Paxton") from the underlying action (Dkt. #39). The Court granted the Securities and Exchange Commission (the "Commission") leave to allege additional facts that might support a claim under the statutes alleged in its original complaint (the "Original Complaint"). The facts alleged in the new complaint (the "Amended Complaint"), which the Court must accept as true, are as follows:

Servergy, Inc. ("Servergy") is a computer hardware company that develops secure, cloud-based data storage servers. From November 2009 to September 2013, Servergy raised approximately $26 million in private securities offerings to develop what it claimed was a revolutionary new server. William E. Mapp, III ("Mapp"), Servergy's co-founder and then-CEO, was responsible for the fundraising campaign and had signatory authority over Servergy's bank

accounts. As Servergy's primary fundraiser, Mapp identified prospective investors through word-of-mouth referrals and offered compensation to individuals for introducing new investors to the company.

Paxton became involved in Servergy's fundraising campaign in the summer of 2011. Paxton currently serves as the Attorney General of Texas. Before serving as Texas's Attorney General, Paxton was a Texas state senator from January 2013 to December 2014 and a Texas state representative from January 2003 to December 2012. Paxton was previously an investment adviser representative of Mowery Capital Management ("MCM"). Paxton at times solicited clients on MCM's behalf and collected asset management fees. In 2011, Paxton reported legal services income from MCM. Paxton was also registered as an investment adviser representative from July 2003 to December 2004 and from December 2013 to November 2014.

On July 12, 2011, Mapp met Paxton—then a member of the Texas House of Representatives—at Paxton's law office in McKinney, Texas, to discuss Servergy. During their meeting, Mapp offered to pay Paxton a 10% commission for any investors Paxton recruited to invest with Servergy. Following the meeting, Mapp emailed Paxton and reiterated his offer to pay Paxton either with Servergy common stock or a combination of cash and stock. Paxton responded to Mapp's offer via email, stating, "I will get to work."

Paxton actively recruited investors for Servergy between July 11, 2011, and July 31, 2011. Throughout Paxton's recruiting efforts, Paxton raised $840,000 for Servergy—32% of all investment funds raised by Servergy in 2011—by promoting the company and soliciting investors for an undisclosed transaction-based compensation in the form of 100,000 shares of Servergy common stock. Paxton told prospective investors that he had met with Servergy's management and determined it was a great company and the investment presented an interesting opportunity.

Paxton did not conduct any due diligence into Servergy or reveal to potential investors that he was being compensated to promote Servergy's stock.

On July 22, 2011, Paxton organized and invited at least seven prospective investors to an investment pitch at Servergy's office. Paxton attended that meeting and also introduced Mapp to at least five additional prospective investors by telephone and email the same day. Among the people Paxton recruited were his friends, business associates, law firm clients, and members of an investment group (the "Investment Group") of which he belonged.

The Investment Group consisted of four members ("Investors 1, 2, 3, and 4") not including Paxton. Based on prior dealings in the Investment Group, members trusted each other to consider the interest of the group as a whole and not exploit one another for a member's personal benefit. Typically, the member who recommended the investment would monitor the investment going forward and represent the group's interest. Paxton did not inform the Investment Group of his compensation arrangement with Servergy.

Following the initial pitch to the Investment Group, Paxton followed up with one of its members ("Investor 1"), a fellow state representative, to further encourage his investment in Servergy. Investor 1 has been involved in the Investment Group for 25 years along with Investors 2, 3, and 4. These four investors have operated under the established policy and expectation that members participating in an investment deal do so on what Investor 1 calls an "equal dollar-for-dollar basis," in which everyone takes the same risk and receives the same benefit. No one member makes money or otherwise benefits from the investment of another member. There was an expectation that if one member of the group was to benefit from a deal, he would disclose that benefit. The group had a known and established pattern of conduct in which the member who recommends an investment typically monitors the deal going forward and represents the interests

3

of the members who have invested. The Amended Complaint alleges Paxton knowingly or recklessly violated his duty to disclose his compensation based on his formal and informal fiduciary relationship with the Investment Group members.

Investor 1 and Paxton have a personal and professional relationship dating back to 2003. Paxton lived in Investor 1's apartment while in Austin on House business. Paxton served as Investor 1's attorney, setting up entities for Investor 1's family and certain business ventures. Paxton began to participate in investments with the Investment Group before soliciting its members to invest in Servergy in 2011. Investor 1 informed Paxton of the Investment Group's established purpose, policies, and practices. Paxton had previously brought other investment opportunities to the Investment Group. To Investors 1, 2, 3, and 4's knowledge, Paxton did not receive any compensation for investments he brought to the Investment Group before Servergy. Paxton agreed to provide legal services in exchange for shares of at least one investment made through the Investment Group, which Paxton disclosed to the Investment Group members. Paxton also performed legal services for members of the Investment Group and some of the entities in which the Investment Group invested.

Investor 1 believed Paxton was investing in the Servergy Investment. Paxton told Mapp that he intended to act as a point person for the Investment Group. Paxton testified that the other three investors would likely invest if Investor 1 were to invest. All four of the Investment Group members invested in Servergy. Investor 2 initially missed the investment deadline. Paxton placed an unsolicited late night phone call to Investor 2 to change his mind, stating that the offering price would double if he did not invest within the next week. Following the phone call, Investor 2 invested $150,000 with Servergy. Both Investor 1 and Investor 2 stated they would not have invested in Servergy had they known Paxton was being paid to promote the company. Investor 3

claims Paxton's failure to disclose his compensation led him into believing that no such compensation was in place. Had Investor 4 known of Paxton's compensation, he would have been skeptical of the investment opportunity.

Also present at the initial July 22, 2011 investment pitch were members of a separate investment group of which Paxton was affiliated, the S3 Group. In 2011, Paxton performed legal services for the S3 Group and served as a registered agent of an S3 Group entity, S3 Management Group, LLC. Paxton is also a member of two S3 Group entities.

On July 23, 2011, Paxton forwarded one of Mapp's solicitation emails directly to a prospective investor and offered to answer any of the individual's questions. By July 28, 2011, five of the twelve prospective investors Paxton recruited had invested a total of $840,000 in Servergy. On August 5, 2011, Servergy issued a stock certificate to Paxton for 100,000 shares as payment for "services." Servergy issued Paxton a Form-1099 in the amount of $100,000 for the 2011 tax year.

The Amended Complaint alleges Paxton continually concealed his Servergy payments. Paxton falsely characterized, omitted key information, or refused to disclose information about his Servergy commissions to the Investment Group in his tax filings, in his mandated political disclosures, and in testimony before the Commission. Servergy issued a Form-1099 to Paxton, classifying the 100,000 shares in Servergy stock as non-employment compensation, which Paxton reported as income related to legal services on his 2011 Form 1040. On August 23, 2011, Paxton signed a subscription agreement in which he claimed he had paid $100,000 in exchange for the shares he received in Servergy. On October 28, 2011, Mapp sent Paxton a revised subscription agreement indicating that Paxton was receiving his shares as a Servergy service provider rather than for cash consideration, but Paxton never executed the corrected agreement. Paxton disclosed

Case 4:16-cv-00246-ALM   Document 96   Filed 03/02/17   Page 6 of 37 PageID #:  2000

his ownership of Servergy stock in his mandated political disclosures in the "stock" section but not the "sources of occupational income" or "gift" sections.

On September 12, 2011, Paxton asked Mapp which of his potential investors had in fact invested in Servergy. On September 24, 2011, Mapp sent Paxton a list of Paxton's contacts that had not yet invested in Servergy. The next day, Paxton emailed a potential investor, inviting him to a Servergy webinar. On October 4, 2011, Mapp renewed his offer via email to pay Paxton to solicit investors.

In early 2013, Mapp, Paxton, and Investor 1 had a meeting about the status of the investment. Mapp falsely told Investor 1 that Servergy was flush with purchase orders. On February 4, 2013, Mapp sent Paxton an update email, to which Paxton responded, "hopefully this will keep them calm." Paxton forwarded this email to Investor 1 and informed him that he would check back to see how his fundraising was going. On February 10, 2013, Paxton informed Mapp that Investor 1 seemed satisfied with the report and said he could "check in once a month on progress that will help you and them." On March 28, 2013, Mapp asked Paxton to check up on Investor 1 because Paxton was "running point" for the Investment Group. Upon being informed by Servergy management that Paxton had entered into an agreement to solicit investors, the Investment Group members retained an attorney who sent Paxton a certified mail letter requesting that he disclose his compensation arrangement with Servergy. Paxton never responded.

On April 11, 2016, the Securities and Exchange Commission filed its Original Complaint (Dkt. #1) in this Court against Mapp, Paxton, Servergy, and an additional promoter, Caleb J. White, asserting various violations of federal securities laws. The Commission specifically claims that Paxton violated Sections 17(a) and 17(b) of the Securities Act and Sections 10(b) and 15(a) of the Exchange Act. On June 9, 2016, Paxton filed a Motion to Dismiss Under Federal Rules of Civil

Procedure 12(b)(6) and 9(b) (Dkt. #16). On July 5, 2016, the Commission filed its Response in Opposition (Dkt. #25). On July 15, 2016, Paxton filed a Reply (Dkt. #26). On September 2, 2016, the Court held oral argument at the request of the parties. On October 7, 2016, the Court issued a Memorandum Opinion and Order (the "Opinion") (Dkt. #39), conditionally granting Paxton's motion to dismiss. The Court granted the Commission leave to amend its allegations against Paxton to submit additional facts that might support a claim under the statutes alleged in the Original Complaint. On October 21, 2016, the Commission filed its Amended Complaint (Dkt. #40). On November 4, 2016, Paxton filed his Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #44). On November 18, 2016, the Commission filed its Response (Dkt. #45). On November 28, 2016, Paxton filed his Reply (Dkt. #46). On December 5, 2016, the Commission filed its Sur-Reply (Dkt. #47).

## II. LEGAL STANDARD

Paxton moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). "The Supreme Court recently expounded upon the *Twombly* standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gonzalez*, 577 F.3d at 603 (quoting *Iqbal*, 556 U.S. at 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.*

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In determining whether to grant a motion to dismiss, a district court may generally not "go outside the complaint." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). However, a district court may consider documents attached to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *Id.*

Paxton also moves to dismiss the Commission's claims under Federal Rule of Civil Procedure 9(b). Rule 9(b) "prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009). Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *Grubbs*, 565 F.3d at 190 (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance

Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010) ("'[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

### III. DISCUSSION AND ANALYSIS

The Commission alleges that Paxton engaged in fraudulent conduct by promoting Servergy's stock without disclosing to potential investors that he was being paid to do so. The central issue in this case—as it was in the first motion to dismiss—is whether Paxton had a duty to disclose his compensation under federal securities laws.[1] The Court must determine whether the Commission pleaded sufficient facts to support a plausible claim against Paxton under federal securities laws.

### A. Fraud Under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act

The Commission alleges that Paxton engaged in fraud in violation of Section 10(b) of the Securities Act and Rule 10b-5 thereunder because he did not disclose to potential investors that he

---

[1] This opinion will necessarily mirror much of the Court's previous Opinion because the law has not changed and the primary allegations have not changed. The Court has, however, fully considered the Commission's Amended Complaint, including any repeated factual allegations and sources of law. The primary factual addition to the Amended Complaint is the Investment Group had an "established policy and expectation[] that members participating in an investment deal do so on what Investor 1 calls an 'equal dollar-for-dollar basis.'"

10

was being paid to promote Servergy stock. To survive a motion to dismiss a securities fraud claim under Rule 10b-5 of the Exchange Act, the Commission must allege facts that, if true, establish (1) a misstatement or omission (2) of material fact (3) in connection with the purchase of a sale or security (4) made with scienter. *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* The elements required to establish a claim under Section 17(a) of the Securities Act are essentially the same except scienter is not required. *See SEC v. Evolution Capital*, 866 F. Supp. 2d 661, 667 (S.D. Tex. 2011). Since the Commission must essentially prove the same elements for Section 17(a) and Rule 10b-5 violations, the Court will consider these allegations together. *See SEC v. Arcturus Corp.*, No. 3:13-cv-4861-k, 2016 WL 1109255, at *14 (N.D. Tex. Mar. 21, 2016).

## 1. Liability Based upon a Misstatement

A defendant may be liable under Rule 10b-5 and Section 17(a) for either a misstatement or an omission. The Commission first alleges that Paxton made actionable representations. Paxton argues, and the Court agrees, that this is purely an omissions case. But the Court will nonetheless address the Commission's position. One of these alleged material misstatements includes Paxton's assertion that Servergy was a "great company" that presented an "interesting" investment opportunity. The Commission also bases its material misrepresentation claim on the fact that Paxton claimed to have personally met with Servergy's management and that Servergy's share price would double before the potential investor returned from vacation. Finally, the Commission argues that Paxton should be held liable for his post-investment comments in 2013. The Court will address these statements in turn.

*a. Puffing Statements*

The first "misrepresentation" offered by the Commission is Paxton's assertion that Servergy was a "great company" that offered an "interesting" investment opportunity. The Commission also alleges Paxton emailed a potential investor, "this is the company that I told you I found very interesting." The Commission alleges these are actionable material misrepresentations and cites several cases in which factual assertions were found to be actionable. *See, e.g., Novak v. Kansas*, 216 F.3d 300, 315 (2d Cir. 2000) (finding defendants' statement that "the inventory situation was in 'good shape' or 'under control'" was not puffery when "they allegedly knew that the contrary was true"); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (finding defendants' statement that the company was doing "fine" when defendants knew that the revenues were slowing may, when taken in context, be actionable); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), 459 U.S. 375 (1983) (finding a "deliberate misstatement of the cost anticipated on the basis of known events" was material) *rev'd in part*. The Court is not persuaded by these cases because Paxton made no similar deliberately false factual assertions. The Commission has not alleged—much less with the requisite particularity—that Paxton knew his statements contained "concrete factual or material misrepresentations." *Southland Sec. Corp.*, 365 F.3d at 372; *see* Fed. R. Civ. P. 9(b). And Fifth Circuit precedent indicates that puffing statements such as calling something a great company "are the vague and optimistic type that cannot support a securities fraud action." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); *Carlucci v. Han*, 886 F. Supp. 2d 497, 524 (E.D. Va. 2012) (calling something a "great investment" is "non-actionable" puffery and "the sort of opinion and exaggeration that is immaterial as a matter of law"); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. MDL-1530, 2004 WL 5278716, at *9 (E.D. Tex. June 16, 2004) (internal quotation

marks omitted) ("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are puffery . . . and are not actionable under federal securities law.").

The Commission attempts to revive its material misrepresentation claim by highlighting Paxton's relationship with members of the Investment Group. The Commission alleges the context in which the statements were made render them material. The Commission offers *Alpine Bank v. Hubbell* to support this assertion. 555 F.3d 1097, 1106–07 (10th Cir. 2009) ("In determining whether a statement is puffery, the context matters. . . . What is said to a particular person may take on meaning that would not be present if made to a large group."). But the Commission ignores the holding in that case. In *Alpine Bank*, a consumer sued a bank over an advertising slogan: "So . . . you're about to buy a new home, or build one. You concentrate on your dream. We'll take care of everything else." *Id.* at 1107. The Tenth Circuit determined "this slogan cannot trigger liability because it amounts to mere puffery. . . . A reasonable person desiring the Bank to perform in a particular way would need a more specific assurance than 'we'll take care of everything else.'" *Id.* Here, as in *Alpine Bank*, a reasonable potential investor would need more specific assurance than Paxton saying Servergy was a "great company." While context may be important, the Commission has not pleaded with particularity any statements amounting to more than mere puffery that could support a Rule 10b-5 or Section 17(a) securities fraud action under Fifth Circuit law.

### b. Other Alleged Misstatements

The other three communications that the Commission bases its misrepresentation claim on also fail. The Commission alleges that Paxton told potential investors that he had met with Servergy's management but does not allege facts to show that this truthful statement was misleading. The next alleged "misstatement" is similarly flawed. The Commission claims Paxton

told an investor that the offering price would double before the individual returned from vacation, but the Amended Complaint did not allege that the statement was false or misleading. Finally, the Commission alleges Paxton should be liable for the communications following the investment in early 2013. But statements following a sale of securities are not made "in connection with the purchase or sale" of securities. *See* 15 U.S.C. § 78; *Arst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973, 977 (10th Cir. 1996) (holding that an "allegedly deceptive practice [that] occurred *after* the sale" could not "have had an impact on [Plaintiff's] decision to sell his shares" and thus "was not 'in connection with' the purchase or sale of a security [under] § 10b" (emphasis in original)); *Town North Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-3125-L, 2014 WL 4851558, at *25 (N.D. Tex. Sept. 30, 2014) (dismissing securities fraud claim based on post-sale misstatements or omissions).  The Court finds that the Commission has not sufficiently pleaded facts that could plausibly support a fraud claim based on a material misstatement.

## 2. Liability Based upon an Omission

The Court has determined that under the facts alleged, Paxton has made no material misrepresentations to support a plausible claim under Rule 10b-5 and Section 17(a). But Paxton could also be liable under a fraudulent omissions theory. The Commission alleges that Paxton violated Rule 10b-5 and Section 17(a) because Paxton had a duty to disclose his compensation yet failed to do so. In a securities fraud omissions case, the defendant must have a duty to speak to be found liable. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." (quoting *Chiarella v. United States*, 445 U.S. 222, 235 (1980))). Paxton argues that the fraud claims under Rule 10b-5 and Section 17(a) should be dismissed because the

Commission has failed to adequately allege Paxton had a duty to disclose his compensation to potential investors.

### a. A Duty to Speak

The Commission alleges generally that Paxton had a duty to inform the potential investors that he was being paid by Servergy to promote its stock. The Commission has pleaded facts that show the omission was material because the Complaint alleges the investors would not have invested had they known Paxton was being paid to promote Servergy's stock. *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that a fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision). But the issue in this case is determining whether a duty existed, not whether the omission was material.  "As the Supreme Court explained in *Matrixx*, whether a defendant owes a duty to disclose turns on whether the omission renders his statement false or misleading, not whether the omitted information was material." *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 802 (S.D. Tex. 2012) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)). While Paxton's compensation may be material, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 562 U.S. at 44; *see also Kunzweiler v. Zero.Net, Inc.*, Civ. A. No. 3:00-CV-2553-P, 2002 WL 1461732, at *9 (N.D. Tex. July 3, 2002) ("[T]he materiality of the information claimed not to have been disclosed . . . is not enough to make out a sustainable claim of securities fraud. Even if the information is material, there is no liability under Rule 10b-5 unless there was a duty to disclose it."). Thus, to survive this motion to dismiss on an omissions theory, the Commission must have pleaded with particularity facts sufficient to show that Paxton had a duty to speak.

b. *The Investment Group's "Express Policy"*

The Commission alleges that Paxton owed a duty to reveal his compensation to his Investment Group because he was in a relationship of trust. The circuits are split on whether a fiduciary-like relationship can trigger a duty to speak. *Compare United States v. Schiff*, 602 F.3d 152, 162–63 (3d Cir. 2010) (rejecting argument that omissions theory of fraud can be premised on a fiduciary duty to disclose and holding that "[t]his argument reaches too far," "is not supported by the language of § 10(b) and Rule 10b-5," and the "legal support for [the] fiduciary duty theory is also weak"), *with SEC v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009) (alterations in original) (holding that "nondisclosure in breach of a fiduciary duty satisfies § 10(b)'s requirement . . . [of] a deceptive device or contrivance"). The Fifth Circuit has not addressed this specific issue, but the Court agrees with another court in this circuit that found a fiduciary relationship triggers a duty to speak. *See, e.g.*, *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, No. CIV.A. 04-0997, 2005 WL 1309153, at *4 (E.D. La. May 19, 2005) ("Generally, a duty to disclose information will not exist absent some confidential, fiduciary, or other special relationship which, under the circumstances of the case, justifies the imposition of a duty to disclose information.").

In the Commission's first round of briefing, it offered *SEC v. Kirch* to assert that Paxton owed a duty to his Investment Group to disclose his Servergy compensation. 263 F. Supp. 3d 1144, 1150 (N.D. Ill. 2003). The Court distinguished this case in its Opinion and noted the Original Complaint did not allege any "express policy" in Paxton's Investment Group on disclosing compensation when promoting stocks. The Commission now alleges for the first time in its Amended Complaint that Paxton owed a duty to reveal his compensation because there were "express policies" within the Investment Group. Specifically, the Amended Complaint alleges that the Investment Group had an "established policy and expectation that members participating in an

investment deal do so on what Investor 1 calls an 'equal dollar-for-dollar basis,' in which everyone takes the same risk and receives the same benefit and that no one member makes money or otherwise benefits off of the investment of another member." The Amended Complaint alleges Investor 1 informed Paxton of these policies and practices. The Commission argues that because Paxton knew of these express policies, the members of the Investment Group "formed a formal fiduciary relationship, by agreement or otherwise, and an informal fiduciary relationship of trust and confidence." The Commission offers *Alexander v. Martin* to support this informal fiduciary theory based on a special relationship of trust and confidence. No. 2:08CV400, 2010 WL 3715165 (E.D. Tex. Aug. 20, 2010). In *Alexander*, the court found a genuine issue of material fact regarding the existence of an informal fiduciary relationship where a girl's uncle previously acted as her trustee, controlled other aspects of her life, used his position to try to influence her in business and personal affairs, and approved decisions for purchases of his niece's home, car and education. *Id.* at *12.

Paxton relies on a number of cases to show that he did not have a fiduciary relationship with his Investment Group. In *U.S. v. Skelly*, the court recognized that the jury charge wrongly "omitted the elements of 'reliance and de facto control and dominance,' which are required to establish a fiduciary relationship." 442 F.3d 94, 99 (2d Cir. 2006); *see also United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (internal quotations omitted) ("[A]t the heart of a fiduciary relationship lies reliance, and de facto control and dominance . . . The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other . . . A fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests."). The Commission does not allege that Paxton asserted control or dominance over his investment club members. There are cases from the

Fifth Circuit, in a different context, supporting Paxton's position. In *Welk v. Simpkins*, the Fifth Circuit held, "Mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship. Businessmen generally do trust one another." 402 F. App'x 15, 20 (5th Cir. 2010). Another court in this circuit found that allegations of "subjective trust" and "personal relationships" are insufficient to establish a fiduciary duty that creates a duty to disclose. *Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-2135-L, 2014 WL 4851558, at *18, *27 (N.D. Tex. Sept. 30, 2014).

The Commission's allegations of the Investment Group's express policies and practices do not give rise to a fiduciary relationship. Unlike *Alexander*, Paxton had no family relationship, did not control other aspects of the investors' lives, and did not use his position to try to influence the investors' business and personal affairs.  2010 WL 3715165, at *12. Courts "do not create such a relationship lightly," and the relationship must be "mutual and understood as such by both parties." *Id.* at *10. Even if Paxton were aware of the alleged policies, the Commission has not pleaded facts indicating that Paxton agreed to abide by them. Because "[a] fiduciary duty cannot be imposed unilaterally," the Commission has not pleaded with particularly a set of facts that give rise to a plausible duty to disclose. *Chestman*, 947 F.2d at 567; *In re Enron Corp.*, 610 F. Supp. 2d at 649 (holding that "unilateral expectations . . . do not give rise to . . . a duty to disclose"). The Court finds that a securities fraud claim based on a fiduciary duty theory is not plausible.[2]

The Commission attempts to revive its fiduciary argument by introducing the Texas state law definition of fiduciary duty and arguing that it should apply here. The Court is hesitant to

[2] The Commission also cites *Aubrey v. Barlin* to assert that a duty to disclose exists between parties who have a special relationship of trust and confidence. 159 F. Supp. 3d 752 (W.D. Tex. 2016). In Aubrey, the court refused to recognize a fiduciary duty because "prior arms-length transactions between the parties—those transactions that are entered into for the independent benefit of each party—do not create a basis for a fiduciary relationship. *Id.* at 761. The court also explained that "not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship. The standard for the formation of an informal fiduciary relationship is high, and courts do not create such a relationship lightly." *Id.* (internal quotations and citations omitted).

analyze the present case under Texas state law, as the Fifth Circuit has not determined whether it is proper to apply state law to federal securities fraud claims. The federal circuits are currently split. The Second Circuit has adopted *Whitman*, which states where "the issue is a duty to disclose, federal law must be paramount or the goal of the 1934 Act to assure transparency in the markets would be severely compromised depending on the vagaries of individual states' laws and policies." *United States v. Whitman*, 904 F. Supp. 2d 363, 370 (S.D.N.Y. 2012), *aff'd*, 555 F. App'x 98 (2d Cir. 2014); *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir. 2014) (adopting *Whitman* and finding the "duty springs from federal law, and that looking to idiosyncratic differences in state law would thwart the goal of promoting national uniformity in securities markets."). Conversely, the Fourth Circuit has held that the "federal securities laws do not give rise to a duty to disclose; rather, the duty to disclose material facts arises only where there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship." *Mueller v. Thomas*, 84 F. App'x 273 (4th Cir. 2003). The Court agrees with the Second Circuit's reasoning, especially considering the ample volume of federal common law that has developed on the duty to disclose in federal securities fraud litigation. *See Chiarella*, 445 U.S. at 228; *Welk*, 402 F. App'x at 20; *Skelly*, 442 F.3d at 98; *Kirch*, 263 F. Supp. 2d at 1144.

Even if the Court was convinced that Texas rather than federal common law should govern the Court's determination of whether Paxton violated federal securities laws, the Commission has not sufficiently pleaded facts supporting a fiduciary relationship under Texas law.  As under federal law, a fiduciary relationship "exists only to the extent that the parties do not deal with each other equally, either because of dominance on one side or weakness, dependence, or justifiable trust on the other." *Pope v. Darcy*, 667 S.W.2d 270, 275 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). The Commission has not alleged dominance, weakness, or dependence; rather, it

argues the Investment Group trusted Paxton to disclose his compensation. Yet the Supreme Court of Texas has determined that fiduciary relationships do not arise from "mere subjective trust alone." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). Federal securities law also makes clear that a fiduciary or similar relationship of trust and confidence requires "influence of a superior or dominating nature—not the 'influence' one peer might exert on another." *United States v. Kim*, 184 F. Supp. 2d 1006, 1011 (N.D. Cal. 2002); *see also Chestman*, 947 F.2d at 568; *Kornman*, 391 F. Supp. 2d at 488. The "reliance" present in a "fiduciary relationship involves *discretionary authority and dependency*." *Chestman*, 947 F. 2d at 569 (emphasis added); *Kornman*, 391 F. Supp. 2d at 487. Because Texas courts "do not create such . . . relationship[s] lightly," the Commission's subjective trust argument is too thin a reed on which to base a federal securities lawsuit. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

### c. The S3 Group

The Commission alleges that Paxton had a duty to disclose his compensation to members of the S3 Group. The Commission claims Paxton formed a fiduciary relationship with S3 Group members because he served as their attorney in forming two S3 entities. There are two issues with these allegations. First, the Amended Complaint nowhere alleges that Paxton's compensation was material to any member of this S3 Group. More importantly, there is no allegation that Paxton was serving as legal counsel to the S3 Group with regard to the Servergy investment. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159–60 (Tex. 1998) (holding that a lawyer's fiduciary "duty to inform does not extend to matters beyond the scope of the relationship" and "a lawyer's fiduciary duties to a client, although extremely important, extend only to dealings within the scope of the underlying relationship of the parties."). The Court finds the Commission has not pleaded sufficient facts to show Paxton had a duty to disclose his commissions to S3 Group members.

### 3. Liability Based upon a Half-Truth

The Commission alleges that Paxton is liable under a half-truth theory. Absent an independent duty to disclose, omissions are actionable when the defendant elects to disclose some material facts, but fails to speak the whole truth. *See First Va. Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977) (recognizing that certain statements made will be materially misleading if the defendant has concealed the fact that he has been compensated for promoting securities). The Commission takes the position that every statement Paxton made encouraging the Investment Group members to invest was a materially misleading half-truth. But the rule of disclosure is "not as absolute as one might gather after reading *First Virginia Bankshares*. The Fifth Circuit most likely would agree that a more precise statement of the rule is that a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject*." *McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396, 416 (E.D. Tex. 1999) (emphasis in original).

To survive a motion to dismiss under this theory, the Commission would have to identify a statement made by Paxton *regarding his compensation* that was materially misleading. *See id.*; *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) (emphasis added) ("Where a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information *with respect to the subjects on which he undertakes to speak*."); *Kunzweiler*, 2002 WL 1461732, at *11 (emphasis added) ("[T]he Court must determine whether the alleged material omissions could have rendered any *identified* affirmative statement or statements made by the defendants misleading under any set of facts.").

The Commission offers *SEC v. Gabelli* to argue that literally true statements can create a materially misleading impression. 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216 (2013). While this may be an accurate statement of law, the Commission has not "identif[ied] which specific statements made by [Paxton] would qualify as misleading half-truths such that the bonus commissions would constitute a material omission under subsection (b)." *U.S. v. Laurienti*, 611 F.3d 530 (9th Cir. 2010). The Commission does not show how any particular statement created a materially misleading impression. Rather, the Commission essentially argues that any statement about Servergy made by Paxton to the Investment Group would qualify as a material half-truth because he violated an "express policy" to not personally benefit more than the other members from the Investment Group. But the half-truth theory of liability requires the omission to be on the same topic as the statement made. *See McNamara*, 57 F. Supp. at 416; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011); *SEC v. Curshen*, 372 F. App'x at 880; *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002).

The Commission disagrees with these cases, claiming they "promote[] an impossible rule under which he could only be liable for failing to disclose his compensation if he first disclosed his compensation" (Dkt. #45 at p. 10). But this is not so. Paxton could be found liable under a half-truth theory of liability if he partially disclosed but materially understated his compensation; for example, if Paxton informed his Investment Group that he was only receiving cash for promoting Servergy when in reality he was receiving cash and stock.  As its name suggests, half-truth liability requires the declarant to actually speak about a topic to be found liable for omitting the remainder of the truth. Because the Commission has not identified any statement about compensation, Paxton cannot be found liable on a half-truth theory of liability.

### 4. Liability Based upon General Fraudulent Conduct

The Commission broadly alleges that Paxton's conduct constituted a fraudulent scheme under Sections 17(a)(1), (3) and Rules 10b-5(a), (c). These scheme liability code sections focus on acts and conduct rather than a misstatement or omission. The Commission offers several cases in which courts have found scheme liability under these code sections for certain conduct. *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (finding scheme liability where Defendants created an in-house transfer agent to conceal a scheme designed to channel transfer agent cost savings away from the funds). This "scheme liability theory [is] recognized by a few courts . . . but not by the Fifth Circuit, itself, which, . . . limit[s] the reach of § 10(b) and Rule 10b-5 to a material misrepresentation or omission where there is a recognized duty to disclose." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008) (citing *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.,* 482 F.3d 372, 384 (5th Cir.2007) ("'[D]eception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff."), *cert. denied,* 552 U.S. 1170 (2008); *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657, 661 (5th Cir. 2004)). And other "[c]ourts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.'" *Id.* (citing *SEC v. Kelly,* 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)). Here, the Commission bases its fraud allegations primarily on Paxton's failure to disclose his compensation. The Commission may not use subsections (a) and (c) of Rule 10b-5 as a back door for liability. *See Regents of Univ. of Cal.*, 482 F.3d at 384 (holding that § 10(b) requires that a defendant fail to satisfy a duty to disclose and "[m]erely pleading that a defendant failed to fulfill that duty by means

of a scheme or an act, rather than by a misleading statement" is insufficient to support a securities fraud claim).

It is clear that the Fifth Circuit requires a breach of a duty to disclose to be liable under Rule 10b-5. *See Regents of Univ. of Cal.* 482 F.3d at 384; *In re Enron Corp.*, 586 F. Supp. 2d at 793. But the Commission argues that the Fifth Circuit has only considered Section 10(b) in precluding scheme liability theories based on omissions; thus, these cases have no bearing on Section 17(a) scheme liability claims. The Court is not convinced. Claims arising under Section 17(a) and Rule 10b-5 are often "analyzed as one" because the basic precepts are the same. *SEC v. Helms*, No. A–13–CV–01036 ML, 2015 WL 5010298, at *1 (W.D. Tex. Aug. 21, 2015). The primary difference between Section 17(a) and Rule 10b-5 is that Rule 10b-5 applies only to acts occurring in connection with the "purchase or sale" of securities while Section 17(a) applies to any "offer or sale." *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980); *see SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 884 (2d Cir. 1968) (noting that "[t]he only difference of substance between § 17(a) and Rule 10b-5 is that the latter applies to purchasers as well as sellers." (citing *Ellis v. Carter*, 291 F.2d 270, 272–274 (9th Cir. 1961)); SEC Rel. No. 3230 (May 21, 1942) ("The new rule closes a loophole in the protection against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase.").

The Commission attempts to stretch Section 17(a) further, arguing that "Section 17(a)(3) is broader than Rule 10b-5(c) at least insofar as 17(a)(3) does not require Paxton to have engaged in conduct that was *itself* deceptive but rather only which 'operated or would operate as a fraud'" (Dkt. #47 at pp. 2–3) (emphasis in original). But the Commission ignores that this same

language—operated or would operate as a fraud—appears in Rule 10b–5(c).[3] Section 17(a) merely extends Rule 10b-5 liability to cover both buyers *and sellers*, offering *and selling* securities. Section 17(a) does not give the Commission carte blanche to prescribe liability where Rule 10b-5 falls short. In omissions cases, the Fifth Circuit requires a duty to disclose to be found liable under Rule 10b-5. *See In re Enron*, 586 F. Supp. 2d at 793 (holding that the Fifth Circuit does not recognize scheme liability in omissions cases under Rule 10b-5 absent a recognized duty to disclose). There is no authority to suggest that this Court should stretch Section 17(a) beyond its scope to find Paxton liable under a scheme theory absent a recognized duty to disclose.

### B. Fraud Under Section 17(b) of the Securities Act[4]

The Commission alleges that Paxton defrauded investors under Section 17(b) of the Securities Act by circulating communications describing securities without disclosing his compensation arrangement. Section 17(b) provides:

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement,

---

[3] The Commission further argues that Section 17(a) is broader because Rule 10b-5 requires a "deceptive" device—language that is not found in Section 17(a). But the operative language of Section 17(a) and Rule 10b–5 is the same. *Compare* 15 U.S.C. § 77q(a)(1) ("to employ . . . any device, scheme or artifice to defraud"), *with* 17 C.F.R. § 240.10b–5(a) ("to employ . . . any device, scheme, or artifice to defraud"). The only place "deceptive" appears is in the heading of Rule 10b-5. A "heading is but a short-hand reference to the general subject matter involved . . . But headings and titles are not meant to take the place of the detailed provisions of the text . . . For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29 (1947). There is no such ambiguity here, as the text of the statute is clear. Even if the statute were ambiguous, the Court would find in favor of the defendant under the rule of lenity. *See United States v. Bustillos-Pena*, 612 F.3d 863, 868–69 (5th Cir. 2010) (applying rule of lenity to ambiguous provision). The rule of lenity dictates that any ambiguity in a statute should be construed in favor of the defendant. The fraud provisions of the federal securities laws at issue here can be prosecuted criminally, *see* 15 U.S.C. §§ 77x, 78ff, and the rule of lenity applies in the civil context when interpreting statutes that also have criminal applications. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011) ("[W]e have said that the rule of lenity can apply when a statute with criminal sanctions is applied in a noncriminal context."); *Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

[4] The Commission provides no new facts or legal authority in its Amended Complaint or briefing on its Section 17(b) claim. As such, this section of the opinion will utilize authorities provided in the Original Complaint's briefing.

> newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77(q). Paxton argues that the Commission's Section 17(b) claim fails because Paxton did not receive consideration for publishing, publicizing, or circulating any communications describing securities. The Amended Complaint identifies two communications that require analysis under Section 17(b).[5] The Court will analyze these communications in turn.

### 1. The Promotional Email

The Commission first alleges that Paxton violated Section 17(b) by forwarding one of Mapp's promotional emails to a potential investor on July 23, 2011.

#### a. Quid Pro Quo

In Paxton's briefing following the Original Complaint, he argued the claim failed as to the email because the potential investor did not invest, and therefore Paxton did not earn a sales commission for that communication. Section 17(b) requires disclosure of compensation from an issuer only if that compensation is received (i) as a *quid pro quo* (ii) for a communication describing a security (iii) that is published or circulated by the means of interstate commerce. *United States v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971). The Commission argued that the *quid pro quo* was the 100,000 shares Paxton received for his recruiting efforts. But the Amended Complaint only alleges that Paxton was paid for his successful recruiting efforts.[6] Thus there was

---

[5] The Commission argued in the original briefing that a third communication, a face-to-face meeting with Investor 1, could serve as a basis for liability under Section 17(b). The plain language of the statute does not support this theory. 15 U.S.C. §77(q) ("[B]y the use of any means . . . of interstate commerce").

[6] At oral argument, the Commission argued that the statute calls for consideration "received or to be received," but the Amended Complaint does not allege that Paxton received or would ever receive any compensation for his unsuccessful attempt to recruit the email recipient.

no *quid pro quo* for the communication identified, as the email recipient never invested with Servergy. *See Amick*, 439 F.2d at 365 (finding violation where defendant "published the article *in return for* the promise of payment" (emphasis added)).

The Commission offered *SEC v. Gagnon* to assert that the Commission needed not prove that Paxton successfully secured investments for Servergy; rather, Paxton needed only to have an agreement to receive consideration to be liable under Section 17(b). No. 10-cv-11891, 2012 WL 994892 (E.D. Mich. Mar. 22, 2012). The Commission's prior briefing purported that the *Gagnon* court based its holding solely on the fact that the defendant had a compensation agreement with an issuer. Yet the court found the defendant liable for not fully disclosing the nature of his agreement after electing to disclose on his website that he would "earn commissions on the money that I bring in, but I will hardly get rich." *Id.* at *11. In reality, he received over $3 million for his promotional efforts and the court held the defendant liable for not "*fully disclos[ing]*" the nature of his arrangement. *Id.* (emphasis in original). The Amended Complaint does not allege that Paxton elected to publicly disclose his compensation agreement, so *Gagnon* is inapplicable. The July 23, 2011 email cannot serve as a basis for a fraud claim because the Commission did not allege Paxton was ever paid—or ever would be paid—for sending the email.

### b. Due Diligence

The Amended Complaint alleges that Paxton failed to conduct due diligence on Servergy's claims before forwarding the promotional email but does not allege that Paxton had a duty to do so. Even if the Commission had alleged such a duty, courts have held that failure to conduct due diligence on a promoted stock does not give rise to liability. *See SEC v. Tambone*, 597 F.3d 436, 488 (1st Cir. 2010) (en banc) ("[W]e reject the SEC's notion that a breach of a duty to investigate, without more, is a breach of a duty to disclose."); *United States v. Schiff*, 602 F.3d 152, 167

(3d Cir. 2010) ("[T]he plain language of § 10(b) and Rule 10b-5 do not contemplate the general failure to rectify misstatements of others"); *Brown v. J.P. Turner & Co.*, No. 1:09-CV-2649-JEC, 2011 WL 1882522, at *4 (N.D. Ga. May 17, 2011) (dismissing Section 10(b) claim, observing that "Plaintiffs do not cite any authority to suggest that a broker has the duty . . . to ensure the accuracy of investment materials"). The Court finds that the Commission has not sufficiently pleaded facts to support that Paxton had a duty to conduct due diligence with respect to the veracity of the promotional email. More importantly, the Court has determined that the email may not serve as a plausible basis for liability under Section 17(b) because the Amended Complaint does not allege facts indicating that Paxton was paid or will be paid for his unsuccessful attempt to solicit the email recipient.[7]

## 2. The Phone Call with Investor 2

The other communication upon which the Commission bases its Section 17(b) allegation is Paxton's phone call with Investor 2. Paxton argued that the Original Complaint failed because there was no broad dissemination of the communication and the communication was not recorded. Paxton supported his position by pointing out that there are no cases holding a defendant liable under Section 17(b) for placing phone calls to potential investors, but this fact is not dispositive. The Commission argued that any oral communication is sufficient to allege a Section 17(b) violation and that broad dissemination is not required.

---

[7] The Commission offered *SEC v. Liberty Capital Group, Inc.* to assert that Paxton did not have to be *directly* compensated for the email to be found liable under Section 17(b). 75 F. Supp. 2d 1160 (W.D. Wash. 1999). But the Amended Complaint does not allege facts to show that Paxton received or ever would receive compensation for his unsuccessful attempt, so the method in which he would receive payment is irrelevant to the analysis.

### a. *Recorded Communication*

Because there are no cases under Section 17(b) on phone calls, the Court must look to the text of the statute. Paxton's position is that Section 17(b) is limited to the publication or circulation of recorded communications because "communication" is found at the end of a list of recorded communications. Paxton cited the Supreme Court's reliance upon the *noscitur a sociis* canon of statutory interpretation as a basis for his argument. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (internal quotation marks omitted) (stating courts must rely on the "principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress"). Paxton argued that under this canon, "communication" should be interpreted narrowly because it accompanies a list of recorded communications.[8]

The Commission did not offer any canons of statutory interpretation but argued that "communication" should be interpreted broadly to include any oral communications. *See Communication*, Black's Law Dictionary (7th ed. 1999) (defining communication as "the expression or exchange of information by speech, writing, or gestures"). But words in statutes should not be interpreted in isolation, ignoring important contextual information. *Deal v. United States,* 508 U.S. 129, 132 (1993) (recognizing the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

---

[8] Paxton also pointed to the legislative history of the Securities Act to show that Section 17(b) was not drafted to prohibit oral communications. Committee on Interstate & Foreign Commerce, H.R. Rep. No. 73–85, at 24 (1933) (explaining that Section 17(b) was "particularly designed to meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion"). However, this approach is unnecessary and inappropriate for the Court because "[o]nly after we apply principles of statutory construction, including the canons of construction, and conclude that the statute is ambiguous, may we consult legislative history." *In re Amy Unknown*, 701 F.3d 749, 759–60 (5th Cir. 2012) (citing *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 518–19 (5th Cir. 2004)). The statute is not ambiguous after applying principles of statutory construction.

The Commission attempted to bolster its position by pointing to a case in which a court found liability under Section 17(b) for communications that included an oral statement. The Commission cited *United States v. Wenger*, where the Tenth Circuit held the defendant liable for publicizing a stock by newsletter and orally through a radio program. 427 F.3d 840, 850 (10th Cir. 2005). The court found the defendant liable because "investors—such as the listeners to [defendant's] radio program and readers of his newsletter who testified in this case—base their decisions whether to buy a stock in part on whether various opinions about the product are self-serving or not." *Id.* Because the court did not indicate whether the radio program alone was sufficient for liability, the Commission cannot use this case to show that an unrecorded single phone call is sufficient to trigger liability under Section 17(b).

The Court agrees with Paxton's interpretation of Section 17(b) but utilizes an additional, more specific contextual canon—*ejusdem generis*. The Supreme Court has recognized the utility of the principle of *ejusdem generis* and explained, "When a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991). Here, the term "communication" follows a list of tangible media, including circulars, advertisements, newspapers, articles, and letters. Thus, the term "communication" should not be interpreted so broadly as to include all unrecorded forms of communication. To hold otherwise would be contrary to longstanding Supreme Court and Fifth Circuit precedent on this established canon of statutory interpretation. *See McBoyle v. United States*, 283 U.S. 25, 25–27 (1931) (utilizing the *ejusdem generis* principle in determining that "automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" did not apply to an airplane); *United States v. Kaluza*, 780 F.3d 647, 657 (5th Cir. 2015)

(utilizing the *ejusdem generis* principle in determining that "[e]very captain, engineer, pilot, or *other person* employed on any steamboat or vessel" only applied to other persons conducting "marine" employment functions). Finally, had the legislature intended the statute to cover all unrecorded communications, it could have drafted the statute more broadly. *See* 15 U.S.C. § 77(w) (providing it is unlawful "to make . . . *any representation*"); 15 U.S.C. § 77(x) (providing it is unlawful if a person "makes *any untrue statement*"); 15 U.S.C. § 77l(a)(2) (providing it is unlawful to offer or sell securities "by means of a[n]…*oral* communication, which includes an untrue statement") (emphases added). The Court finds that the phone call was not a recorded communication as required under the federal securities laws. Thus, the Commission has failed to allege facts that could plausibly support a violation of Section 17(b) based on the phone call to Investor 1.

### b. Broad Dissemination

The Court has found that the Commission has failed to allege facts that could plausibly support a violation of Section 17(b) based on either the promotional email or the phone call to Investor 1. But the parties spent a considerable portion of their prior briefing arguing whether a communication must be broadly disseminated to serve as a basis for liability under Section 17(b). It is clear that the phone call to Investor 2 was not broadly disseminated—Paxton called a single potential investor. Since the Fifth Circuit has not expressly ruled on whether broad dissemination is required, the Court must look to the text of the statute. The statute provides that it shall be unlawful for any person, "by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication" describing a security without disclosing compensation. 15 U.S.C. §77(q). The

ordinary, contemporary, common meanings of the words "publish," "give publicity to," and "circulate" do not connote a private, singular communication with one intended recipient. *See Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 880 (S.D. Tex. 2007) ("It is of course a truism that statutory construction begins with the 'ordinary, contemporary, common meaning' of the words of the statute.") (quoting *Williams v. Taylor,* 529 U.S. 420, 432 (2000)). "Publish" is defined, "To distribute copies (or a work) to the public." *Publish*, Black's Law Dictionary (9th ed. 2009). Similarly, "publicity" is defined as "public attention; notoriety." *Publicity*, Black's Law Dictionary (9th ed. 2009). The plain language of the statute does not lend itself to application to a single phone call because the publicity element is absent.[9] Black's does not define "circulate," but Webster's defines it as "to pass from person to person" or "to come into the hands of readers." Webster's New Collegiate Dictionary (1st ed. 1977). No one in common parlance refers to a single, person-to-person telephone call as "circulating" a communication. *See Bond v. United States*, 134 S. Ct. 2077, 2090 (2014) (rejecting government's statutory interpretation, reasoning that "no speaker in natural parlance" would use the statutory term at issue to describe the defendant's conduct).

Importantly, all of the cases in other circuits holding a defendant liable under Section 17(b) have involved broadly disseminated and recurring publications. *See Amick*, 439 F.2d at 365 (finding violation where a defendant published a weekly article, Indiana Investor and Business News, that was frequently utilized by numerous Indiana investors); *Liberty Capital Grp., Inc.*, 75 F. Supp. 2d at 1161–62 (finding SEC adequately pleaded violation where it claimed that defendant violated Section 17(b) "by publishing favorable accounts of publicly-traded companies in a

---

[9] At oral argument, the Commission argued that the Court would have to draw a line regarding how broadly a communication must be disseminated to trigger liability under Section 17(b). But the Court does not have to draw such a line because the communications alleged—a single phone call and a single email—are decidedly not broadly disseminated.

newsletter and on the Internet" over a period of two years); *Ginsburg v. Agora, Inc.*, 915 F. Supp. 733, 736–37 (D. Md. 1995) (noting that defendants, as authors and publishers of an investment newsletter, were "certainly within the class of persons potentially liable" under Section 17(b) where they "marketed [the newsletter] to the general public and, in May of 1993 . . . sent [the newsletter] to between 6,800 and 7,200 subscribers"). While the Court need not determine how broadly a communication must be disseminated to trigger liability under Section 17(b), the Court finds that Section 17(b) does not cover a single phone call to one investor. The same reasoning may be applied to the single-recipient promotional email.

The Commission has failed to allege that Paxton "published, gave publicity to, or circulated" any recorded communication describing a security. The promotional email allegation is deficient because the Amended Complaint does not allege that Paxton was paid or would be paid for his unsuccessful recruiting effort, and the phone call allegation is deficient because the call was not a recorded communication.[10] Thus the Court finds the Amended Complaint does not allege facts to support a plausible claim under Section 17(b).

### C. Failing to Register Under Section 15(a) of the Exchange Act[11]

The Amended Complaint's final allegation against Paxton is that he was required to register as a broker but failed to do so. Section 15(a)(1) provides that it shall be unlawful to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker is registered. 15 U.S.C. § 78(o). The Exchange Act defines a broker as a person "engaged in the business of

---

[10] Neither communication was broadly disseminated, but this is not the basis for the Court's holding.

[11] The allegations about Section 15(a) are the same as the Original Complaint except the Commission expands on Paxton's previous work as an investment adviser representative for Mowery Capital in the Amended Complaint. An investment adviser is distinct from a broker under federal securities law. 15 U.S.C. § 80b-2(a)(11).

effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Paxton claims that he was not acting as a broker as defined under the Exchange Act and thus did not have to register with the Commission.

Paxton argues that the Section 15(a) claim should be dismissed because the Commission fails to allege that Paxton "effected transactions" in securities "for the account of others." Specifically, Paxton argues that he did not actually handle securities, enter trades, or otherwise exert any authority over anyone's account. The Commission claims it does not have to allege that Paxton had actual authority or control over his clients' accounts or assets. The Commission believes that control over accounts is merely a factor in determining whether a person is acting as a broker. Paxton argues that control is an essential element under the statutory definition of "broker."

The Court must look to case law to determine which interpretation is correct, as the Exchange Act does not directly define what is required to "engage in the business" of effecting transactions "on the account of others." Several courts have approached this issue by distinguishing brokering activities from facilitating securities transactions. In *SEC v. Kramer*, the Commission alleged that the defendant acted as an unregistered broker in violation of Section 15(a) where he received transaction-based commissions for actively soliciting "intimate friends and family" over a period of two years. 778 F. Supp. 2d 1320 (M.D. Fla. 2011). The court determined that the defendant had acted as a facilitator rather than a broker because his conduct "consisted of nothing more than bringing together the parties to a transaction," and the Commission presented no evidence of the defendant possessing "authority over the accounts of others." *Id.* at 1339.

Similarly, in *SEC v. M&A West, Inc*., the court was unwilling to classify the defendant as an unregistered broker where he was paid to facilitate securities transactions without actually

controlling the accounts of others. No. C-01-3376 VRW, 2005 WL 1514101, at *9 (N.D. Cal. June 20, 2005). The court concluded, "In particular, no assets were entrusted to [defendant], and the Commission identifies no evidence that he was authorized to transact 'for the account of others' . . . Although [defendant] was in the business of *facilitating* securities transactions *among other persons*, the Commission cites no authority for the proposition that this equates to '*effecting* transactions in securities *for the account of others*.'" *Id.* at *9.

The *Kramer* and *M&A West* cases suggest that control over the account of others is an element rather than a factor. The Commission offers a case that does not rely on control of accounts as dispositive; rather, it utilizes a fact-intensive broker versus finder distinction to determine whether an individual must register with the Commission. *See SEC v. Offill*, No. 3:07-cv-1643-D, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012). In *Offill,* the court noted the,

> distinction drawn between the broker and finder or middleman is that the latter bring[s] the parties together with no involvement on [his] part in negotiating the price or any other terms of the transaction . . . A finder, however, will be performing the functions of the broker-dealer, triggering registration requirements, if activities include: analyzing the financial needs of an issuer, recommending or designing financial methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities.

*Id.* at *7.

The Commission also offers *SEC v. Helms*, in which the court found the defendant did more than simply introduce the investor to sellers, triggering a registration requirement. No. A-13-CV-01036, 2015 WL 6438872 (W.D. Tex. Oct. 20, 2015). In *Helms*, the "[investor] and [defendant] exchanged multiple email communications concerning the . . . investment" and "[the defendant] conveyed [the investor's] questions about the investment to Sellers." *Id.* at 3. The Commission has not alleged that Paxton performed any of the functions identified in these cases, such as answering any investors' questions or otherwise doing more than introducing the investors

to Mapp. The Commission alleges that *offering* to answer potential investors' questions was sufficient to trigger a registration requirement under *Helms*.

The Court disagrees with the Commission's position and finds that Paxton was merely *facilitating* securities transactions rather than performing the functions of a broker. Here, as in *Kramer*, the Commission presented no evidence of Paxton possessing "authority over the accounts of others." *See Kramer*, 778 F. Supp. 2d at 1339. The Commission failed to allege that assets were entrusted to Paxton or that he was authorized to transact for the account of others. *See M&A West*, 2005 WL 1514101, at *9. Further, Paxton did not transcend his role as a finder because he did not perform the functions identified in *Offill*. 2012 WL 246061, at *8. Paxton was neither involved in negotiating the price or terms of the transaction nor was he performing any of the other functions of the broker-dealer. *See id*. Although Paxton had prior involvement in the sale of securities during his tenure as a registered broker, this factor alone is not enough to classify Paxton as a broker-dealer rather than a finder. *See id*. The Court finds that the Amended Complaint has insufficient facts to support a plausible claim under Section 15(a) of the Exchange Act.

## IV. CONCLUSION

This case has not changed since the Court conditionally dismissed the Commission's Original Complaint. The primary deficiency was, and remains, that Paxton had no plausible legal duty to disclose his compensation arrangement with investors. The question before the Court is not whether Paxton should have disclosed his compensation arrangement but whether Paxton had a legal duty under federal securities law to disclose. As alleged, Paxton's conduct simply does not give rise to liability under the federal securities laws as they exist today.  And it is not the province of the Court to stretch federal securities laws beyond their scope to prescribe liability based on moral considerations or policy concerns. The only issue before the Court is to determine whether

the facts as pleaded give rise to a plausible claim under federal securities laws. With that limitation in mind, the Court has determined that under the facts pleaded by the Commission in the Amended Complaint, Paxton did not have a legal obligation to disclose his financial arrangement.

The Court finds that the Amended Complaint has not alleged facts sufficient to support a plausible claim under Sections 17(a) and 17(b) of the Securities Act or Sections 10(b) and 15(a) of the Exchange Act.

It is therefore **ORDERED** that Defendant Warren K. Paxton, Jr.'s Motion to Dismiss (Dkt. #44) is hereby **GRANTED** and Plaintiff's claims against Defendant Warren K. Paxton, Jr. are **DISMISSED** with prejudice.

**SIGNED this 2nd day of March, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE