## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No.: 4:16-CV-00246** |
| **WILLIAM E. MAPP, III,** | § | |
| **WARREN K. PAXTON, JR.,** | § | |
| **CALEB J. WHITE, and** | § | |
| **SERVERGY, INC.** | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

---

## DEFENDANT WILLIAM E. MAPP, III'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

GREENBERG TRAURIG, LLP

Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
David W. Klaudt
  Texas Bar No. 00796073
  klaudtd@gtlaw.com
Amanda R. McKinzie
  Texas Bar No. 24088028
  mckinziea@gtlaw.com
Natalie D. Thompson
  Texas Bar No. 24088529
  thompsonna@gtlaw.com
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 (Telephone)
(214) 665-3601 (Facsimile)

ATTORNEYS FOR WILLIAM E. MAPP, III

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF ISSUES ........................................................................................... 1

III.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS ................................................. 2

        A.      Servergy Made Four Separate Securities Offerings............................... 2
        B.      Mapp and Servergy Took Pains to Ensure that All Investors Were
                Accredited. ............................................................................................. 3
        C.      Mapp and Servergy Reasonably Believed the Dominion Joint Ventures
                Were Accredited Investors....................................................................... 4
        D.      Statements in the Private Placement Memorandum Regarding the Number
                of Units Pre-Ordered as of February 14, 2013, Were Neither False Nor
                Material and Mapp Acted Reasonably and Without Scienter................. 9
        E.      Mapp's References to Freescale Were Neither False Nor Material and
                Mapp Acted Reasonably and Without Scienter. ................................... 11

IV.     LEGAL STANDARDS .............................................................................................. 13

V.      ARGUMENT AND AUTHORITIES ............................................................................. 14

        A.      There is a Genuine Dispute of Material Fact Regarding the Commission's
                Section 5 Claims. ................................................................................. 14

                1)      The Commission has not made a prima facie case: Mapp cannot be
                        liable for Servergy's sales. ........................................................ 14
                2)      Servergy made four separate offerings, and each must be
                        considered separately for purposes of Section 5....................... 16
                3)      Servergy's offerings were exempt from registration requirements
                        under Regulation D. ................................................................... 18

                        (a)     Regulation D, Section 506(b): Servergy's securities were sold to
                                accredited investors....................................................... 18

                        (b)     Regulation D, Section 508: any failure to comply with the
                                requirements of Section 506(b) is entitled to Section 508's good-
                                faith safe harbor. .......................................................... 22

        B.      Mapp is Entitled to Judgment as a Matter of Law on the Commission's
                Scheme Liability Claims....................................................................... 23
        C.      There is a Genuine Dispute of Material Fact Regarding Essential Elements
                of the Commission's Claims under Section 17(a) and Rule 10b-5...................... 24

                1)      There is a genuine dispute of material fact regarding the
                        Commission's alleged material misrepresentations and omissions. ......... 25

                        (a)     Statements regarding the number of pre-ordered units in the
                                February 14, 2013 PPM and presentation to WFG Financial's
                                agents were neither false nor material. ......................... 25

   (b) Statements to investor Rusty Mayeux regarding Freescale were neither false nor material. ............................................................. 27

  2) There is a genuine dispute of material fact regarding Mapp's mental state. ........................................................................... 28

   (a) Scienter is not established. ........................................................... 28

   (b) Negligence is not established. ....................................................... 29

VI. CONCLUSION AND PRAYER ................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,*
   446 U.S. 680 (1980) ................................................................................................ 24

*Anderson v. Aurotek,*
   774 F.2d 927 (9th Cir. 1985) .................................................................................. 15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 248 (1986) ........................................................................................ 13

*Basic, Inc. v. Levinson,*
   485 U.S. 224 (1988) ................................................................................................ 25

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................................................ 13

*Dennis v. Gen. Imaging, Inc.,*
   918 F.2d 496 (5th Cir. 1990) .................................................................................. 14

*Donohoe v. Consol. Operating & Prod. Corp.,*
   982 F.2d 1130 (7th Cir. 1992) ................................................................................ 17

*Faye L. Roth Revocable Tr. v. UBS Painewebber, Inc.,*
   323 F. Supp. 2d 1279 (S.D. Fla. 2004) .................................................................. 19

*Fontenot v. Upjohn Co.,*
   780 F.2d 1190 (5th Cir. 1986) ................................................................................ 14

*Goodwin Properties, LLC v. Acadia Grp., Inc.,*
   No. 01-49-P-C, 2001 WL 800064 (D. Me. July 17, 2001) .................................... 19

*In re BP p.l.c. Sec. Litig.,*
   852 F. Supp. 2d 767 (S.D. Tex. 2012) .................................................................... 27

*In re Doxey,*
   Release No. 10077 (S.E.C. Release No. May 5, 2016) .......................................... 19

*Livens v. William D. Witter, Inc.,*
   374 F. Supp. 1104 (D. Mass. 1974) ....................................................................... 17

*Mary S. Krech Tr. v. Lakes Apartments,*
   642 F.2d 98 (5th Cir. 1981) .................................................................................... 18

*Matrixx Initiatives, Inc. v. Siracusano,*
   563 U.S. 27 (2011) .................................................................................................. 25

*McGregory v. City of Jackson, Miss.,* 335 F. App'x 446, 448 (5th Cir. 2009) ............................ 14

*Meadows v. SEC,*
   119 F.3d 1219 (5th Cir. 1997) ................................................................................ 25

*Owens v. Jastrow,*
   789 F.3d 529 (5th Cir. 2015) .................................................................................. 28

*Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Corp.,*
   417 F. Supp. 2d 1073 (D. Minn. 2006) ............................................................ 19, 22

*Prestonwood Tr. v. Bank of Am., N.A.*,
4:14-CV-806, 2015 WL 8329948 (E.D. Tex. Dec. 9, 2015) (Mazzant, J.) ....................... 13, 14

*SEC v. Blackburn*,
156 F. Supp. 3d 778 (E.D. La. 2015) ..................................................... 15

*SEC v. CMKM Diamonds, Inc.*,
729 F.3d 1248 (9th Cir. 2013) ........................................................... 15

*SEC v. Cole*,
No. 12-CV-8167 RJS, 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ............................ 28, 29

*SEC v. Continental Tobacco Co. of S.C.*,
463 F.2d 137 (5th Cir. 1972) ............................................................ 14

*SEC v. Curshen*,
372 F. App'x 872 (10th Cir. 2010) ....................................................... 25

*SEC v. Farmer*,
No. 4:14-CV-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ............................... 24

*SEC v. Ficken*,
546 F.3d 45 (1st Cir. 2008) ............................................................. 25

*SEC v. Gann*,
565 F.3d 932 (5th Cir. 2009) ............................................................ 24

*SEC v. Ginder*,
752 F.3d 569 (2d Cir. 2014) ........................................................... 24, 29

*SEC v. Hughes Capital Corp.*,
124 F.3d 449 (3d Cir. 1997) ............................................................. 25

*SEC v. Ishopnomarkup.com, Inc.*,
No. 04-CV-4057DRHARL, 2007 WL 2782748 (E.D.N.Y. Sept. 24, 2007) ............... 17, 22, 23

*SEC v. Levin*,
849 F.3d 995 (11th Cir. 2017) .......................................................... 22

*SEC v. Life Partners Holdings, Inc.*,
854 F.3d 765 (5th Cir. 2017) ........................................................... 24

*SEC v. Mapp*,
240 F. Supp. 3d 569 (E.D. Tex. 2017) ................................................... 26

*SEC v. Monterosso*,
756 F.3d 1326 (11th Cir. 2014) ......................................................... 24

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980) ........................................................ 15, 17

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007) ........................................................ 15, 16

*SEC v. Seghers*,
298 F. App'x 319 (5th Cir. 2008) ....................................................... 25

*SEC v. Sethi Petroleum, LLC*,
229 F. Supp. 3d 524 (E.D. Tex. 2017) ................................................... 25

*SEC v. St. Anselm Expl. Co.*,
   936 F. Supp. 2d 1281 (D. Colo. 2013) ...................................................................... 29

*SEC v. Syron*,
   934 F. Supp. 2d 609 (S.D.N.Y. 2013) ....................................................................... 24

*Supernova Sys., Inc. v. Great Am. Broadband, Inc.*,
   No. 1:10-CV-319, 2012 WL 425552 (N.D. Ind. Feb. 9, 2012) ............................. 19

*United States v. Tager*,
   788 F.2d 349 (6th Cir. 1986) ..................................................................................... 26

*Weiss v. SEC*,
   468 F.3d 849 (D.C. Cir. 2006) ................................................................................... 25

*Wright v. Nat'l Warranty Co.*,
   953 F.2d 256 (6th Cir. 1992) ..................................................................................... 19

**Statutes & Regulations**

**Statutes**

15 U.S.C. § 77d(a)(2) ......................................................................................... 18, 24

15 U.S.C. § 77e ......................................................................................................... 1

15 U.S.C. § 77q(a)(1) ..................................................................................... 1, 23, 28

15 U.S.C. § 77q(a)(2)–(3) .................................................................................. passim

15 U.S.C. § 78j(b) ..................................................................................................... 1

17 C.F.R. § 230.501(a) .................................................................................. 19, 21, 22

17 C.F.R. § 230.501(e) ............................................................................................ 22

17 C.F.R. § 230.502(a) ............................................................................................ 17

17 C.F.R. § 230.502(b) ................................................................................. 18, 22, 23

17 C.F.R. § 230.506 ........................................................................................... passim

17 C.F.R. § 230.508 ........................................................................................... 22, 23

17 C.F.R. § 240.10b-5 ..................................................................... 1, 23, 24, 28

17 C.F.R. §§ 230.500–.508 ................................................................................ 1, 14, 18

28 U.S.C. § 2462 ..................................................................................................... 18

81 Fed. Reg. 83494-01 (Nov. 21, 2016) ............................................................... 14

Securities Act § 4(a)(2) ........................................................................................... 18

Securities Act of 1933 ........................................................................................ 1, 18

Securities Exchange Act of 1934 .............................................................................. 1

**Rules**

FED. R. CIV. P. 56 ................................................................................................... 13

Defendant William E. Mapp, III ("Mapp") hereby respectfully submits his response in opposition to Plaintiff's Motion for Summary Judgment [Dkt. 113], and would show the Court as follows:

## I.   INTRODUCTION

The Commission's Motion for Summary Judgment attempts to retroactively give Mapp a crystal ball. It seeks to establish liability based on information to which Mapp was not privy during the time in question. And it seeks to establish liability for intentional fraud based on alleged misrepresentations that were both true and immaterial. Indeed, each of the Commission's claims turns on one or more classic jury questions: reasonableness, good faith, negligence, and scienter. Myriad disputes of material fact remain. The Commission is not entitled to judgment as a matter of law.

## II.   STATEMENT OF ISSUES

The Commission's Motion [Dkt. 113] does not include a statement of issues as required by Local Rules 7(a)(1) and 56. However, Mapp will address whether fact questions preclude summary judgment on the following questions:

(a)  Whether Servergy's four offerings should be integrated;

(b)  Whether Mapp can be personally liable under Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, for Servergy's securities offerings;

(c)  Whether Servergy's securities offerings are entitled to an exemption from registration under Regulation D, 17 C.F.R. §§ 230.500–.508;

(d)  Whether Mapp made material misrepresentations of fact; and

(e)  Whether Mapp acted with scienter, as is required under Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); and Section 10 of the Securities Exchange Act of 1934 ("Exchange Act'), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5;

(f)  Whether Mapp acted with negligence, as is required under Section 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2)–(3).

### III.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

**A.    Servergy Made Four Separate Securities Offerings.**

1.    Series A was offered between approximately November 2009 and April 2010. [Ex. M.] Investors in this offering purchased Servergy stock at $0.25 a share. [Ex. N.] The purpose of the Series A offering was to raise "pre-production" funds, which were ultimately used for "engineering, design, development, fab, assembly and testing of Servergy's Rev 1 Pre-Production Units, as well building a strategic ecosystem and infrastructure of people, process and technology." [Ex. O at 14.]  Dominion Joint Venture Group, or "Dominion JV No. 1," invested $78,000 in this offering on April 18, 2010. [Ex. P at 4.] It is undisputed that Series A was complete and closed before April 11, 2011, the date five years prior to the filing of this lawsuit. [*See* Pl.'s SOF 6.]

2.    Series B was offered between approximately April 2010 and August 2011. [Exs. Q, R.] Investors in this offering purchased Servergy stock at $1.00 a share. [Ex. R.]  Series B funds were used "to build Rev 2 and 3 Pre-Production Units and further build the management team and necessary infrastructure." [Ex. O at 14.] Dominion Joint Venture No. 2 ("Dominion JV No. 2") invested in this offering. [Ex. S.]

3.    Investors in Series C, which began in approximately October 2011, purchased Servergy stock at $2.00 a share. [Ex. T] The purpose of this offering was to raise the funds needed to become "production ready." [Exs. U, V.]  Becoming "production ready" included ensuring the product design was ready for production, validating software and hardware, and manufacturing production-ready units for consumer beta testing. [Exs. W, X, Y.] Dominion Joint Venture Group No. 3, or "Dominion JV 3," invested $184,852 in this offering. [Ex. Z at 4.]

4.    The WFG Offering took place between February and September 2013.  Investors in this offering purchased Servergy stock at $2.00 a share. [Ex. O at 4.] The purpose of the WFG

Offering was to raise funds specifically to bring the CTS-1000 to market, including beginning production, and to develop other products to be sold by Servergy. [Ex O, AA.] Funds were used, for example, to address product-build issues and to ultimately manufacture units to be sold to customers. [Exs. BB-DD.] Servergy's Private Placement Memorandum ("PPM"), drafted specifically for this offering, makes clear that the purpose of the offering is to bring the CTS-1000 to market. [Ex. O at 4–5.] None of the Dominion JVs invested in this offering.

5.      Servergy filed Forms D disclosing its private offerings under the exemption from registration provided by Regulation D § 506 (17 C.F.R. § 230.506) on March 18, 2011, November 17, 2011, May 10, 2012, February 14, 2013, and April 16, 2013. [Exs. E–J.]

**B.      Mapp and Servergy Took Pains to Ensure that All Investors Were Accredited.**

6.      Servergy hired experienced securities counsel to ensure that its offerings met all the requirements of Regulation D and applicable state law regarding registration of securities. [Ex. L, Mapp Decl. ¶ 4; Exs. EE, FF.] In April 2011, Servergy retained Henry Exall of Exall & Wood, PLLC. [Ex L, Mapp Decl. ¶ 4.] Mr. Exall represented the company until at least 2013. [Ex. L, Mapp Decl. ¶ 4.] Mapp regularly corresponded with Mr. Exall regarding accreditation of investors. [Ex. L, Mapp Decl. ¶ 4; *see, e.g.*, Ex. FF.] The law firm Baker & McKenzie also assisted with securities-related issues related to Servergy's WFG Offering. [Ex. L, Mapp Decl. ¶ 4; Ex. BBB.]

7.      Servergy decided "very early on at the advice of counsel" that its offerings would only be open to accredited investors. [Ex. B, Mapp Tr. 134; *see* Ex. GG.] Potential investors initially certified their accredited investor status through Servergy's nondisclosure agreement ("NDA"), which they were required to execute in order to attend a webinar providing information about the investment opportunity. [Ex. B, Mapp Tr. 134–35, 482–83; Ex. C, White Tr. 172, 186; Ex. HH.] Servergy then required all investors to certify their accredited investor

status again in their subscription agreements. [Ex. B, Mapp Tr. 135, 483; Exs. FF, II.] Mapp consulted with Servergy's counsel regarding the accreditation requirements. [Ex. L, FF; Mapp Decl. ¶¶ 4, 5.]

8.     Mapp consistently emphasized the accreditation requirement when discussing the investment opportunity. [Ex. L, Mapp Decl. ¶ 5; Ex. B, Mapp Tr. 423–24 ("He said I've got other customers and other investors I can bring to the table. I said, well, so long as they're accredited, let's talk.").] It was Mapp's consistent practice to emphasize that the offering was only available to accredited investors and that investors needed to understand the potential risk of loss that comes with investing in a startup. [Ex. L, Mapp Decl. ¶ 5.] Mapp was directed by counsel to emphasize these warnings, and he did so. [Ex. L, Mapp Decl. ¶ 5.] These risks and the accreditation requirement were also clearly outlined in Servergy's offering materials and subscription agreements. [Exs. O at i–iii, III at i–iii.]

9.     Servergy "did the very best to the best of our knowledge and ability" to ensure that investors' accredited status was confirmed. [Ex. B, Mapp Tr. 483.] Mapp relied on investors' representations in the NDAs and subscription agreements that they were an accredited investor, could bear the financial risk, and understood the risk of loss. [Ex. L, Mapp Decl. ¶ 5.] On occasion, Servergy found out that a prospective investor was not accredited, whereupon Servergy returned the funds. [Ex. B, Mapp Tr. 570.]

**C.     Mapp and Servergy Reasonably Believed the Dominion Joint Ventures Were Accredited Investors.**

10.     Caleb White ("White") became a member of Servergy's board of directors on September 28, 2011. [Ex. Q.] Mapp communicated to White that Servergy's board had determined Servergy would only accept investments from accredited investors and White confirmed his understanding of that requirement and confirmed that the joint ventures would

comply. [Ex. L, Mapp Decl. ¶ 6; Exs. KK, MM.] It is undisputed that the Dominion Joint Ventures represented to Servergy that they were accredited investors, i.e. entities in which all of the equity owners are accredited. [*See* Dkt. 113, Pl.'s SOF ¶ 13 & Ex. 22–24.] Mapp relied on the Dominion JVs' certifications in their Servergy subscription agreements that they were entities owned by accredited investors. [Ex. L, Mapp Decl. ¶ 6.]

11.     In the Commission's own words, the Dominion JV investments were "attributable to the efforts of Caleb White." [Dkt. 113 at 5.] Mapp's involvement in the Dominion JVs was to collect signed NDAs [Ex. C, White Tr. at 162, 172, 186], provide information about the investment opportunity [Ex. C, White Tr. 158], and then finalize the investment transaction with the Dominion JVs—each of which certified that it was an accredited investor as defined in Regulation D [Ex. P, S, Z]—in coordination with Servergy's employees. Mapp made it clear to potential investors that Servergy did not facilitate the Dominion JVs, explaining to a potential investor that "there are several investor groups who have set up JVs for accredited investors to invest through, but Servergy has nothing to do with these." [Ex. NN.] In fact, White has already agreed to pay disgorgement to the Commission based on the Dominion JV investments without admitting or denying the Commission's allegations. [*See* Dkt. 3; Dkt. 9.]

12.     Mapp repeatedly reminded White and potential investors that Servergy would only meet with and accept accredited investors who had confirmed that they met the criteria set out in the NDA and Servergy Subscription Agreement. [Ex. L, Mapp Decl. ¶ 6.] For example, Mapp reminded Servergy's CFO, Michael Holder ("Holder"), to "[please] ensure [White] continues following proper process with JV and [its] Accredited investors." [Ex. OO.] He made efforts to ensure that investors introduced by White met accredited investor requirements. [*See, e.g.*, Exs. PP, RR]. And he explicitly explained to White that Servergy would have to return

funds if an investor was not accredited. [Ex. RR.] Mapp also noted the accredited investor requirement when describing the joint ventures. [*See* Ex. NN, SS.]

13.     Other Servergy officers were also involved in ensuring that investors provided subscriptions agreements verifying their accredited investor status. [*See, e.g.*, Ex. PP, TT, UU.] For example, Holder prepared an update for White stating that Servergy "would certainly be glad to speak with any accredited investors that you would recommend to us." [Ex. UU.] Mapp communicated to White that Servergy's board of directors had determined early on that Servergy would only accept investments from accredited investors. [Ex. L, Mapp Decl. ¶ 6.] During a special meeting of the Board of Directors, White confirmed that, "to the best of his knowledge, all investors in each of the various Dominion JV entities that he manages were accredited investors." [Ex. KK.]

14.     White worked with additional outside counsel to set up and administer the joint ventures, [Ex. C, White Tr. 162, 178, 186], and Mapp was aware of this fact [Exhibit L, Mapp. Decl. ¶ 6]. This provided additional assurances that the Dominion JVs were in compliance with Servergy's accredited investor requirements. [Ex. L, Mapp Decl. ¶ 6.] Mapp was told that each joint venturer verified his or her accredited investor status to White and the Dominion JVs' counsel; he relied on the Dominion JVs' certifications in their Servergy subscription agreements that they were entities owned by accredited investors**.** [Ex. L, Mapp Decl. ¶ 6; Exs. P, S, Z.] Based on the many times White had been informed that investors in the Dominion JVs must be accredited and Mapp's knowledge that White was working with counsel, Mapp believed that the Dominion JVs included only accredited investors. [Ex. L, Mapp Decl. ¶ 6.]

15.     When asked whether it was his "understanding that as long as you had one accredited investor sign the joint venture agreement that it did not matter whether the other

investors were accredited or not," White testified: "I wouldn't say that." [Ex. C, White Tr. 179.] He explained that "the way the subscription agreement was laid out, it had an accredited investor questionnaire from the company," and "somebody had to fill that out." [Ex. C, White Tr. 179.] White further explained "[i]t was clear that this was an accredited investor offering." [Ex. C, White Tr. 169.] White stated (1) he had no reason to believe not all of the Dominion JV members were accredited and (2) all of them had certified their accredited investor status to Servergy through Servergy's NDA prior to investing. [Ex. C, White Tr. 170–72.]

16.     Mapp was not contemporaneously aware of numerous facts on which the Commission relies. Mapp was not aware that White may have believed having a single, accredited Dominion JV investor sign Servergy's subscription agreement was sufficient. [Ex. L, Mapp Decl. ¶ 7.] That is contrary to what had been explained to White and contrary to what Mapp believed White understood at the time. [Ex. L, Mapp Decl. ¶ 6.] Indeed, White testified that "[i]t was clear that this was an accredited investor offering. Bill was good about that." [Ex. C, White Tr. 169.]

17.     Mapp was also not aware that White may not have been an accredited investor when he invested in Servergy through Dominion JV No. 1 in April 2010. [Ex. L, Mapp Decl. ¶ 8; *see* Ex. P.] White represented to Mapp that he had experience and was sophisticated with investments, and Mapp had no reason to suspect that he was not an accredited investor. [Ex. L, Mapp Decl. ¶ 8.] Mapp believed that White was an accredited investor at all relevant times. [Ex. L, Mapp Decl ¶ 8.]

18.     Mapp was also not privy to documents cited by the Commission as evidence that non-accredited investors invested through the Dominion JVs, including (a) the subscription agreements provided by the joint venturers for the Dominion JVs [*see* SEC SOF ¶ 15 & Exs. 25–

27]; (b) the list of investors attached by the Commission as Plaintiff's Ex. 55; and (c) the emails between White and an investor attached as Plaintiff's Exhibits 29 and 30. [Ex. L, Mapp Decl. ¶ 9; *see* Ex. KK (minutes noting Servergy did not have records of Dominion JV members).]

19.     Mapp was not aware that some members of the Dominion JVs had indicated they were not accredited, that potentially non-accredited investors had invested in the Dominion JVs, or that a nineteen-year-old may have invested in Dominion JV 2. [Ex. L, Mapp Decl. ¶ 10.] Plaintiff's Exhibits 29 and 30 indicate that in June 2011, White (not Mapp) received an email from Michael Hartsfield, PhD., a university professor, stating that his nineteen-year-old daughter was interested in investing in the Dominion JV. Mapp was not a party to these communications and was not aware that a nineteen-year-old may have invested through Dominion JV No. 2. [*See* SEC Ex. 29, 30; Ex. L, Mapp Decl. ¶¶ 9, 10.]

20.     Mapp received an email from investor Edwards on July 10, 2010, discussing a meeting with potential investors.[1] [Ex. VV; *see* Ex C, White Tr. 199.] Edwards stated:

> A couple of them have plenty of money and if they invest I would like for them to invest in the joint venture with Caleb and I so we will be able to reach our goal of $50k block for Set-B of this $1 per share round. We both have people that can only invest $1-2k and want them to be able to get in on this round @ $1.

[Ex. VV.] Mapp did not understand the statement that some of the potential investors "can only invest $1-2k" to mean that the potential investors were not accredited. [Ex. L, Mapp Decl. ¶ 11.] Rather, he interpreted the statement to mean some attendees would be accredited investors who simply did not wanted to invest smaller sums in a startup company. [Ex. L, Mapp Decl. ¶ 11.] Indeed, in the same email chain Mapp reminds Edwards that the attendees needed to complete Servergy's NDA. [Ex. VV.]

---

[1]     As discussed below, this event took place outside of limitations and, consequently, cannot be used to establish liability.

21.     In the emails attached as Plaintiff's Exhibits 31 and 32, Mapp's reminders to White that direct investors must be accredited do not exclude that requirement for joint venture members, and he did not intend them to do so. [Ex. L, Mapp Decl. ¶ 11.]

22.     On March 23, 2011, Mapp reached out to White regarding a prospective investor named Rob Storck ("Storck") who had indicated none of the accredited investor categories applied to him. [Ex. RR.] Mapp explained "[i]f he is not a [ac]credited investor we will need to return his money." [Ex. RR.] On March 28, 2011, Mapp asked Holder and White to "follow up with" Storck, who had asked if he could "have Caleb add [his] name to the joint venture list." [Ex. WW.] This event likewise took place outside of limitations. Mapp wrote this email based on his understanding that Holder and White were aware only accredited investors could invest in the Dominion JVs, just as only accredited investors could invest in Servergy directly. [Ex. L, Mapp Decl. ¶ 12.] In asking Holder and White to "follow up" with Storck, Mapp was instructing them to make sure the investor's situation was properly handled, meaning that either the investor's subscription agreement needed to be corrected to reflect that he was an accredited investor or, if Storck was in fact not accredited, he would not be able to invest in Servergy either directly or through a joint venture. [Ex. L, Mapp Decl. ¶ 12; *see* Ex. OO.] Mapp trusted Holder and White to handle the situation properly. [Ex. L, Mapp Decl. ¶ 12.] Mapp did not know at the time that Storck may have invested through Dominion JV 2 thereafter. [Ex. L, Mapp Decl. ¶ 12.]

**D.     Statements in the Private Placement Memorandum Regarding the Number of Units Pre-Ordered as of February 14, 2013, Were Neither False Nor Material and Mapp Acted Reasonably and Without Scienter.**

23.     Lance Smith, Servergy's Chief Operating Officer, initiated the relationship with WFG Financial and was responsible for negotiating and signing Servergy's agreement with WFG Financial. [*See* Exs. YY–EEE.] During the WFG offering, WFG Financial was responsible for identifying accredited investors, communicating with these investors about the company

(including obtaining necessary confidentiality agreements, such as NDAs), and facilitating investments. [Ex. DDD at 6.] Once WFG Financial began to raise money, Mapp "took off [his] fundraising hat" and "focus[ed] on other things." [Ex. B, Mapp Tr. 512.]

24.    The "pre-orders" section of Servergy's Private Placement Memorandum ("PPM"), dated February 14, 2013, had not appeared in the Confidential Information Memorandum ("CIMs") used for Series A, B, and C. [Compare Ex. GGG, HHH & III, *with* Ex. O at 39.] A team led by Smith was primarily responsible for preparing the PPM, along with counsel and WFG Financial. [*See* Exs. JJJ–LLL.] When reviewing the PPM, Mapp relied on information provided by Smith for the statement that Servergy had received "25 orders totaling over 1,500 units with planned delivery in late 2013." [Ex. L, Mapp Decl. ¶ 13.] The Commission does not contend that investors were ever told Servergy's pre-orders were binding commitments.

25.    During the March 2013 presentation to WFG Financial, Mapp also relied on information provided by Smith regarding the number of pre-orders. [Ex. L, Mapp Decl. ¶ 14.] Mapp did not believe this statement to be false. [Ex. L Mapp Decl. ¶ 14.]

26.    The PPM Supplement was not intended as a complete amendment to the PPM. Rather, Mapp was informed that it was a supplemental document discussing limited issues. [Ex. MMM.] Smith, who was primarily responsible for preparing the supplement [*see, e.g.*, Exs. NNN, OOO], worked with Servergy's securities counsel and WFG Financial to prepare the supplement. [*See* Ex. JJJ, NNN, PPP.] Though Mapp had the opportunity to review the supplement, it was ultimately finalized without his sign-off. [Exs. QQQ, RRR.]

27.    Mapp did not think that the "pre-orders" section of the PPM needed to be amended after the Koerr order was cancelled because Servergy had received additional pre-orders during that time period and because the number of pre-orders was constantly in flux. [Ex.

L, Mapp Decl. ¶ 13.] Severgy's pre-orders were "fluid," and "chang[ed] often," as WFG Financial knew. [Ex. SSS.] And the PPM Supplement, dated July 31, 2013, specifically notes the PPM is "dated February 14, 2013" and does not amend the section entitled "pre-orders." [Ex. LL at 2.] Mapp did not consciously decide not to amend the section of the PPM entitled "pre-orders." [Ex. L, Mapp Decl. ¶ 13.] Rather, he simply did not think the section on pre-orders needed to be amended or supplemented, and no one else proposed that idea to him. [Ex. L, Mapp Decl. ¶ 13.]

28.     In April 2013, Severgy's sales team reported it had received interest from a company called RockPlace in pre-ordering 1,000 units. [Ex. TTT.]

29.     Severgy continued to consider Koerr, Inc. (also referred to as KSB) a sales opportunity even after learning that Koerr had decided to order servers using a 64-bit processor from Dell. [Ex. D, Smith Tr. 214–15.] Though Koerr had informed Severgy that it needed a 64-bit processor, Freescale, which makes the processor used in the CTS-1000, was developing a 64-bit option that Severgy planned to integrate into its servers in the future. [Ex. D, Smith Tr. 214–15.]

## E.   Mapp's References to Freescale Were Neither False Nor Material and Mapp Acted Reasonably and Without Scienter.

30.     In emails dated July 26 and July 30, 2012, to investor David "Rusty" Mayeux, Mapp made reference to Freescale. [Exs. UUU, VVV.] Mayeux and his wife were among Severgy's first investors. [Ex. B, Mapp Tr. 432; Exs. WWW, XXX.] Mapp has known Mayeux since 2009, when Mayeux and his wife first invested in Severgy. [Ex. L, Mapp Decl. ¶ 15; Ex. K, Mayeux Decl. ¶ 3.] Mr. and Mrs. Mayeux made subsequent investments in Severgy, both directly and through their family partnership, on five occasions between October 2009 and July 2012. [Ex. K, Mayeux Decl. ¶ 3.] When Mapp resided in McKinney, Texas, Mapp and Mayeux

communicated often and socialized along with their families. [*See* Ex. B, Mapp Tr. 432; Exs. YYY–CCCC.] Between 2009 and 2013, Mapp regularly provided updates to Mayeux regarding the status of the company and his own day-to-day activities.  [Ex. L, Mapp Decl. ¶ 15; *see* Exs. YYY, CCCC, HHHH, IIII.]

31.     Mayeux understood that the July 26 and 30, 2013, email referred to a potential future order from Freescale. [Ex. K, Mayeux Decl. ¶ 4.] He did not consider Mapp's references to Freescale in either of the emails important to his decision to invest in Servergy. [Ex. K, Mayeux Decl. ¶ 5.] Mayeux does not believe Mapp intended to mislead him or that there was any danger he would be misled by the emails' references to Freescale. [Ex. K, Mayeux Decl. ¶ 6.]

32.     In July 2012, Mayeux was aware that the CTS-1000 was not ready for production, that Servergy was not taking orders, and that Servergy was in need of cash to make payroll (among other things). [Ex. L, Mapp ¶ 15.] On July 26, 2012, Mapp forwarded Mayeux notes regarding Servergy's meeting with Freescale on July 25, 2012. [Ex. UUU.] The notes made clear that Freescale had not yet placed an order. [Ex. UUU, *see* Ex. L, Mapp Decl. ¶ 16.] That is why Mapp described it as an "order on the way." [Ex. L, Mapp ¶ 16.] Mayeux understood that Freescale had not yet ordered any servers. [Ex. L, Mapp Decl. ¶ 16; Ex. K, Mayeux Decl. ¶ 4.]

33.     In the July 30, 2012 email, Mapp wrote that he would keep Mayeux "posted on exciting developments as we start gearing-up to get 'production ready' and head into production on our first order from http://www.freescale.com." [Ex. VVV.] Mayeux understood this did not mean that Freescale had finalized an order. [Ex. K, Mayeux Decl. ¶ 4.] Given the context of the July 26, 2012, email just a few days earlier, Mr. Mayeux's knowledge that Servergy was not yet taking orders, and many conversations between Mapp and Mr. Mayeux, Mapp believed that Mr.

Mayeux would understand the reference to be to the opportunity represented by Servergy's meeting and proposal to Freescale, not a final, binding order. [Ex. L, Mapp Decl. ¶ 17.] Mapp did not make any misrepresentations, intentional or otherwise, in either of these emails. [Ex. L, Mapp Decl. ¶¶ 16, 17; Ex. K, Mayeux Decl. ¶ 4.]

34.     In the July 30, 2012, email, Mapp stated that the attachment investment documents (including Servergy's subscription agreement) had been "requested" by Mayeux [Ex. VVV], indicating that Mayeux had already decided to make a further investment prior to Mapp's sending the email. [Ex. L, Mapp Decl. ¶ 17.]

35.     Indeed, Mayeux remained involved in supporting Servergy for at least a year thereafter, long after it was clear that Freescale had not placed an order in July 2012.  [*See* Exs. DDDD-HHHH.] Other communications further clarified that Freescale had not yet placed an order. For example, an email communication on August 8, 2012, noted that Servergy was "in the process" of securing its "first client." [Ex. IIII.]

36.     Mapp never intentionally misrepresented or omitted facts about Servergy that he thought investors would want to know. [Ex. L, Mapp Decl. ¶ 18.]

## IV.     LEGAL STANDARDS

"The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Prestonwood Tr. v. Bank of Am., N.A.*, 4:14-CV-806, 2015 WL 8329948, at *1 (E.D. Tex. Dec. 9, 2015) (Mazzant, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). The movant is only entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Reasonable doubts are resolved in favor of the non-moving party. *McGregory v. City of Jackson,*

*Miss.*, 335 F. App'x 446, 448 (5th Cir. 2009). "If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes 'beyond peradventure all of the essential elements of the claim or defense.'" *Prestonwood Tr.*, 2015 WL 8329948, at *2 (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

## V.   ARGUMENT AND AUTHORITIES

### A.   There is a Genuine Dispute of Material Fact Regarding the Commission's Section 5 Claims.

To establish a prima facie case for violation of Securities Act Section 5(a) and (c), which prohibit the unregistered sale of securities, the Commission must prove (1) that Mapp offered or sold securities; (2) that the securities were not registered; and (3) that Mapp used the "facilities of interstate commerce" to offer and sell the securities. *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 503 (5th Cir. 1990). If the SEC makes out its prima facie case, Mapp must show that an exemption from the registration requirement existed. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). The Commission has promulgated Regulation D to provide regulatory safe harbors implementing such exemptions. *See* 15 C.F.R. §§ 230.500–.508.[2]

#### 1)   The Commission has not made a prima facie case: Mapp cannot be liable for Servergy's sales.

There is a genuine dispute of material fact as to whether Mapp may be personally liable under Section 5 for Servergy's sales of securities. Mapp does not disagree that Servergy's securities were not registered or that they were sold using facilities of interstate commerce. But to make out a prima facie case under Section 5, the Commission must show that *Mapp* offered or

---

[2]       Regulation D was substantially (though not materially as to the provisions at issue in this case) amended by the Commission in 2016 with a May 2017 effective date. *See* 81 Fed. Reg. 83494-01 (Nov. 21, 2016). All citations are to the versions of the regulatory provision effective during the time of Servergy's offerings.

sold the securities. Although "liability under Section 5 is not limited to the person or entity that ultimately passes title to the security"—*Servergy*—other persons that the Commission seeks to hold responsible as "participants" in the transaction must have had a "significant" "role in the transaction." *SEC v. Blackburn*, 156 F. Supp. 3d 778, 797 (E.D. La. 2015) (quoting *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980)). Importantly, this analysis "usually involves a question of fact for the jury." *Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir. 1985); *see also SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1258 (9th Cir. 2013) ("[W]hether a defendant is a substantial factor in the distribution of unregistered securities is a question of fact requiring a case-by-case analysis.").

"A defendant plays a significant role when he is both a 'necessary participant' and 'substantial factor' in the sales transaction." *Blackburn*, 156 F. Supp. 3d at 797 (quoting *Murphy*, 626 F.2d at 652). "A participant's title, standing alone, cannot determine liability under Section 5, because the mere fact that a defendant is labeled as a . . . CEO . . . does not adequately explain what role the defendant actually played." *CMKM*, 729 F.3d at 1258. More than but-for causation is required, *id.* at 1255, and participant liability requires a high level of involvement, *see, e.g.*, *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007) (defendant could be liable under Section 5 where he "chose the date" to call in an obligation, directed a shareholder to sell her shares to repay that obligation, provided a buyer for the shares, "directed" a lawyer to prepare a stock sale contract, and "instructed" the seller "where to send the proceeds").

Mapp was neither a "necessary participant" nor a "substantial factor" in the Dominion JV investments at issue, which were made in Series A, B, and C.[3] It is undisputed that these

---

[3] The Commission does not contend that any non-accredited investors invested in the WFG Offering. To the extent that offering is relevant, Mapp certainly was not a "substantial factor." [SOF 23.] Once the WFG Offering began, Mapp "took off [his] fundraising hat" and "focus[ed] on other things." [SOF 23.]

investments are "attributable to the efforts of Caleb White" [Dkt. 113 at 5], from whom the Commission has already received disgorgement [Dkt. 9]. In the Commission's own words, White "solicited" the individual joint venture investors and "formed and managed" the Dominion JVs. [Dkt. 113 at 5.] Mapp's involvement in the Dominion JVs was to require potential investors to sign an NDA certifying their accredited investor status, provide information about the company, and then finalize the ultimate investment transaction with each of the Dominion JVs— each of which certified it was an accredited investor as defined in Regulation D. [SOF 10–11.] Mapp made it clear to potential investors that Servergy did not facilitate the Dominion JVs, explaining to a potential investor that "there are several investor groups who have set up JVs for accredited investors to invest through, but Servergy has nothing to do with these." [SOF 11.] Mapp's peripheral involvement in the Dominion JV investments was far too limited to rise to the level of participant liability. *See Phan*, 500 F.3d at 906. The Commission is not entitled to judgment as a matter of law that Mapp "sold" securities within the meaning of Section 5, as there is at least a genuine dispute of material fact on this issue.

### 2) Servergy made four separate offerings, and each must be considered separately for purposes of Section 5.

Servergy filed Forms D with the Commission stating its intention to make its offerings pursuant to Regulation D § 506. [SOF 5.] The Commission recognizes that Servergy's fundraising was "separated . . . into four separate offerings." [Dkt. 113, Pl.'s SOF ¶ 6; *see also* Dkt. 40 at 1 ("From November 2009 to September 2013 . . . McKinney, Texas based technology company Servergy, Inc. ('Servergy') raised approximately $26 million in private securities *offerings*" (emphasis added)).]. Yet the Commission now contends that these separate offerings constitute one single offering under the principle of integration.  [Dkt. 113 at 16–17.]

The following factors govern whether integration is appropriate: (a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purposes. 17 C.F.R. § 230.502(a); *see Murphy*, 626 F.2d at 645. There is no express hierarchy between the factors. *See Murphy*, 626 F.2d at 645–46; *SEC v. Ishopnomarkup.com, Inc.*, No. 04-CV-4057DRHARL, 2007 WL 2782748, at *4–5 (E.D.N.Y. Sept. 24, 2007).

Although Servergy's four offerings may have occurred with some overlap and each involved the issuance of common stock for cash [SOF 1–4], other facts militate against integration. *See Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir. 1992). Servergy had unique purposes for each offering as each was tied to a distinct phase of development and/or production. The general purpose of the Series A offering was to raise capital for development, design and engineering of pre-production units of the CTS-1000. [SOF 1.] Series B was meant to capitalize the build of later revisions of pre-production units, and Series C was meant to capitalize preparation for production readiness. [SOF 2–3.] Finally, the WFG offering was meant to capitalize the final phase—manufacturing and sales of the CTS-1000— and was referred to as a "go-to-market" raise.  [SOF 4.] Servergy also issued Series A, B, and C at different prices per share [SOF 1–4], further weighing against integration.  *See Livens v. William D. Witter, Inc.*, 374 F. Supp. 1104, 1107 (D. Mass. 1974). Because Servergy assigned different purposes and share prices to each offer, there is a genuine issue of material fact as to whether Servergy's offerings should be integrated.

3)   **Servergy's offerings were exempt from registration requirements under Regulation D.**

Section 4 of the Securities Act of 1933 provides a registration exemption for securities offerings, including an exemption for "transactions by an issuer not involving any public offering." Securities Act § 4(a)(2), *codified at* 15 U.S.C. § 77d(a)(2). The Commission has promulgated Regulation D, 17 C.F.R. §§ 230.500–.508, to provide a safe harbor under this exemption. The purpose of regulatory safe harbors such as Regulation D is "to provide objective standards upon which businessmen may rely." *Mary S. Krech Tr. v. Lakes Apartments*, 642 F.2d 98, 102 (5th Cir. 1981). Servergy's securities offerings qualified for the exemption provided by Regulation D § 506(b). 17 C.F.R. § 230.506(b). Section 506(b) applies when, *inter alia*, an offering is sold to accredited investors and up to thirty five other purchasers (i.e., investors who are not accredited investors). 17 C.F.R. § 230.506(b)(2). If the offering includes sales to "other purchasers," certain additional financial information must be provided. 17 C.F.R. § 230.502(b).

The Commission contends that Servergy's offerings are not entitled to exemption under Regulation D because the Dominion JVs were not accredited investors. As a threshold matter, Dominion JV No. 1 invested in Series A in April 2010, well outside the five-year statute of limitations provided by 28 U.S.C. § 2462. [SOF 1.] As such, liability under Section 5 cannot be based on Dominion JV No. 1's investment, and thus it is immaterial whether Caleb White was or was not an accredited investor himself when he invested through Dominion JV No. 1. (Even if it were material, Servergy and Mapp reasonably believed he was an accredited investor. [SOF 17.].) Only Dominion JV No. 2 and Dominion JV No. 3 are at issue.

(a)   **Regulation D, Section 506(b): Servergy's securities were sold to accredited investors.**

To be exempt under Regulation D § 506(b), securities must be sold to accredited investors and no more than 35 other purchasers. Section 501(a) defines the regulatory term

"accredited investor" to include, in relevant part, a "*person who comes within any of the following categories*, or *who the issuer reasonably believes comes within any of the following categories*, at the time of the sale of the securities to that person," 17 C.F.R. § 230.501(a) (emphases added):

- Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.  17 C.F.R. § 230.501(a)(5).

- Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year. 17 C.F.R. § 230.501(a)(6).

- Any entity in which all of the equity owners are accredited investors. 17 C.F.R. § 230.501(a)(8).

It is undisputed that the Dominion JVs certified their accredited investor status. [SOF 10; *see* Dkt. 113 at Pl.'s SOF ¶ 13.] Mapp and Servergy relied on these certifications. [SOF 9–10.] Numerous courts have recognized that an offeror may reasonably rely on such certifications. *See, e.g.*, *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 260–61 (6th Cir. 1992); *Supernova Sys., Inc. v. Great Am. Broadband, Inc.*, No. 1:10-CV-319, 2012 WL 425552, at *5 (N.D. Ind. Feb. 9, 2012); *Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F. Supp. 2d 1073, 1083 (D. Minn. 2006): *Faye L. Roth Revocable Tr. v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279, 1301 (S.D. Fla. 2004); *Goodwin Properties, LLC v. Acadia Grp., Inc.*, No. 01-49-P-C, 2001 WL 800064, at *7 (D. Me. July 17, 2001). And the Commission itself has held that such certifications create a fact issue precluding summary adjudication. *See In re Doxey*, Release No. 10077 (S.E.C. Release No. May 5, 2016) (reversing summary adjudication despite some evidence investor was not accredited because investor had certified its accredited investor status). This fact alone precludes summary judgment for the Commission.

---

Moreover, there is ample evidence that, even if the Dominion JVs did not meet the regulatory requirements to qualify as accredited investors, Servergy reasonably believed them to be. Servergy's offering documents emphasized that the offerings were only available to accredited investors, and investors were required to certify as much in both an NDA and a subscription agreement. [SOF 7, 13.] Servergy hired experienced securities counsel, Henry Exall of Exall & Wood PLLC, to ensure that its offerings met all of the requirements of Regulation D § 506 and applicable state law regarding registration of securities. [SOF 6.] Mapp was aware that White had hired outside counsel to facilitate the Dominion JV investments and was told that the joint venturers verified their accredited investor status. [SOF 14.] Servergy and Mapp repeatedly emphasized the accreditation requirement when speaking about the offerings. [SOF 8, 12–13.] Mapp believed that the Dominion JVs included only accredited investors. [SOF 14.] And White confirmed as much to Servergy's board. [SOF 14.]

Importantly, Mapp was not aware of the bulk of the facts cited by the Commission as evidence that he knew investors in the Dominion JVs were not accredited. [SOF 16–19.] The evidence to which he had access was limited. First, a July 21, 2010 email from Don Edwards ("Edwards") noting that some prospective investors could only invest "$1-2k." [SOF 20.] In addition to having taken place outside the statute of limitations, Edwards's email does not state that these attendees were not accredited investors (contrary to the Commission's characterization). [SOF 20.] And Mapp's understand of this email was reasonable. He interpreted the statement to mean that some attendees were accredited investors who simply wanted to invest smaller sums in a startup company. [SOF 20.] Indeed, in the same email chain, Mapp reminded Edwards of the requirement that attendees sign an NDA, which verified their accredited investor status. [SOF 20.] Moreover, Mapp was aware that the Dominion JVs had outside counsel

reviewing and facilitating their investment transactions. [SOF 14.] Even if these attendees did not meet the requirements for accreditation, the Commission has put forward no evidence that these attendees ultimately invested in Servergy; as movant, the Commission is not entitled to any inference that they did so.

Secondly, the Commission points to two email chains between Mapp and White and contends that Mapp's reminders that Servergy investors must be accredited state that investors through the Dominion JVs did not need to be accredited. [Dkt. 113, Pl's Exs. 31, 32.] The emails say no such thing [SOF 21], and the Commission is not entitled to the favorable reading it urges at summary judgment. Moreover, there is significant contrary evidence that Mapp made the requirement clear to White. [SOF 12–15.] White himself testified "[i]t was clear that this was an accredited investor offering." [SOF 15.]

The final piece of evidence of which Mapp was contemporaneously aware is a March 28, 2011, email asking Holder and White to "follow up" with an investor who had indicated none of the accredited investor categories applied to him. [SOF 22.] Like the first, this communication took place outside of limitations and is an improper basis for liability. [SOF 22.] In any event, Mapp intended Holder and White to handle the investor's situation properly, whether by determining that he was accredited and obtaining a subscription agreement or, if he was not accredited, not accepting his investment. [SOF 22.] Just days earlier, Mapp had made clear to White that if the investor were not accredited his investment would be returned. [SOF 22.] Mapp was not contemporaneously aware that Storck may have invested through Dominion JV No. 2. [SOF 22.]

Even if the Dominion JVs did not meet the qualifications, they are "accredited investors" based on Servergy's reasonable belief that they qualified. *See* 17 C.F.R. § 230.501(a). There is at

least a genuine dispute of material fact as to the reasonableness of Servergy's belief that the Dominion JVs were accredited investors.

> **(b)     Regulation D, Section 508: any failure to comply with the requirements of Section 506(b) is entitled to Section 508's good-faith safe harbor.**

Regulation D provides a safe harbor where a failure to comply with its requirements (1) "did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity;" (2) "was insignificant with respect to the offering as a whole;" and (3) "[a] good faith and reasonable attempt was made to comply with all applicable terms, conditions and requirements of [Section 506]." 17 C.F.R. § 230.508(a)(1)–(3); *see SEC v. Levin*, 849 F.3d 995, 1002–06 (11th Cir. 2017) (holding that the safe harbor applies in actions brought by the Commission). The offeror's good faith in complying with Regulation D is a question of fact best resolved by the jury. *See, e.g.*, *Ishopnomarkup.com*, 2007 WL 2782748, at *9; *Pinnacle Commc'ns*, 417 F. Supp. 2d at 1086–87.

Section 506(b) allows investments by up to thirty five other "purchasers," or non-accredited investors.[4] Section 502(b) requires that "other purchasers" receive additional financial information. Under the Commission's theory, if the Dominion JVs did not qualify as accredited investors under Section 501(a)(8), the requirements not met are (1) the information requirement of Section 502(b); and (2) the requirement that the purchasers be "sophisticated" (or that the issuer reasonably believe they are). [Dkt. 113 at 17–19.] Section 508 provides that certain failures to comply are to be "deemed significant," but these requirements are not included. *See*

---

[4]     Accredited investors are not included in calculating the number of purchasers under Section 506(b). 17 C.F.R. § 230.501(e)(1)(iv) (2016).

17 C.F.R. § 230.508(a)(2); *see Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *9.[5] Servergy provided the Dominion JVs with detailed information about the company its offering documents, and it is undisputed that White, a representative of the Dominion JVs, sat on Servergy's board of directors, making him privy to the intimate details of the company's operations. [SOF 10, 11.] And, for the same reasons Servergy reasonably believed the Dominion JVs were accredited, it reasonably believed they were sophisticated. [SOF 10–15.] There is at least a genuine dispute of material fact as to whether Servergy's alleged failure to comply with Regulation D was "significant with respect to the offering as a whole" and whether Servergy made "[a] good faith and reasonable attempt to comply" with Regulation D. *See Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *9 (refusing to grant summary judgment to the Commission).[6]

Alternatively, the inclusion of one unaccredited investor in each of Series A, B, and C was "insignificant with respect to the offering as a whole." 17 C.F.R. § 230.508(a)(2). The same would follow if the offerings were integrated: three non-accredited investors—when compared to the hundreds that made investments in Servergy's offerings—are insignificant as to the offering as a whole. *Id.*

**B.     Mapp is Entitled to Judgment as a Matter of Law on the Commission's Scheme Liability Claims.**

As to the Commission's claims under Section 17(a)(1) and (3) and Rule10b-5 (a) and (c), the Commission has not alleged scheme liability, which "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Farmer*, No. 4:14-

---

[5]      Section 506(b)(2)(i)'s limitation on the number of purchasers that are not accredited investors *is* included as a "failure to comply" that "shall be deemed significant to the offering as a whole"; the Commission does not contend that more than thirty five investors were not accredited.

[6]      As discussed above, because Servergy's four offerings were separate and should not be integrated, Section 502(b)(2)(i)'s requirements regarding the type of information to be furnished—which differ based on the amount of the offering—apply to each offering separately.

CV-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015). The Commission's motion for summary judgment likewise does not set forth any "inherently deceptive act" that could establish scheme liability. As set forth in Mapp's Motion for Judgment on the Pleadings [Dkt. 112], Mapp is entitled to judgment as a matter of law on these claims. Nevertheless, Mapp will address these claims along with the Commission's misrepresentation claims below, as all are based on the same alleged misrepresentations.

## C.     There is a Genuine Dispute of Material Fact Regarding Essential Elements of the Commission's Claims under Section 17(a) and Rule 10b-5.

There is a genuine dispute of material fact precluding summary judgment on the Commission's claims under Section 17(a)(2) and Rule 10b-5(b). To establish its claims under Rule 10b-5(b), the SEC must prove by a preponderance of the evidence that Mapp "(1) made a misstatement or omission (2) of material fact (3) in connection with the purchase or sale of securities (4) with *scienter*." *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009).

With the following exceptions, liability under Section 17(a) is the same. Under Section 17(a)(2), the Commission must prove that Mapp "obtain[ed] money or property" through misrepresentations or omissions of material fact, 15 U.S.C. § 77q(a)(2); *see SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013).[7] Section 17(a)(2) and (3) require a showing of negligence, rather than scienter. *See SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 786 (5th Cir. 2017).[8]

---

[7]     As set forth in Mapp's Motion for Partial Summary Judgment [Dkt. 116], Mapp is entitled to judgment as a matter of law on the Commission's Section 17(a)(2) claim because he did not receive money or property by means of the alleged misrepresentations. Alternatively, there is at least a genuine dispute of material fact on this question such that the Commission is not entitled to judgment as a matter of law on its claim under Section 17(a)(2).

[8]     Precedent forecloses the Commission's argument that dicta from *Aaron v. SEC*, 446 U.S. 680 (1980), allows the Commission to establish liability under Section 17(a)(3) based on the "effect" on the "investing public" without regard to the defendant's mental state. [Dkt. 113 at 26.] Numerous courts, including the Fifth Circuit and this one, have recognized that liability under Section 17(a)(2) and (3) requires negligence. *See, e.g.*, *Life Partners*, 854 F.3d at 786; *SEC v. Monterosso*, 756 F.3d 1326, 1333–34 (11th Cir. 2014); *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); *SEC v. Curshen*, 372 F. App'x

**1) There is a genuine dispute of material fact regarding the Commission's alleged material misrepresentations and omissions.**

The Commission has not shown that the misrepresentations alleged were either false or material. A misrepresentation or omission is material where there is "a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)) (emphases added). Information is material if an investor would "act on the basis of" the information. *Id.* at 43.

**(a)     Statements regarding the number of pre-ordered units in the February 14, 2013 PPM and presentation to WFG Financial's agents were neither false nor material.**

The Commission does not contend that the PPM's section entitled "pre-orders" was inaccurate at the time the PPM was published in February 2013; rather, it argues that the section became false as of March 10, 2013, when Koerr informed Will Mapp that it would be using a Dell 64-bit server instead of the CTS-1000 for its "gotomarket platform." [*See* Dkt. 113 at Pl.'s SOF ¶ 29.]

Servergy's pre-order numbers were fluid and continually in flux, and Servergy received additional interest and pre-orders during this time period, including interest in 1,000 units in April 2013. [SOF 26, 28.] Mapp relied on information provided by Smith, Servergy's Chief

---

872, 877 (10th Cir. 2010); *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008); *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008); *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 454 (3d Cir. 1997); *SEC v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524, 541 (E.D. Tex. 2017) (Mazzant, J.) (citing *Meadows v. SEC*, 119 F.3d 1219, 1226 n.15 (5th Cir. 1997)).

Moreover, the Commission does not cite a single piece of evidence to support its vague contention that Servergy's securities offerings had an "enormous" effect on "members of the investing public." [Dkt. 113 at 26.] Indeed, Mayeux attests that Mapp's emails mentioning Freescale were *not* important to his decision to invest. [SOF 31.] The Commission must present evidence, not argument, to show entitlement to summary judgment. Thus, even if the Commission's overly permissive reading of *Aaron* were correct, it would not be entitled to summary judgment.

---

Operating Officer, in reviewing the PPM and describing Servergy's pre-orders. [SOF 24, 25.] There is a genuine dispute of material fact as to whether the PPM's statement regarding the number of pre-orders was false and material, given that pre-orders changed frequently and there is evidence of additional interest in 1,000 units in April 2013. [SOF 28.] As movant, the Commission is not entitled to an inference in its favor that the number was false.[9]   The Commission is likewise not entitled to an inference that investors considered the number of pre-orders listed in the PPM important to their investment decision, and there is no evidence any did.

There is likewise a genuine dispute of material fact regarding the significance of the PPM Supplement. The PPM Supplement was not intended as a complete amendment to the PPM but, as Mapp was informed, was a supplemental document discussing limited issues. [SOF 26.] Even if the number of pre-orders was no longer accurate when the PPM Supplement was issued in September 2013—and, as discussed above, there is a question of fact as to how many pre-orders existed at that time [SOF 27, 28]—there is a fact question as to materiality. The Supplement, dated July 31, 2013, specifically notes the PPM is "dated February 14, 2013" and does not amend the section entitled "pre-orders." [SOF 27.] Prospective investors would not have considered the number of pre-orders as of February 2013 material to their decision to invest five to seven months later.

As to the Commission's suggestion that Mapp omitted "the impact of Koerr's 64-bit requirement" [Dkt. 113 at 23], there is no evidence that Mapp had a duty to disclose such minute details regarding Koerr. *SEC v. Mapp*, 240 F. Supp. 3d 569, 580 (E.D. Tex. 2017) (Mazzant, J.) ("In a securities fraud omissions case, the defendant must have a duty to speak to be found

---

[9]     *United States v. Tager*, 788 F.2d 349, 350 (6th Cir. 1986), is inapposite. The Commission does not allege that WFG Financial was defrauded or suffered any loss, and has not stated a claim for fraud on a broker-dealer. [*See, e.g.*, Dkt. 40 (FAC) ¶ 23 ("Servergy and Mapp knowingly misled *investors*" (emphasis added)).]

liable."). Liability requires a showing that the defendant spoke "concerning material details . . . , without revealing certain additional facts necessary to make his statement not misleading." *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 802 (S.D. Tex. 2012). Even if the Koerr pre-order were material (and the Commission has put forward no evidence that it was), the PPM does not refer to the Koerr pre-order or make any statement connecting Koerr to the number of pre-orders listed. As discussed above, the number of pre-orders was "fluid." [SOF 27.] Consequently, the Commission has not established a duty to disclose the fact that Koerr had declined to order the CTS-1000 in March 2013, much less the details of its rationale for doing so. There is at least a genuine dispute of material fact regarding any duty to disclose.

  **(b) Statements to investor Rusty Mayeux regarding Freescale were neither false nor material.**

  Mapp did not make any misrepresentation of fact regarding Freescale in his July 26, 2013, and July 30, 2013, emails to Mayeux. Mayeux attests that he understood both emails to refer to a potential future order and that, in any event, the statements regarding Freescale were not important to his decision to make a further investment in Servergy. [SOF 31–33.] Mayeux was a long-time investor in Servergy; he was well aware that Servergy was not yet taking orders and that Freescale had not yet placed an order. [SOF 30, 32.] As a matter of law, Mapp made no misrepresentations in these emails. Alternatively, there is a genuine dispute of material fact regarding falsity.

  The emails' references to Freescale were likewise immaterial. Given Mayeux's own testimony that the statements regarding Freescale were not important to his decision to invest in Servergy, these statements are immaterial as a matter of law. [SOF 31.] Mayeux had already made five investments in Servergy. [SOF 30.] He was intimately familiar with Servergy's business operations and the references to Freescale did not affect his decision to invest on July

30, 2012. [SOF 30–31.] Indeed, evidence indicates he had already decided to make this investment at the time he received the July 26 and 30, 2013, emails. [SOF 34.] And Mayeux remained involved and invested in Servergy for years, long after it would have been obvious that Freescale had not placed an order in July 2012. [SOF 35.] There is, at the very least, a genuine dispute of material fact regarding materiality.

### 2) There is a genuine dispute of material fact regarding Mapp's mental state.

To establish liability under Section 17(a)(1) and Rule 10b-5, the Commission must establish that Mapp acted with scienter. Liability under Section 17(a)(2) and (3) requires that he have acted with negligence.

### (a) Scienter is not established.

To establish scienter, the SEC must show that Mapp acted with "an intent to deceive, manipulate, defraud or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citation omitted). Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standard of ordinary care, and that present a danger of misleading . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 536 (citation omitted) (emphasis added). "[S]cienter issues are seldom appropriate for resolution at the summary judgment stage." *SEC v. Cole*, No. 12-CV-8167 RJS, 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015).

There is ample evidence that Mapp lacked scienter, which requires "an extreme departure from the standard of ordinary care" equivalent to intentional fraud. *Owens*, 789 F.3d at 536. Mapp did not intentionally misrepresent or omit facts about Servergy that he thought investors would want to know. [SOF 36.] Mapp did not draft the section of the PPM entitled "pre-order," and relied on information provided by Smith in his review of the document and in stating the

number of then-existent pre-orders during the March 2013 presentation to WFG Financial agents. [SOF 23–24, 27.] No one suggested that the "pre-orders" section of the PPM be supplemented, and Mapp did not consciously decide not to amend it. [SOF 27.] Moreover, Mapp knew that the team in charge of the PPM Supplement—led by Smith—was working with Servergy's outside securities counsel as well as WFG Financial. [SOF 24.] And Servergy continued to view the order from Koerr as a viable opportunity, albeit one that would not come to fruition until Servergy developed a 64-bit version of its servers. [SOF 29.]

As to the Rusty Mayeux emails, Mapp was aware that Mayeux was a long-time investor in Servergy who was well aware of the details of Servergy's business, including that it was not yet taking orders. [SOF 30–32.] He communicated regularly with Mayeux and knew Mayeux would understand his references to Freescale as an opportunity, not an order. [SOF 30–33.] Indeed, Mayeux attests that he understood Mapp perfectly and that he does not believe Mapp intended to mislead. [SOF 31.] There at least is a genuine dispute of material fact as to whether Mapp acted with intent to deceive.

### (b)     Negligence is not established.

As discussed *supra*, Section 17(a)(2) and (3) require the Commission to show that Mapp acted negligently, or that he failed to "use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation." *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1293 (D. Colo. 2013) (citation omitted). To establish negligence, the Commission must introduce "evidence on the appropriate standard of care against which a jury [can] measure [Mapp's] conduct." *Ginder*, 752 F.3d at 576. And negligence is "typically a jury determination." *Cole*, 2015 WL 5737275, at *6. The Commission has not put forward any evidence of the appropriate standard of care or that Mapp failed to meet any such standard.

There is no evidence that under the circumstance a reasonable CEO would have acted differently than Mapp did with respect to the number of pre-orders or Mapp's communications with investor Mayeux. As to pre-orders, Mapp relied on information provided by Smith, Servergy's COO, and he was aware that the number of pre-orders was fluid and that the PPM was dated February 14, 2013. [SOF 24–25, 27.] No one, including Servergy's securities counsel or WFG, suggested to Mapp that the pre-orders section of the PPM should be amended. [SOF 27.] His emails to Mayeux did not contain any misrepresentations and were written (and received) in the context of Mayeux's extensive background knowledge about Servergy's operations. [SOF 30–33.] Mayeux attests not only that he was not misled but also that he does not think there was any danger he could be misled. [SOF 31.] Mapp acted reasonably. Independently, the Commission's failure to show any evidence of the appropriate standard of care precludes summary judgment in its favor on the negligence required to establish liability under Section 17(a)(2) and (3).

## VI.   CONCLUSION AND PRAYER

The Commission is not entitled to judgment as a matter of law. Numerous genuine disputes of material fact remain regarding whether Mapp can be personally liable for Servergy's securities sales, whether Servergy's securities offerings are entitled to an exemption from Securities Act Section 5's registration requirements under Regulation D, and whether Mapp made any material misrepresentation of fact or acted with the mental state required for liability under the securities laws. Reasonableness, good faith, negligence, and scienter are classic jury questions; the Commission has certainly not established these issues as a matter of law. Mapp respectfully requests that the Commission's Motion for Summary Judgment [Dkt. 113] be denied in full and that he be granted such further relief as to which he may show himself entitled.

Respectfully submitted,

*/s/ David W. Klaudt*

Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
David W. Klaudt
  Texas Bar No. 00796073
  klaudtd@gtlaw.com
Amanda R. McKinzie
  Texas Bar No. 24088028
  mckinziea@gtlaw.com
Natalie D. Thompson
  Texas Bar No. 24088529
  thompsonna@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 (Telephone)
(214) 665-3601 (Facsimile)

**ATTORNEYS FOR WILLIAM E. MAPP, III**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record via the

Court's CM/ECF system this 13th day of October, 2017.

*/s/ David W. Klaudt*

David W. Klaudt