# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § § § § § § | Civil Action No. 4:16-CV-00246 Judge Mazzant |
| v. | | |
| WILLIAM E. MAPP, III | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff Securities and Exchange Commission's Motion for Summary Judgment (Dkt. #113) and Defendant William E. Mapp, III's Partial Motion for Summary Judgment (Dkt. #116). Having considered the relevant pleadings and evidence, the Court finds that Plaintiff's motion should be denied in part and granted in part. The Court further finds that Defendant's motion should be denied in part and granted in part.

### BACKGROUND

Servergy, Inc. ("Servergy") is a computer hardware company that develops secure, cloud-based data storage servers. From November 2009 to September 2013, Servergy raised approximately $26 million in private securities offerings to develop what it claimed was a revolutionary new server, the CTS-1000. William E. Mapp, III ("Mapp"), Servergy's co-founder and then-CEO, was responsible for the fundraising campaign and had signatory authority over Servergy's bank accounts. Mapp and Servergy marketed the CTS-1000 as a smaller, more efficient server that could replace servers from competitors such as IBM, Cisco, Dell, and HP.

As Servergy's primary fundraiser, Mapp identified prospective investors through word-of-mouth referrals and offered compensation to individuals for introducing new investors to the company. Once investors expressed interest in Servergy, they could attend investor

presentations hosted by Mapp in-person or virtually through webinars. Mapp also provided the investors a Confidential Information Memorandum describing the offering and subscription agreement.

From November 2009 through October 2013, more than 200 investors located in at least 30 states purchased Servergy securities for a combined amount of over $26 million. Over $1.4 million of the $6 million raised during the period of November 2009 through March 2013 is attributable to the efforts of Caleb White ("White"), the owner of an insurance firm named Sound Harbor Financial, P.C. After meeting Mapp in November 2009, White solicited more than 150 individuals who invested with Servergy between April 2010 and April 2012. In return, Servergy paid White approximately $66,000 for his services. White was appointed to Servergy's board of directors on September 28, 2011.

Because White's investors were unable or unwilling to invest the minimum amount Servergy required for a direct investment, White formed and managed the three successive joint ventures, Dominion Joint Venture Group No. 1, 2, and 3 (collectively the "Dominion JVs") to acquire Servergy securities. Investing in the Dominion JVs allowed White's investors—who may not be capable of investing the $50,000 minimum for a direct investment in Servergy—to acquire an equity stake in Servergy for as little as $1,000.

Servergy separated its multi-year fundraising into four separate offerings:

(1) Series A was offered between approximately November 2009 and April 2010 and raised approximately $800,000. Investors in this offering purchased Servergy stock at $0.25 a share. The purpose of the Series A offering was to raise pre-production funds, which were ultimately used for "engineering, design, development, fab, assembly and testing of Servergy's Rev 1 Pre-Production Units, as well building a strategic ecosystem and infrastructure of people, process and technology." Dominion JV 1 invested approximately $78,000 in this offering on April 18, 2010.

(2) Series B was offered between approximately April 2010 and August 2011 and raised approximately $3.6 million. Investors in this offering purchased Servergy stock at $1.00 a

share. Series B funds were used "to build Rev 2 and 3 Pre-Production Units and further build the management team and necessary infrastructure." Dominion JV 2 invested in this offering.

(3) Series C was offered between December 2011 and March 2013 that raised approximately $1.7 million. Investors in this offering purchased Servergy stock at $2.00 a share. The purpose of this offering was to raise the funds needed for the CTS-1000 to become "production ready." Becoming "production ready" included ensuring the product design was ready for production, validating software and hardware, and manufacturing production-ready units for consumer beta testing. Dominion JV 3 invested approximately $184,852 in this offering.

(4) Between March 2013 and October 2013, Servergy engaged broker-dealer WFG Investments, Inc. ("WFG") to raise an additional $19.4 million for the company by offering up to 10,000,000 shares of Servergy common stock at a price of $2.00 per share (the "WFG Offering"). The purpose of the WFG Offering was to raise funds specifically to bring the CTS-1000 to market, including beginning production, and to develop other products to be sold by Servergy. Funds were used, for example, to address product-build issues and to ultimately manufacture units to be sold to customers. Servergy's Private Placement Memorandum, drafted specifically for this offering, makes clear that the purpose of the offering is to bring the CTS-1000 to market. None of the Dominion JVs invested in this offering.

Servergy never filed a registration statement for any of its offerings of securities. Rather, Servergy filed Form Ds with the SEC, all claiming exemptions from registration under Rule 506 of Regulation D.

Servergy purported to only accept investments from accredited investors. To that end, Servergy's subscription agreement required investors to certify that they: (1) were accredited; (2) had the knowledge and experience in financial and business matters to be capable of evaluating the investment; and (3) were able to bear a total loss of their investment. Although White and other Dominion JV investors represented on Servergy's subscription agreements that the Dominion JVs were entities in which all of the equity owners were accredited, this was not the case.

In late July 2012, before Servergy raised money with WFG, Servergy had only $5,101 in its bank accounts. Around the same time, Mapp solicited a prospective investment from David

3

Mayeux ("Mayeux"). In emails sent to Mayeux on July 26, 2012, and July 30, 2012, Mapp mentioned the possibility of an order from Freescale Semiconductor, Inc. ("Freescale). Shortly after receiving Mapp's second email, Mayeux wired $40,000 to Servergy. After Servergy received the Mayeux's $40,000 investment, it immediately paid $12,139 for rent and approximately $24,250 for payroll expenses. By the following day, Servergy had approximately $10,024 remaining in its bank accounts.

In Fall 2012, Mapp attempted to implement a "pre-order" system that would require a potential customer to deposit with Servergy a refundable deposit to reserve future CTS-1000 units. After initially failing to create much demand, Mapp removed the deposit requirement from the pre-order system. Thus, Servergy pre-orders would not require any deposit from customers. Soon after, Koerr, Inc. ("Koerr"), a Canadian company that provided instrumentation, electrical, and automation services to the oil and gas industry, was interested in using Servergy's CTS-1000 server in some of its products, and signed a non-binding pre-order agreement form on October 18, 2012, for 1,000 units.

On October 19, 2012, Mapp sent an email to investors announcing Servergy's pre-order sales model. In the same email, he also announced that Servergy "received a signed pre-order agreement today for 1,000 units" and was discussing a "2013 roll out schedule" with the potential purchaser (Koerr). By early 2013, Servergy claimed to have received pre-orders for more than 1,500 CTS-1000 units.

In preparation for the WFG Offering, Servergy drafted Private Placement Memorandum ("PPM") dated February 14, 2013. With regard to Servergy's pre-orders, the PPM claimed that

> Servergy has received significant interest from various US Fortune 500 and Global 1000 companies for its Cleantech Server ®. Since announcing in the Fall of 2012 that Servergy is taking pre-orders the company has received over 25 orders totaling over 1,500 units with planned delivery in late 2013.

(Dkt. #113, Exhibit 3 at p. 39). Mapp participated in the drafting of the PPM.

In connection with the WFG Offering, Mapp conducted a live presentation regarding Servergy on or before March 5, 2013 ("WFG Presentation"), which was recorded and made available to WFG financial advisors for use in soliciting prospective investors. During the presentation, Mapp stated Servergy had "two thousand plus and growing" pre-orders for the CTS-1000. He quantified the financial impact of Servergy's pre-orders as "about $20 million" and noted that $20 million was equal to the amount of investment money being raised by Servergy at the time.

After receiving and examining an actual CTS-1000 unit for testing, Koerr's Chief Technology Officer ("CTO") discovered that the CTS-1000 was not built on 64-bit architecture. On March 10, 2013, Koerr's CTO informed Mapp that Koerr was not interested in a 32-bit system and withdrew its pre-order.

Mapp and Servergy continued to use same PPM through September 2013, which still listed the same pre-order demand. Mapp also sent personalized PPMs to specifically targeted investors, which contained the same claims about pre-orders. Using these PPMs, Servergy raised nearly $20 million after March 10, 2013.

In September 2013, Servergy issued a Supplement to its PPM, which amended the February 14, 2013 PPM to include, among other things, positive business updates such as patent claims issued and manufacturing agreements. The Supplement did not amend the section on pre-orders.

On October 21, 2016, the Securities and Exchange Commission ("SEC") filed its Amended Complaint, against Mapp, Warren K. Paxton, Jr. ("Paxton"), Servergy, and White, asserting various violations of federal securities laws (Dkt. #40). The SEC specifically claims that Mapp

violated Sections 5(a) and 5(c), 17(a) of the Securities Act and Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.  On April 15, 2016, the Court entered final judgment against Servergy and White, dismissing them from the case (Dkt. #8; Dkt. #9).  On June 9, 2017, Paxton filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #44).  On March 2, 2017, the Court granted Paxton's motion to dismiss (Dkt. #96).  On September 29, 2017, the SEC filed its Motion for Summary Judgment (Dkt. #113).  On the same day, Mapp filed his Partial Motion for Summary Judgment (Dkt. #116).  On October 13, 2017, both parties filed their respective responses (Dkt. #120; Dkt. #122).  On October 20, 2017, both parties filed their respective replies (Dkt. #124; Dkt. #125).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of

material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### *Defendant Mapp's Motion for Partial Summary Judgment*

In his motion, Mapp asserts (1) the limitations period set forth in 28 U.S.C. § 2462 bars reliance on any conduct that occurred before April 11, 2011 and (2) Mapp cannot be liable under

Section 17(a)(2) of the Securities Act because he did not obtain money or property as a result of the alleged misrepresentations.

**A. Claims Time-Barred under Section 2462**

Mapp asserts that because the form of relief sought are penalties, he cannot be subject to liability based on conduct that occurred prior to April 11, 2011, because those claims are time-barred by Section 2462. He further claims that Section 2462 also bars any reliance on any conduct that occurred before April 11, 2011. The language of Section 2462 reads as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

The SEC filed its Original Complaint on April 11, 2016 (Dkt. #1). For the five-year statute of limitations to apply to the SEC's claims, they must seek to impose a "civil fine, penalty, or forfeiture." 28 U.S.C. § 2462. The SEC argues that the injunction is an equitable remedy and not a penalty under Section 2462. Equitable remedies are not subject to Section 2462's time limitations. *S.E.C. v. Bartek*, 484 F. App'x 949, 956 (5th Cir. 2012).

Mapp argues that the injunction sought operates as a penalty, as it is intended to punish him for his alleged wrongdoing, rather than merely remedy the harm caused by his actions. In his summary judgment motion, Mapp merely cites case law holding that injunctions have been found to function as penalties and subject to Section 2462's time limitations, but presents no evidence nor arguments regarding how the injunction imposed against him in the present case functions as a penalty. Mapp provides no evidence of the possible collateral consequences of this remedy, no evidence of whether this remedy address the past harm, and no evidence that this remedy does not

focus on preventing future harm due to low likelihood that Mapp would engage in similar harmful behavior in the future. *See SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 884 (N.D. Tex. 2011), *aff'd sub nom. SEC. v. Bartek*, 484 F. App'x 949 (5th Cir. 2012).

The SEC bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact. Mapp has failed to carry his initial burden and the Court finds that Mapp's motion should be denied with regard to Section 2462's statute of limitations.[1]

Furthermore, as pointed out by the SEC, the vast majority of the relevant conduct alleged to constitute violations occurred well after April 11, 2011—the date five years preceding the SEC filing its Complaint. *See SEC v. Boteler*, 2014 WL 11460401, at *1 (N.D. Tex. Mar. 11, 2014). Thus, the disciplinary actions are timely even if Section 2462's five-year limit applies.

Lastly, even if the Court does find that the injunction operates as a penalty and Section 2462 bars claims for conduct that occurred before April 11, 2011, the SEC may still rely on such incidents as evidence in support of timely claims for violations of federal securities law. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–115 (2002) (holding that, even where a time-barred adverse employment action cannot itself form the basis of a discrimination or retaliation claim, the same action may serve as evidence of an employer's discriminatory or retaliatory motive); *Birkelback v. SEC*, 751 F.3d 472, 482 (7th Cir. 2014) (upholding sanctions ruling that considered conduct outside of the five-year limitations period).

---

[1] This holding does not end the Court's inquiry. Once the Court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies and must determine whether the forms of relief sought are penalties subject to Section 2462.

Mapp's conduct before April 11, 2011 is relevant to his level of scienter[2] and the appropriate remedies to be imposed.[3] Thus, the SEC may still rely on such incidents as evidence to support the timely claims of federal securities law violations

## B. Liability under Section 17(a)(2) – "Obtain Money or Property"

Section 17(a)(2) of the Securities Act makes it unlawful to "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C.A. § 77q(a)(2). "It is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus. It must be plausibly alleged that the money was obtained 'by means of' the false statement." *United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting 15 U.S.C. § 77q(a)).

Mapp asserts that he did not receive any compensation that could be attributed to the alleged misrepresentations. The SEC claims that Mapp's receipt of his salary was wholly dependent on the investor funds obtained as a result of the alleged misrepresentation. The SEC argues that Serverity has no other means to pay Mapp's salary other than the investors' funds raised. SEC presents Mapp's sworn testimony in which he states "[he] didn't really kick in a full

---

[2] Scienter (like all mental states) is typically proved by circumstantial evidence. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91 n.30 (1983) ("The Court of Appeals [in *Herman & Maclean v. Huddleston*, 640 F.2d 534 (5th Cir. 1981)] also noted that the proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving defendant's state of mind supports a lower standard of proof. In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient.").

[3] *See SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017) (holding Section 2462 would not bar injunctive relief); *SEC v. Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016) (holding that "injunctions are equitable, forward-looking remedies and not penalties within the meaning of § 2462"); *SEC v. Quinlan*, 373 F. App'x 581, 588 (6th Cir. 2010) (holding injunction was remedial, rather than punitive based on findings of risk to investing public of recurring wrongful conduct); *SEC v. Wey*, 2017 WL 1157140, at *29 (S.D.N.Y. Mar. 27, 2017) (holding Section 2642 does not apply to injunctions sought to "protect the public from future harm"); *SEC v. Straub*, 2016 WL 5793398, at *14 (S.D.N.Y. Sept. 30, 2016) (holding that "if the SEC is entitled to injunctive relief here, that relief would not be covered by Section 2462").

salary that was in [his] agreement until after we were fully funded through [WFG]." (Dkt. #120 at p. 3).

Furthermore, Mapp claims that he received five million shares of Servergy stock on October 20, 2009 (Dkt. #116 at p. 5). As previously discussed, Mapp failed to prove as a matter of law that the injunction sought operates as a penalty and subject to Section 2462's statute of limitations, barring claims relating to conduct that occurred prior to April 11, 2011. Thus, his receipt of the five million shares additionally creates a fact issue as to whether he obtained money or property as a result of the alleged misrepresentation.

Even if Mapp's receipt of the Servergy stock in October 2009 is time-barred, there is additional evidence that he "obtained money or property" as defined under 17(a)(2). Although Mapp's original employment agreement with Servergy called for him to receive a salary of $250,000 per year, he accepted much smaller amounts in the years before Servergy's fundraising efforts became successful, taking as little as $10,000 in 2009. After the WFG fundraising efforts, Mapp began to make more salary from Servergy. Mapp's salary for 2012 was $118,429.33. His salary for 2013 increased after the WFG offering to $212,443.52. The SEC has presented sufficient evidence to create a fact issue as to whether Mapp obtained money or property under Section 17(a)(2).

*SEC's Motion for Summary Judgment*

In the SEC's summary judgment motion, the SEC asserts that there is no genuine issue of material fact to whether Mapp violated Section 5 of the Securities Act, Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act.

## A. Integration

As preliminary matter, the SEC asks this Court to integrate the Series A, B, and C offerings with the WFG Offering into a single offering on the grounds they are all part of a single plan of financing. The "integration theory" has been utilized by courts to determine whether to treat two separate securities issuances as one. *See Bayoud v. Ballard*, 404 F. Supp. 417, 424 (N.D. Tex. 1975). "The doctrine of integration prevents issuers of securities from avoiding the requirements of section 5 by breaking offerings into small pieces." *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir. 1992). "When two separate securities issuances are 'integrated' into one, if either separate issuance was required to be registered, the integrated issuance must be registered." *Bayoud*, 404 F. Supp. at 424. The following factors should be considered in determining whether offers and sales should be integrated for purposes of the exemptions under Regulation D:

> (a) Whether the sales are part of a single plan of financing; (b) Whether the sales involve issuance of the same class of securities; (c) Whether the sales have been made at or about the same time; (d) Whether the same type of consideration is being received; and (e) Whether the sales are made for the same general purpose.

17 C.F.R. § 230.502.

Mapp does not contest that the second, third, and fourth factor favor integration (Dkt. #122 at p. 17). However, he argues that the offerings should be considered four separate offerings for the purpose of Section 5 liability because they had unique purposes tied to a distinct phase of the development and/or production of the CTS-1000, and the offerings were issued at different prices per share. Specifically Mapp claims:

> The general purpose of the Series A offering was to raise capital for development, design and engineering of pre-production units of the CTS-1000. Series B was meant to capitalize the build of later revisions of pre-production units, and Series C was meant to capitalize preparation for production readiness. Finally, the WFG

offering was meant to capitalize the final phase—manufacturing and sales of the CTS-1000—and was referred to as a "go-to-market" raise.

(Dkt. #122 at p. 17) (citations omitted).

Despite Mapp's assertions, he has failed to point to evidence showing the existence of a genuine issue of material fact on this question and all of the factors strongly support a finding that there was a single offering in this case. The sales of Servergy's securities were part of a single plan to finance Servergy's operations. The sales of Servergy's securities were of the same class because they were all issued as common stock. The offerings were close in time, if not consecutive. All investors bought Servergy securities using the same type of consideration: cash. The sales of Servergy securities were all made for the same purpose: financing Servergy's operations for the development and manufacture of the CTS-1000. *See Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir.1992) ("The term 'same general purpose' suggests a level of generality to the integration analysis that may be satisfied by the observation that the purpose of each partnership was to drill for oil."); *SEC v. Alternate Energy Holdings, Inc.*, 2014 WL 2515710, at *7 (D. Idaho May 13, 2014) ("Although the PPMs vary in some respects as to the projects listed on each, the purpose of the PPMs was not limited to those particular listed projects. Instead, the listed projects were examples of the projects AEHI was pursuing in furtherance of its general business purpose . . . Thus, the fact that the PPMs listed different projects pursued by AEHI does not make the offerings distinct.").

The Court finds that the four separate offerings should be integrated as a matter of law. *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 907 n.9 (5th Cir. 1977); *see SEC v. Murphy*, 626 F.2d 633, 645–46 (9th Cir.1980) (finding that offerings of limited partnership sales in certain cable television systems which raised approximately $7.5 million from 400 investors should be

integrated when the offerings were all part of one financing plan and purchased with the same type of consideration).

**B. Section 5 of the Securities Act**

A prima facie case for violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77(a) and 77(e)] may be established by showing a defendant: (1) offered or sold a security; (2) there was no registration statement on file with the SEC or in effect as to the security; and (3) the defendant used interstate transportation, or communication, or the mails in connection with the offer or sale. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901–02 (5th Cir. 1980). Once the prima facie case is made, the burden shifts to the defendant to show an applicable exemption or safe harbor from registration. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 156 (5th Cir. 1972). Section 5 violations are strict liability offenses and do not require proof of scienter. *Swenson v. Engle*, 626 F.2d 421, 424 (5th Cir. 1980).

Here, "Mapp does not disagree that Servergy's securities were not registered or that they were sold using facilities of interstate commerce." (Dkt. #122 at p. 14). Mapp argues that he did not personally offer or sell the securities because he was not a "necessary participant" nor a "substantial factor" in the Dominion JV investments at issue.

Section 5 is not limited to the person or entity that ultimately passes title to the security. *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980). "Instead, courts have established the concept of 'participant' liability to bring within the confines of § 5 persons other than sellers who are responsible for the distribution of unregistered securities." *Id.* "A defendant may be liable as a participant in a Section 5 violation if the defendant's role in the transaction is significant." *Sec. & Exch. Comm'n v. Blackburn*, 156 F. Supp. 3d 778, 797 (E.D. La. 2015) (citing *Murphy*, 626 F.2d

at 648). "A defendant plays a significant role when he is both a 'necessary participant' and 'substantial factor' in the sales transaction." *Id.* (citing *Murphy*, 626 F.2d at 652). In *Murphy,* the defendant's participation in the securities transaction was so pervasive that the Ninth Circuit found "[t]he conclusion that Murphy engaged in steps necessary to the distribution is inescapable," and therefore, affirmed the grant of summary judgment. 626 F.2d at 652.

In the present case, although Mapp likely played a significant role in the distribution of the unregistered Servergy securities, he has created a fact issue with regard to whether his involvement with the Dominion JVs rose to the level of participant liability. Mapp presented evidence that a substantial amount of investments in the Series A, B, and C offerings are attributable to the efforts of White. Thus, the undisputed facts do not establish that Mapp was a substantial participant in the Dominion JVs and Servergy securities distribution as a matter of law. *See S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1259 (9th Cir. 2013). A reasonable jury could conclude that Mapp was not a substantial participant in the Servergy securities sale.

Because the SEC has failed to establish a prima facie Section 5 violation against Mapp personally, this claim should proceed to trial.

**C. Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to (a) "employ any device, scheme, or artifice to defraud"; (b) "make an untrue statement of a material fact" or a material omission; or (c) "engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person." To establish liability under Section 10(b), the SEC must prove a defendant acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Fifth Circuit, scienter may be established by a

showing of "severe recklessness," *i.e.*, "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981). To establish a violation in the offer or sale of a security under Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)], the SEC must prove essentially the same elements, though scienter is not an element of Sections 17(a)(2) and (3). *See SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008) (citing *Aaron v. SEC*, 446 U.S. 680, 702 (1980)).

A defendant may be liable under Rule 10b-5 and Section 17(a) for either a misstatement or an omission. The SEC first alleges that Mapp made actionable misrepresentations. One of these alleged material misstatements includes Mapp's assertions about the success of Servergy's pre-order program. The SEC also bases its material misrepresentation claim on the fact that Mapp conveyed to an investor news of an order from Freescale, when it was merely a proposal that Freescale was considering. The Court will address these statements in turn.

The SEC contends that Servergy was able to raise nearly $20 million because Mapp repeatedly misled the public about the success of Servergy's pre-order program, specifically in its issuance of its PPM. On October 18, 2012, Koerr signed a non-binding pre-order agreement form for 1,000 units. It its PPM dated February 14, 2013, Servergy claimed that

> Servergy has received significant interest from various US Fortune 500 and Global 1000 companies for its Cleantech Server ®. Since announcing in the Fall of 2012 that Servergy is taking pre-orders the company has received over 25 orders totaling over 1,500 units with planned delivery in late 2013.

(Dkt. #113, Exhibit 3 at p. 39). Mapp participated in the drafting of the PPM.

16

On March 10, 2013, Koerr's CTO informed Mapp that Koerr was not interested in a 32-bit system. The SEC asserts that despite Mapp's knowledge that Koerr revoked its pre-order, Mapp and Servergy continued to use same PPM through September 2013, which still listed the same pre-order demand. Mapp also sent personalized PPMs to specifically targeted investors after March 10, 2013, which contained the same claims about pre-orders.

It is not contested that the PPM was inaccurate at the time it was published in February 2013. Mapp argues that there is a genuine fact issue as to whether the statements regarding the pre-orders were false because "pre-orders changed frequently and there is evidence of additional interest in 1,000 units in April 2013." (Dkt. #122 at. p. 26). Mapp points to evidence that "[i]n April 2013, Servergy's sales team reported it had received interest from a company called RockPlace in pre-ordering 1,000 units." (Dkt. #122 at p. 11).

Although the amount of pre-orders may have been material to an investor's decision to invest in Servergy, the SEC has not provided sufficient evidence to conclusively prove that the amount of pre-orders listed in the PPM was inaccurate. Although the SEC asserts that it is undisputed that 1,000 units of the "1,500 units with planned delivery in late 2013" consisted of Koerr's orders that were ultimately revoked, that is not explicitly apparent from the evidence presented. Nor has the SEC provided evidence or authority that Mapp had a duty to disclose the fact that Koerr revoked its pre-order. Regarding Mapp's pre-order statements, the Court finds that at this stage, the SEC has not conclusively proven that Mapp's pre-order statements constitute material misrepresentations or omissions under Rule 10b-5 and Section 17(a).

The SEC also asserts that Mapp made a material misrepresentation to an investor in late July 2012. The SEC claims Mapp solicited a prospective investment from Mayeux. The SEC asserts that in the emails sent to Mayeux, Mapp presented the news of a meeting with Freescale as

17

an actual order from a major company to induce Mayeux to invest in Servergy. Thus, Mapp was able to keep Servergy was financially afloat by referring to a "proposal" as an "order."

However, Mapp presented evidence that Mayeux understood that the emails referred to potential future orders from Freescale, and Mayeux also did not consider Mapp's references to Freescale in either of the emails important to his decision to invest in Servergy. The Court finds that there is a genuine fact issue to whether those statements were false or material to Mayeux's decision to invest. Because the SEC has failed to conclusively prove an element of their 10-b and 17(a) claims, those claims should proceed to trial.

Therefore, the Court finds that the SEC's motion for summary judgment should be denied as to all claims except the integration of the offerings.

## CONCLUSION

Accordingly, it is therefore **ORDERED** that Defendant's Partial Motion for Summary Judgment (Dkt. #116) is hereby **DENIED**.

It is further **ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. #113) is hereby **GRANTED** only to the extent that Servergy's Series A, B, C, and WFG Offering are considered a single offering under the principle of integration. The remainder of Plaintiff's motion is **DENIED**.

**IT IS SO ORDERED**.
SIGNED this 8th day of November, 2017.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE