# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>v.<br><br>WILLIAM E. MAPP, III | §<br>§<br>§ Civil Action No. 4:16-CV-00246<br>§ Judge Mazzant<br>§<br>§<br>§<br>§ |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is William E. Mapp, III's for Judgment on the Pleadings under Federal Rules of Civil Procedure 12(c) (Dkt. #112). Having considered the relevant pleadings, the Court finds that the motion should be denied in part and granted in part.

## BACKGROUND

Servergy, Inc. ("Servergy") is a computer hardware company that develops secure, cloud-based data storage servers. From November 2009 to September 2013, Servergy raised investor funds through private securities offerings to develop what it claimed was a revolutionary new server, the CTS-1000. William E. Mapp, III ("Mapp"), Servergy's co-founder and then-CEO, was responsible for the fundraising campaign and had signatory authority over Servergy's bank accounts. Mapp and Servergy marketed the CTS-1000 as a smaller, more efficient server that could replace servers from competitions such as IBM, Cisco, Dell, and HP.

As Servergy's primary fundraiser, Mapp identified prospective investors through word-of-mouth referrals and offered compensation to individuals for introducing new investors to the company. Once investors expressed interest in Servergy, they could attend investor presentations hosted by Mapp in-person or virtually through webinars. Mapp also provided the

investors a Confidential Information Memorandum ("CIM") describing the offering and subscription agreement.

In total, more than 200 investors located in at least 30 states purchased Servergy securities for a combined amount of over $26 million. Over $1.4 million of the $6 million raised during the period of November 2009 through March 2013 is attributable to the efforts of Caleb White ("White"), the owner of an insurance firm named Sound Harbor Financial, P.C. After meeting Mapp in November 2009, White solicited more than 150 individuals who invested with Servergy between April 2010 and April 2012. In return, Servergy paid White approximately $66,000 for his services. White was appointed to Servergy's board of directors on September 28, 2011.

Because White's investors were unable or unwilling to invest the minimum amount Servergy required for a direct investment, White formed and managed the three successive joint ventures, Dominion Joint Venture Group No. 1, 2, and 3 (collectively the "Dominion JVs") to acquire Servergy securities. Investing in the Dominion JVs allowed White's investors—who may not be capable of investing the $50,000 minimum for a direct investment in Servergy—to acquire an equity stake in Servergy for as little as $1,000.

Between February 2013 and September 2013, Servergy engaged broker-dealer WFG Investments, Inc. ("WFG") to raise an additional $20 million for the company by offering up to 10,000,000 shares of Servergy common stock at a price of $2.00 per share (the "WFG Offering"). The purpose of the WFG Offering was to raise funds specifically to bring the CTS-1000 to market, including beginning production, and to develop other products to be sold by Servergy. Servergy's Private Placement Memorandum ("PPM") was drafted specifically for this offering.

Servergy never filed a registration statement for any of its offerings of securities and purported to only accept investments from accredited investors. Although White and other

2

Dominion JV investors represented on Servergy's subscription agreements that the Dominion JVs were entities in which all of the equity owners were accredited, this was not the case.

In late July 2012, before Servergy raised money with WFG, Servergy pitched a possible sale to Freescale Semiconductor, Inc. ("Freescale). At the time, Servergy had just over $5,000 in its bank accounts. Around the same time, Mapp solicited a prospective investor through emails sent on July 26, 2012, and July 30, 2012. In those emails, Mapp mentioned the possibility of an order from Freescale. Shortly after receiving Mapp's second email, the investor wired $40,000 to Servergy. After Servergy received the $40,000 investment, it was able to meets its rent and payroll obligations for the month. Ultimately, Freescale never purchased or ordered a single CTS-1000.

In Fall 2012, Mapp attempted to implement a "pre-order" system that would require a potential customer to deposit with Servergy a refundable deposit to reserve future CTS-1000 units. After initially failing to create much demand, Mapp removed the deposit requirement from the pre-order system. Thus, Servergy pre-orders did not obligate customers to purchase the CTS-1000. Soon after, Koerr, Inc. ("Koerr"), a potential customer, was interested in using Servergy's CTS-1000 server in some of its products, and signed a non-binding pre-order agreement form on October 2012 for 1,000 units.

In preparation for the WFG Offering, Servergy drafted the PPM dated February 14, 2013. With regard to Servergy's pre-orders, the PPM claimed that the company has received over "25 orders totaling over 1,500 units with planned delivery in late 2013." Mapp participated in the drafting of the PPM.

In connection with the WFG Offering, Mapp conducted a live presentation regarding Servergy on or about February 14, 2013 ("WFG Presentation"), which was recorded and made available to WFG financial advisors for use in soliciting prospective investors. During the

3

presentation, Mapp claimed that Servergy had received pre-orders for over 2,000 CTS-1000 unites and the company would begin to turn a profit after selling only 600 units.

After receiving and examining an actual CTS-1000 unit for testing, Koerr's Chief Technology Officer ("CTO") discovered that the CTS-1000 was not built on 64-bit architecture. On March 10, 2013, Koerr's CTO informed Mapp that Koerr was not interested in a 32-bit system and withdrew its pre-order. Mapp and Servergy continued to use same PPM, which still listing the same pre-order demand until the WFG Offering closed in September 2013.

In September 2013, Servergy issued a Supplement to its PPM, which amended the February 14, 2013 PPM to include, among other things, positive business updates such as patent claims issued and manufacturing agreements. The Supplement did not amend the section on pre-orders.

The PPM also claimed that the CTS-1000 was an enterprise-grade general purpose server that would directly compete with the top server makers like IBM, Dell, and Hewlett Packard. It further claimed that the CTS-1000 consumed up to 80% less power than other servers, and included the following chart:

| Model | Servergy CTS100 | IBM PS701 | Cisco B200 M2 | Dell PowerEdge M160X | HP ProLiant BL420 |
|---|---|---|---|---|---|
| CPU | 8-Core | 8-Core | 8-Core | 8-Core | 8-Core |
| Hard Drive | 4 x ITB | 1 x 300GB | 2 x 146GB | 1 x 1TB | 2 x 1TB |
| RAM | 32GB | 32GB | 192GB | 96GB | 32GB |
| Power Supply Quantity x Watts / server(s) = Watts per server | 130W for each server = 130W/server | 4 x 2980W / 14 servers = 851W/server | 4 x 2500W / 8 servers = 1250W/server | 6 x 2700W / 16 servers = 1012W/server | 6 x 2400W / 8 servers = 1800W/server |
| Dimensions | 8.75 in W x 1.75 in H x 14.00 in D | 9.65 in W x 1.14 in H x 17.55 in D | 16.5 in W x 1.95 in H x 24.40 in D | 15.2 in W x 2.00 in H x 19.20 in D | 7.11 in W x 2.18 in H x 20.37 in D |
| U Size | 1/4 of 1U | 9U | 6U | 10U | 10U |
| Weight | 9.0lbs | 9.6lbs | 25.0lbs | 24.5lbs | 14.0lbs |
| Ethernet | 2 x 10 Gb 2 x 1 Gb | Dual Port 1GbE | Dual Port 10GbE | Dual Port 1GbE | Dual Port 1GbE |
| Price | Up To $9,500 no enclosure required | Up $13,000 + enclosure | $13,000 + enclosure | $12,000 + enclosure | $30,000 + Enclosure |

4

| Enclosure Price | Not required. $0 | Up To $10,779 | Up To $8,000 | Up To $5,000 | Up To $30,517 |

Mapp and Servergy represented to investors that an independent lab confirmed these results.

On October 21, 2016, the Securities and Exchange Commission ("SEC") filed its Amended Complaint, against Mapp, Warren K. Paxton, Jr. ("Paxton"), Servergy, and White, asserting various violations of federal securities laws (Dkt. #40). The SEC specifically claims that Mapp violated Sections 5(a) and 5(c), 17(a) of the Securities Act and Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder. On April 15, 2016, the Court entered final judgment against Servergy and White, dismissing them from the case (Dkt. #8; Dkt. #9). On June 9, 2017, Paxton filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #44). On March 2, 2017, the Court granted Paxton's motion to dismiss (Dkt. #96). On September 29, 2017, Mapp filed his Motion for Judgment on the Pleadings (Dkt. #112). On October 13, 2017, the SEC filed its response (Dkt. #119). On October 20, 2017, Mapp filed his reply (Dkt. #123).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not the delay trial—a party may move for judgment on the pleadings." "A motion brought pursuant to Fed. R. Civ. P 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (citation omitted); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312–13 (5th Cir. 2002). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 420 (5th Cir. 2001) (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000)).

"Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Great Plains Tr.*, 313 F.3d at 312 (quoting *Hughes*, 278 F.3d at 420). The standard applied under Rule 12(c) is the same as that applied under Rule 12(b)(6). *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 209 (5th Cir. 2009); *Guidry* v. *Am. Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir. 2007).

Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *Grubbs*, 565 F.3d at 190 (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).

Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian*

*Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010) ("'[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

## ANALYSIS

### A. Scheme Liability

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to **(a) "employ any device, scheme, or artifice to defraud"**; (b) "make an untrue statement of a material fact" or a material omission; **or (c) "engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person."** To establish liability under Section 10(b), the SEC must prove a defendant acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Fifth Circuit, scienter may be established by a showing of "severe recklessness," i.e., "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981). To establish a violation in the offer or sale of a security under Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)], the SEC must

7

prove essentially the same elements, though scienter is not an element of Sections 17(a)(2) and (3). *See SEC v. Seghers*, 298 F. App'x. 319, 327 (5th Cir. 2008) (citing *Aaron v. SEC*, 446 U.S. 680, 702 (1980)).

In the Amended Complaint, the SEC alleges that Mapp's conduct constitutes a fraudulent scheme under Sections 17(a)(1), (3) and Rules 10b-5(a), (c). Mapp argues that the SEC has failed to adequately plead scheme liability, because the SEC is required to allege independent fraudulent conduct separate and apart from Mapp's alleged misrepresentations or omissions to investors. Mapp asserts that the Amended Complaint only alleges misrepresentations and omissions and no inherently deceptive acts.

These scheme liability code sections focus on acts and conduct rather than a misstatement or omission. For example, "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) and Rule 10b–5 that do not fall within the category of misleading statements and omissions." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 579 (S.D. Tex. 2002) (noting, however, that "[c]ommon to claims of deceptive statements about the financial condition of an issuing corporation and to claims based on market manipulation through deceptive trading activity is the introduction of inaccurate information into the marketplace.").

Although this scheme liability theory is recognized by a few courts, it has not been explicitly recognized by the Fifth Circuit, which "limit[s] the reach of § 10(b) and Rule 10b-5 to a material misrepresentation or omission where there is a recognized duty to disclose." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008) (citing *Regents*

*of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.,* 482 F.3d 372, 384 (5th Cir. 2007) ("'[D]eception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff."), *cert. denied,* 552 U.S. 1170 (2008); *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657, 661 (5th Cir. 2004)).

Some district courts in the Fifth Circuit have followed the Second, Eighth, and Ninth Circuits holding that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions." *SEC v. Narayan*, No. 3:16-cv-01417-M, Slip Op. No. 149 (N.D. Tex. Aug. 28, 2017) (quoting *Pub. Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012); *see SEC v. Killion*, No. 4:16-cv-00621, Slip Op. No. 39 (S.D. Tex. Mar. 24, 2017); *SEC v. Farmer*, No. 4:14-cv-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015). *See also United States v. Ellison*, No. 14-30180, 2017 WL 3485017, at *4 (9th Cir. Aug. 15, 2017); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

To prove scheme liability in the Second and Ninth Circuits, the defendant must have engaged in fraudulent conduct, as opposed to misstatements. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011). On March 2, 2017, this Court granted Defendant Paxton's 12(b)(6) motion on a scheme liability theory noting that other courts "have not allowed subsections (a) and (c) of Rule 10b–5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5.'" *Id.* The SEC based its fraudulent scheme allegations against Paxton "primarily on Paxton's failure to disclose his

9

compensation." *Id*. As such, this Court ruled that the SEC could not use "subsections (a) and (c) of Rule 10b-5 as a back door for liability." *Id.*

After reviewing the relevant case law from recent district court cases in the Fifth Circuit, the Court finds it persuasive to require the complaint to allege conduct beyond misrepresentations or omissions to properly plead scheme liability. The Court now turns to the issue of whether the Amended Complaint sufficiently alleges that Mapp engaged in fraudulent conduct that could be considered a scheme.

Mapp argues that the SEC has not alleged any conduct of Mapp that is by nature deceptive. Mapp argues that the conduct alleged by the SEC to be fraudulent is wrongful only in the context of Mapp's misrepresentations and omissions to Servergy investors. Thus, in the absence of those misrepresentations, Mapp's conduct was not inherently fraudulent. The SEC responds that although securities fraud schemes often involve misstatements, the Amended Complaint pleads Mapp committed inherently deceptive acts, separate and apart from the alleged misrepresentations.

The SEC argues that the Amended Complaint charges Mapp with making materially misleading claims about the state of Servergy's technology, including the CTS-1000's power efficiency and utility, and its business prospects. The SEC alleges the following conduct by Mapp in support of the alleged fraudulent scheme: (1) Mapp "forwarded emails with false claims, including the false PPM", (2) Mapp "hosted presentations, in person and virtually through webinars, pitching opportunities to invest in Servergy", (3) Mapp "conducted a live demonstration 'juxtaposing the CTS-1000's power efficiency with a Dell server' that as not a comparable product", and (4) Mapp created a "pre-order" system that categorized bare expressions of interest as a "pre-order" of the CTS-1000 (Dkt. #119 at p. 3–4).

10

After considering the Amended Complaint and the parties' arguments, the Court concludes that the Amended Complaint states a plausible claim against Mapp for scheme liability.

### 1. Pre-Order System

The SEC alleges that

> [t]o demonstrate market demand for the CTS-1000, Mapp implemented a pre-order program . . . requiring customers to pay a 50% deposit to pre-order the CTS-1000. When no potential customers were willing to pay a deposit, Mapp changed the program . . . , dropping the deposit requirement and . . . calling for a customer to sign a non-binding pre-order form. . . . In order to create the false appearance that Servergy had received more than one pre-order, Mapp's son . . . published [the] pre-order form on Servergy's website. . . . Mapp began to use the term "pre-order to refer to any instance in which a prospective customer indicated, either orally, via email, or on Servergy's online pre-order form that it would consider buyer the CTS-10000 when it ultimately became available on the market. . . . Mapp simply invented his own misleading definition of the term "pre-order" to disguise the fact that Servergy had neither actual product orders nor binding legal or financial commitments to purchase the CTS-1000.

(Dkt. #40 at ¶¶ 24–31).

In *SEC v. Killion*, the SEC had alleged that defendant Uni-Pixel had entered into business contracts that were "highly contingent, posed serious risk to Uni-Pixel, and included terms that Uni-Pixel reasonably knew it couldn't not satisfy." No. 4:16-cv-00621, Slip Op. No. 39 at 26–27 (S.D. Tex. Mar. 24, 2017). The complaint further alleged that Uni-Pixel failed to disclose the material terms of these contacts, but touted them to the public as significant achievements. *Id*. at 27. The court held that

> [T]he making of highly "contingent," high risk business contracts [] does not in and of itself state a "scheme to defraud." . . . To the contrary, the heart of the SEC's scheme to defraud allegations are that Defendants made untrue statements of material fact and material misleading omissions of facts in public statements and filings regarding the contracts and Uni-Pixel's business operations, that is, violations of Rule 10b-5(b).

*Id*. The court concluded, "no 'scheme' can be discerned for which liability attaches apart from the alleged misrepresentations and misleading omissions."

11

Similar to the high risk contacts, a non-binding pre-order agreement may carry a high risk that a customer may back out in the future. In this case, that's exactly what happened with Koerr. Creating a pre-order system is not an inherently deceitful act, even without the deposit requirement. The customers who fill out a pre-order form on Servergy's website are not misled about their particular commitment. The misleading statements to investors regarding the amount of pre-orders makes the conduct deceptive.

Thus, this conduct only became deceptive though the misstatements to investors and included in the PPM. The SEC has not adequately pleaded scheme liability against Mapp with regard to this conduct.

### 2. Emails, Investor Presentations and Dell Demonstration

The actions alleged to have been performed by Mapp, such as emailing investors and conducting investor presentations, are also not, standing alone, fraudulent or indicative of improper actions. That conduct is wrongful only in the context of Mapp's alleged misrepresentations and omissions.

However, the SEC does allege that a live demonstration or lab test conducted in October 2010, which compared the CTS-1000 with a Dell server, was an inherently deceitful act. The SEC argues that the lab test merely tested the power consumption and thermal output of an early CTS-1000 prototype board in isolation rather than in comparison to any other server" and Servergy only tested the CTS-1000 against one other, non-comparable Dell server released nearly four years before the WFG offering launched. The SEC argues that Mapp knew the lab test did not conduct comparable testing pitting the CTS-1000 against other comparable servers.

Nevertheless, in conjunction with a live demonstration, Mapp and Servergy claimed that CTS-1000s "literally help[ed] pay for themselves by consuming up to 80% less power [and]

12

cooling" than other servers and represented to investors that the independent lab test confirmed those claims. An early iteration of this claim appeared in Servergy's CIM and was repeatedly asserted by Mapp in oral and written communications with investors and in the PPM. Therefore, the SEC alleges that not only were Mapp's and Servergy's power and thermal output claims baseless and false, but they manipulated an independent lab test to confirm those claims and also falsely represented to investors that lab test confirmation.

Although the SEC has identified actionable misrepresentations and false statements regarding the CTS-1000 utility compared to industry competitors that were repeatedly made to investors, the Amended Complaint also identifies a scheme in which Mapp participated in that contributed to the false impression that the CTS-1000 was a superior server.

Conducting a lab test in isolation to achieve an intended result may constitute a deceptive act in itself that had "the principal purpose and effect of creating a false appearance of fact" about Servergy and the CTS-1000. *Farmer*, 2015 WL 5838867, at *15 (finding sufficient evidence of scheme liability where defendant had manipulated the market by financing IPO investments without disclosing that to investors, as well as coordinating a market awareness campaign that disseminated false information about the business's activities). Although promoting the CTS-1000 as a superior server consisted of false statements, Mapp's actions in hiring lab technicians to test CTS-1000's utility and potentially directing them to manipulate the testing to achieve an intended result is conduct distinct from the statements themselves. The SEC has alleged sufficient facts of deceptive conduct to hold Mapp liable under a scheme liability theory.

### B. Disgorgement

The SEC seeks disgorgement of $26,491.435.61 against Mapp personally, which reflects the amount of investor funds Servergy raised. Mapp's opposition to the motion and arguments

13

cast no doubt on that figure. However, Mapp argues that disgorgement is not an equitable remedy available to the SEC in this case.

"The district court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). The party seeking disgorgement must distinguish between what has been legally and illegally obtained. *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007). In actions brought by the SEC involving a securities violation, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Allstate Ins. Co.*, 501 F.3d at 413 (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)). In the securities context, the proper starting point for disgorgement is the total proceeds received from the sale of the securities. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972). The SEC bears the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation. *First City Fin. Corp.*, 890 F.2d at 1232; *SEC v. Rockwall Energy of Tex., LLC*, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012). Once the SEC meets its burden, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City*, 890 F.2d at 1232.

Courts have required tippers in insider trading cases to disgorge profits gained by individuals who received and traded on that information, even though the tipper never received any profits. *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998); *SEC v. Clarke*, 915 F.2d 439, 454 (9th Cir. 1990). For these reasons, the Supreme Court recently held that disgorgement is actually a penalty. *Kokesh v. SEC*, 137 S. Ct. 1535, 1644 (2017). However, whereas here, there is a claim based on fraudulent activity, disgorgement may be available as an equitable remedy,

14

notwithstanding the absence of loss to individuals or independent claims for restitution. *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim. *Id*. Thus, disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct.

The SEC argues for a disgorgement award of $26,491,435.61, because Mapp's misrepresentations enable Servergy to raise $26,491,435.61 via the various offerings, specifically the WFG Offering. The SEC does not present additional facts of ill-gotten gains. The SEC alleges that the essence of the offerings were to encourage investors to invest in Servergy under false pretenses that Servergy had a high demand of pre-orders. Thus, by misleading investors, Servergy was able to raise much more money than it would have raised had Mapp told the truth. Mapp asserts that he did not personally receive any investor funds. He further asserts that the investors have retained their shares in Servergy, which according to the SEC remains in business and is now generating revenue from CTS-1000 sales. Mapp also points to the SEC's settlement with Servergy, which did not include a disgorgement award.

It would be premature to categorically preclude a disgorgement award at the pleading stage and the language of the Amended Complaint is sufficient to encompass disgorgement as "Rule 8(a)(3) of the Federal Rules of Civil Procedure does not require that the demand for judgment be pled with great specificity." *Sheet Metal Workers Local 19 v. Keystone Heating & Air Cond.*, 934 F.2d 35, 40 (3d Cir. 1991); *Sheet Metal Workers' Local 19 v. Herre Bros.*, 201 F.3d 231, 249 (3d Cir. 1999) (finding the phrase "[s]uch other relief as the Court deems just and reasonable" broad enough to encompass the remedy of specific performance).

## CONCLUSION

Accordingly, it is therefore **ORDERED** that Defendant's Motion for Judgment on the Pleadings (Dkt. #112) is hereby **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Defendant's Motion for Judgment on the Pleadings (Dkt. #112) is hereby **GRANTED** only to the extent Plaintiff's scheme liability claims under 10b-5(a) and (c) of the Exchange Act and 17(a)(1) and (3) cannot be based on Defendant Mapp's conduct regarding the institution of the pre-order system and are **DISMISSED** with prejudice.

It is further **ORDERED** that Defendant's motion be **DENIED** as to the remainder of the claims.

**IT IS SO ORDERED**.
 SIGNED this 9th day of November, 2017.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE