# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § § § § § § | |
| | | Civil Action No. 4:16-CV-00246 |
| v. | | Judge Mazzant |
| WILLIAM E. MAPP, III | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Securities and Exchange Commission's Motion for Remedies and to Enter Final Judgment against Defendant William E. Mapp, III (Dkt. #191). After reviewing the record, the Court finds the motion should be granted in part.

## BACKGROUND

Servergy, Inc. ("Servergy") is a computer hardware company that develops secure, cloud-based data storage servers. From November 2009 to September 2013, Servergy raised approximately $26 million in private securities offerings to develop what it claimed was a revolutionary new server, the CTS-1000. William E. Mapp, III ("Mapp"), Servergy's co-founder and then-CEO, was responsible for the fundraising campaign and had signatory authority over Servergy's bank accounts. Mapp and Servergy marketed the CTS-1000 as a smaller, more efficient server that could replace servers from competitors such as IBM, Cisco, Dell, and HP.

As Servergy's primary fundraiser, Mapp identified prospective investors through word-of-mouth referrals and offered compensation to individuals for introducing new investors to the company. Once investors expressed interest in Servergy, they could attend investor presentations hosted by Mapp in-person or virtually through webinars. Mapp also provided the

investors a Confidential Information Memorandum describing the offering and subscription agreement.

From November 2009 through October 2013, more than 200 investors located in at least thirty (30) states purchased Servergy securities for a combined amount of over $26 million. Over $1.4 million of the $6 million raised during the period of November 2009 through March 2013 is attributable to the efforts of Caleb White ("White"), the owner of an insurance firm named Sound Harbor Financial, P.C. After meeting Mapp in November 2009, White solicited more than 150 individuals who invested with Servergy between April 2010 and April 2012. In return, Servergy paid White approximately $66,000 for his services. White was appointed to Servergy's board of directors on September 28, 2011.

Because White's investors were unable or unwilling to invest the minimum amount Servergy required for a direct investment, White formed and managed the three successive joint ventures, Dominion Joint Venture Group No. 1, 2, and 3 (collectively the "Dominion JVs") to acquire Servergy securities. Investing in the Dominion JVs allowed White's investors—who may not be capable of investing the $50,000 minimum for a direct investment in Servergy—to acquire an equity stake in Servergy for as little as $1,000.

Servergy separated its multi-year fundraising into four separate offerings:

(1) Series A was offered between approximately November 2009 and April 2010 and raised approximately $800,000. Investors in this offering purchased Servergy stock at $0.25 a share. The purpose of the Series A offering was to raise pre-production funds, which were ultimately used for "engineering, design, development, fab, assembly and testing of Servergy's Rev 1 Pre-Production Units, as well building a strategic ecosystem and infrastructure of people, process and technology." Dominion JV 1 invested approximately $78,000 in this offering on April 18, 2010.

(2) Series B was offered between approximately April 2010 and August 2011 and raised approximately $3.6 million. Investors in this offering purchased Servergy stock at $1.00 a share. Series B funds were used "to build Rev 2 and 3 Pre-Production Units and further

build the management team and necessary infrastructure." Dominion JV 2 invested in this offering.

(3) Series C was offered between December 2011 and March 2013 that raised approximately $1.7 million. Investors in this offering purchased Servergy stock at $2.00 a share. The purpose of this offering was to raise the funds needed for the CTS-1000 to become "production ready." Becoming "production ready" included ensuring the product design was ready for production, validating software and hardware, and manufacturing production-ready units for consumer beta testing. Dominion JV 3 invested approximately $184,852 in this offering.

(4) Between March 2013 and October 2013, Servergy engaged broker-dealer WFG Investments, Inc. ("WFG") to raise an additional $19.4 million for the company by offering up to 10,000,000 shares of Servergy common stock at a price of $2.00 per share (the "WFG Offering"). The purpose of the WFG Offering was to raise funds specifically to bring the CTS-1000 to market, including beginning production, and to develop other products to be sold by Servergy. Funds were used, for example, to address product-build issues and to ultimately manufacture units to be sold to customers. Servergy's Private Placement Memorandum, drafted specifically for this offering, makes clear that the purpose of the offering is to bring the CTS-1000 to market. None of the Dominion JVs invested in this offering.

Servergy never filed a registration statement for any of its offerings of securities. Rather, Servergy filed Form Ds with the SEC, all claiming exemptions from registration under Rule 506 of Regulation D.

Servergy purported to only accept investments from accredited investors. To that end, Servergy's subscription agreement required investors to certify that they: (1) were accredited; (2) had the knowledge and experience in financial and business matters to be capable of evaluating the investment; and (3) were able to bear a total loss of their investment. Although White and other Dominion JV investors represented on Servergy's subscription agreements that the Dominion JVs were entities in which all of the equity owners were accredited, this was not the case.

In Fall 2012, Mapp attempted to implement a "pre-order" system that would require a potential customer to deposit with Servergy a refundable deposit to reserve future CTS-1000 units.

3

After initially failing to create much demand, Mapp removed the deposit requirement from the pre-order system. Thus, Servergy pre-orders would not require any deposit from customers. Soon after, Koerr, Inc. ("Koerr"), a Canadian company that provided instrumentation, electrical, and automation services to the oil and gas industry, was interested in using Servergy's CTS-1000 server in some of its products, and signed a non-binding pre-order agreement form on October 18, 2012, for 1,000 units.

On October 19, 2012, Mapp sent an email to investors announcing Servergy's pre-order sales model. In the same email, he also announced that Servergy "received a signed pre-order agreement today for 1,000 units" and was discussing a "2013 roll out schedule" with the potential purchaser (Koerr). By early 2013, Servergy claimed to have received pre-orders for more than 1,500 CTS-1000 units.

In preparation for the WFG Offering, Servergy drafted Private Placement Memorandum ("PPM") dated February 14, 2013. With regard to Servergy's pre-orders, the PPM claimed that

> Servergy has received significant interest from various US Fortune 500 and Global 1000 companies for its Cleantech Server ®. Since announcing in the Fall of 2012 that Servergy is taking pre-orders the company has received over 25 orders totaling over 1,500 units with planned delivery in late 2013.

(Dkt. #113, Exhibit 3 at p. 39). Mapp participated in the drafting of the PPM.

In connection with the WFG Offering, Mapp conducted a live presentation regarding Servergy on or before March 5, 2013 ("WFG Advisors Call"), which was recorded and made available to WFG financial advisors for use in soliciting prospective investors. During the presentation, Mapp stated Servergy had "two thousand plus and growing" pre-orders for the CTS-1000. He quantified the financial impact of Servergy's pre-orders as "about $20 million" and noted that $20 million was equal to the amount of investment money being raised by Servergy at the time.

4

After receiving and examining an actual CTS-1000 unit for testing, Koerr's Chief Technology Officer ("CTO") discovered that the CTS-1000 was not built on 64-bit architecture. On March 10, 2013, Koerr's CTO informed Mapp that Koerr was not interested in a 32-bit system and withdrew its pre-order.

Mapp and Servergy continued to use the same PPM through September 2013, which still listed the same pre-order demand. Mapp also sent personalized PPMs to specifically targeted investors, which contained the same claims about pre-orders. Using these PPMs, Servergy raised nearly $20 million after March 10, 2013.

In September 2013, Servergy issued a Supplement to its PPM, which amended the February 14, 2013 PPM to include, among other things, positive business updates such as patent claims issued and manufacturing agreements. The Supplement did not amend the section on pre-orders.

On October 21, 2016, the Securities and Exchange Commission ("SEC") filed its Amended Complaint, against Mapp, Warren K. Paxton, Jr. ("Paxton"), Servergy, and White, asserting various violations of federal securities laws (Dkt. #40). The SEC specifically claims that Mapp violated Sections 5(a) and 5(c), 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder ("Rule 10b-5"). On April 15, 2016, the Court entered final judgment against Servergy and White, dismissing them from the case (Dkt. #8; Dkt. #9). On November 4, 2016, Paxton filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Dkt. #44). On March 2, 2017, the Court granted Paxton's motion to dismiss (Dkt. #96).

Following an eight-day trial, on December 13, 2017, the jury found that Mapp violated Section 17(a)(2) of the Securities Act of 1933 ("Section 17(a)(2)"). The jury found Mapp not liable for violations of Rule 10b-5, Sections 5(a) and (c) of the Securities Act, or Section 17(a)(1)

5

and 17(a)(3) of the Securities Act. On March 5, 2018, the SEC filed a Motion for Remedies and to Enter Final Judgment (Dkt. #191). On March 20, 2018, Mapp filed a response (Dkt. #193). On March 27, 2018, the SEC filed a reply (Dkt. #195). On May 1, 2018, the Court held a hearing on the issue of an appropriate remedy (Dkt. #199).

## DISCUSSION

### A. Permanent Injunction

Section 21(d) of the Exchange Act provides for injunctive relief when the evidence establishes a "reasonable likelihood" that a Defendant will engage in future violations of the securities laws. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978). "[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720; *see SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1973).

Courts consider a number of factors when imposing permanent injunctions, including: (1) egregiousness of the defendant's conduct; (2) isolated or recurrent nature of the violation; (3) degree of scienter; (4) sincerity of the defendant's recognition of his transgression; and (5) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *Blatt*, 583 F.2d at 1334–35. The SEC argues that the Court should permanently enjoin Mapp because his violations were multiple, continued, egregious, and undertaken with scienter (Dkt. #191 at pp. 2–3).

"[I]t will almost always be necessary for the [SEC] to demonstrate that the defendant's past sins have been the result of more than negligence. . . . An injunction is a drastic remedy, not a mild

6

prophylactic, and should not be obtained against one acting in good faith." *Aaron v. SEC,* 446 U.S. 680, 703 (1980) (C.J. Burger, concurrence). "Although no single factor is determinative, . . . the degree of scienter 'bears heavily' on the decision." *SEC v. Pros Int'l, Inc.,* 994 F.2d 767, 769 (S.D.N.Y.1993) (affirming district court's denial of a permanent injunction because, even though defendant's "actions were clearly negligent and probably reckless, there [was] no showing that [he] intended to defraud investors"). The SEC constantly bears the burden to prove intent to deceive. *SEC v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008). In the Fifth Circuit, scienter is established by showing a defendant acted intentionally or with severe recklessness. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 366 (5th Cir. 2004) (holding that scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers . . . is either known to the defendant or so obvious that the defendant must have been aware of it.'") (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)); *see Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations" involving an "extreme departure from the standards of care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

The jury found that Mapp violated Section 17(a)(2), which means they found Mapp "obtained money or property by means of [an] untrue statement of a material fact or [an] omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (Dkt. #180 at p. 12; Dkt. #182 at ¶ 6). A violation of Section 17(a)(2) necessarily includes a finding that he acted "either negligently, recklessly, or with an intent to defraud." (Dkt. #180 at p. 13).

The SEC asserts that Mapp's conduct in this case involved at least an extreme departure from the standards of care, and/or was at least severely reckless. Mapp asserts that "[t]he jury's sole liability finding was a negligence-based violation of Securities Act § 17(a)(2)" because the jury found Mapp not liable under Rule 10b-5 and Section 17(a)(1), thus rejecting the claim that he acted with scienter. The SEC counters that "[i]n the absence of an explicit jury finding, the Court is free to determine that Mapp's state of mind based on a review of the evidence." (Dkt. #195 at p. 2).

The Court agrees with Mapp that the jury found that Mapp did not act with scienter, but that he negligently violated section 17(a)(2). The Jury Charge instructed the jury that

> The second element for Section 17(a)(2) and 17(a)(3) requires the SEC to prove that Mapp acted negligently. "Negligently" means the failure to use that degree of care which an ordinary person would use under the same or similar circumstances. Negligence may consist of either doing something that a reasonable person would not do under the circumstances, or it may consist of failing to do something that a reasonable person would do under the circumstances.

(Dkt. #180 at pp. 13–14). The jury was instructed that negligence is sufficient for liability under Section 17(a)(2), and refused to find liability for misrepresentations under Rule 10b-5(b) (or any other scienter-based claim). The Jury Charge also highlighted some differences between Section 17(a)(2) and Rule 10b-5(b), and the jury was properly instructed on those differences.

> **Section 17(a)(2) does not require that Mapp personally made the statements, as in Rule 10b-5(b).** In order to demonstrate that Mapp obtained money or property "by means of" one or more material misstatements or omissions, the SEC need not prove that Mapp himself made the particular misstatement or omission but only that he used the misstatement or omission to obtain money or property. "By means of" means, then, "to use."

(Dkt. #180 at p. 13).

There was more than sufficient evidence to find that Mapp personally made the statements to satisfy Rule 10b-5(b). However, the jury did not find Mapp liable under Rule 10b-5(b) and it

8

is consistent with the jury's verdict that Mapp merely negligently violated the securities law. The jury's findings that Mapp did not engage in intentional or reckless illegal conduct weighs against the imposition of injunctive relief.

Setting aside the degree of intent, the SEC argues that Mapp's conduct was recurrent and not isolated and favors imposing an injunction against him. The SEC asserts that the jury determined that Mapp's misstatements and omissions occurred *before and after* April 11, 2011, a date five years before the filing of the Complaint and nearly two years before Mapp and Servergy engaged the services of WFG to help the company raise $20 million from investors (Dkt. #191 at pp. 3–5) (emphasis in original) (*See* Dkt. #182 at ¶ 8). However, during trial, the SEC did not allege any such misrepresentations that occurred before April 11, 2011, did not prove any such misrepresentations at trial, and the jury was instructed that the SEC only alleges the following misstatements or omissions:

- Mapp made material misrepresentations and omissions regarding the amount of orders or pre-orders for Servergy's product, the CTS-1000, including
    - Servergy's 2013 Private Placement Memorandum (the "PPM") statement that "[s]ince announcing in fall of 2012 that Servergy is taking pre-orders the company has received over 25 orders totaling over 1,500 units with planned delivery in late 2013";
    - The WFG Advisors Call that Servergy had 2,000 pre-orders;
    - Mapp's failure to amend the amount of orders or pre-orders listed in the 2013 PPM.

- Mapp made material misrepresentations and omissions regarding the nature of the technology in Servergy's product, the CTS-1000, in the WFG Advisors' Call, and in Servergy's 2013 PPM, including on page 27 of the PPM.

- Mapp made material misrepresentations and omissions regarding the relative power efficiency of the server and the fact that the CTS-1000 was a 32-bit server, including Mapp's failure to disclose during the WFG raise that the CTS-1000 was based on a 32-bit processor.

(Dkt. #180 at p. 9).

The Court finds that the relative magnitude of the conduct weighs against an injunction here. While the negligent conduct was not isolated and was recurring with respect to Mapp's embellishments about the amount of pre-orders and the specifications of the CTS-1000, the record does not reveal it to be such a pervasive characteristic of Mapp's method of doing business as to indicate that he will continue to violate the securities laws unless an injunction is issued.

The Court further does not find Mapp's willingness to contest the SEC's accusations as a lack of remorse. Mapp's statements during trial indicate that he relied, in part, on Servergy's officers, employees, and advisors to provide the information in the PPM and to ensure the offerings were in compliance with federal securities law. The jury further found that Mapp satisfied the Rule 506 and Rule 508 of Regulation D exemptions to a violation of Section 5(a) and (c) of the Securities Act (Dkt. #182 at ¶¶ 11, 12). Specifically, Rule 508, a safe harbor provision, requires that Servergy made a good faith and reasonable attempt to comply with the requirements of Regulation D (Dkt. #180 at p. 17). This conduct similarly indicates that an injunction is not necessary to ensure future compliance.

Finally, the last factor, Mapp's position to violate securities laws in the future, also weighs against imposing an injunction. Mapp has submitted a sworn declaration in which he states that he is no longer an employee or officer of Servergy and has been employed as an Uber driver since 2016 (Dkt. #193, Exhibit A at ¶¶ 1–2). Accordingly, the Court finds that the SEC has failed to demonstrate that the issuance of injunctive relief is warranted.

**B. Disgorgement**

Courts traditionally order disgorgement in SEC enforcement proceedings to deprive defendants of "any monetary reward for violating securities laws and to protect the investing public by providing an effective deterrent to future violations." *Kokesh v. SEC*, 137 S.Ct. 1635, 1640

(2017) (citations omitted). As an initial matter, Mapp contends that the United States Supreme Court's recent decision in *Kokesh* eliminates the SEC's authority to obtain disgorgement as a remedy in civil enforcement actions (Dkt. #193 at pp. 9–13). *See generally id.* at 1635. Alternatively, he argues that the SEC's disgorgement requests are unreasonable and not necessary for the benefit of investors (Dkt. #193 at pp. 14–16). The Court will address both arguments in turn.

1. **Effect of *Kokesh***

In *Kokesh*, the Supreme Court held that "disgorgement in the securities-enforcement context is a 'penalty' within the meaning of 28 U.S.C. § 2462." *Kokesh*, 137 S.Ct. at 1639. Mapp asserts that because such disgorgement is a penalty, it is no longer a remedial or compensatory exercise of the Court's equity power and that the SEC must have statutory authorization to seek disgorgement as a remedy (Dkt. #193 at pp. 9–13). Mapp interprets the decision to mean that disgorgement is a penalty in every sense of the word; however, in *Kokesh*, the Supreme Court limits designating disgorgement as a penalty only "within the meaning" of the five-year statute of limitations provided by § 2462. *Kokesh*, 137 S.Ct. at 1639; *see SEC v. Jammin Java Corp.*, No. 2:15-CV-08921, 2017 WL 4286180, at *3 (C.D. Cal. Sept. 17, 2017) ("*Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement").

The Court finds that Mapp's interpretation expands beyond the clear decision in *Kokesh*, which provides no basis that would compel the Court to abandon precedent of permitting the SEC to obtain disgorgement in civil enforcement actions. *See SEC v. Sample*, No. 3:14-CV-1218-B, 2017 WL 5569873, at *2 (N.D. Tex. Nov. 20, 2017) ("*Kokesh* had no effect on how courts apply

11

disgorgement principles."). Because *Kokesh* does not eliminate disgorgement as a remedy in the present case, the Court must determine the proper amount.

### 2. Disgorgement Amount

"The district court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). The party seeking disgorgement must distinguish between what has been legally and illegally obtained. *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007). In actions brought by the SEC involving a securities violation, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.* (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)). In the securities context, the proper starting point for disgorgement is the total proceeds received from the sale of the securities. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

The SEC bears the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation. *First City*, 890 F.2d at 1232; *SEC v. Rockwall Energy of Tex., LLC*, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012). The Commission must show that the disgorgement sought is "causally connected to the violation." *Allstate*, 501 F.3d at 413. Once the SEC meets its burden, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City*, 890 F.2d at 1232. Financial hardship is not a ground for denying disgorgement. *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 746 (5th Cir. 2004) ("[Defendants'] inability to pay is irrelevant. Disgorgement deprives wrongdoers of ill-gotten gains; and a person remains unjustly enriched by what was illegally received, whether he retains the proceeds of his wrongdoing").

The SEC argues for a disgorgement amount of $711,074.77 because that is the amount of money Mapp received in "salary, car allowance, bonus, vacation pay out, and separation pay" since April 11, 2011 (Dkt. #191 at p. 14). The SEC asserts that Servergy had no profitable business operations and sold no products; thus, did not make money to pay Mapp's salary. According to the SEC, Mapp's misrepresentations enabled Servergy to raise over $24 million via investor funds. Thus, the SEC asserts that Mapp received his entire salary as a result of his securities violations. The SEC does not provide additional evidence of the alleged ill-gotten gains. In response, Mapp argues that the SEC's disgorgement requests are unreasonable and not necessary for the benefit of investors (Dkt. #193 at pp. 14–16).

As the Court previously mentioned, the only alleged misrepresentations submitted to the jury were in the PPM and PPM Supplement, both of which were issued in 2013, and the WFG Advisors Call (Dkt. #180 at p. 9). Furthermore, the jury rejected the SEC's only claim premised on pre-2013 conduct, the Section 5 claim, because it found Mapp satisfied the Rule 506 and 508 exemptions (Dkt. #182 at p. 3). The declaration of Carol Hahn attached to the SEC's motion provides a report of payroll data from January 1, 2011, to December 31, 2017. The data shows that from April 16, 2011, to September 30, 2013, Mapp received $321,818.87 in compensation from Servergy, and from October 1, 2013, to December 31, 2017, Mapp received $389,255.90 in compensation from Servergy. Thus, at the very least $321,818.87 should be deducted from the SEC's requested disgorgement amount because Mapp was not found to have violated any securities law during that time period.

Furthermore, although the Court recognizes "the disgorgement figure should include all gains flowing from the illegal activities" and does not have to be exact, the Court is unable to ascertain the amount by which Mapp profited. *SEC v. Huff*, 758 F. Supp. 2d 1288, 1356

(S.D. Fla. 2010). Uncertainty regarding the disgorgement amount should usually fall on the wrongdoer; however, in this case, any order of disgorgement would be based on speculation. "[T]he SEC cannot satisfy its burden to *reasonably* approximate a disgorgement amount merely by proving the violations and then" simply stating the salary Mapp received from the transactions were all profits; "[w]ithout proof, a court cannot speculate[.]" *SEC v. Wyly*, 56 F. Supp. 3d 260, 269 (S.D.N.Y. 2014) (emphasis in original).

The jury found that the PPM encouraged investors to invest under false pretenses that the CTS-1000 was a more superior server compared to competitors and Servergy had secured future orders and sales. By misleading investors, Servergy was able to raise much more money than it would have raised had the PPM been truthful. The SEC called no expert witnesses to establish the appropriate amount of disgorgement and completely ignores the value Mapp provided Servergy as an employee and its CEO. For example, a non-profit organization still pays its employees some sort of wage even though the company does not produce a profit. Thus, the SEC can only speculate on the amount of money Mapp earned as a result of his misrepresentations and omissions.

Furthermore, testimony at trial indicates Servery is currently operational and investors have retained their shares. Lance Smith, Servergy's Chief Operations Officer, and Vihar Rai, Servergy's Vice President of Engineering, testified at trial that Servergy is currently marketing its CTS-1000 technology as a cyber-security device through a licensing agreement with Cyphre Security Solutions (Dkt. #193 at p. 15). Accordingly, the Court finds that the total amount of compensation Mapp earned from Servergy is not a reasonable approximation of illegal profits connected to the violation. Because the Court declines to impose a disgorgement award, the Court also declines to award any prejudgment interest.

### C. Civil Penalty

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Court to assess civil penalties. 15 U.S.C. §§ 77t(d), 78u(d). Such penalties "are designed to serve as deterrents against securities law violations, in contrast with disgorgement, which primarily aims to remove a defendant's profit from illegal transactions and which merely places the offender in the same position he would have been had he not committed the offense." *SEC v. Helms*, No. A-13-CV-01306, 2015 WL 5010298, at *21 (W.D. Tex. Aug. 21, 2015) (citation omitted). There are three tiers of penalties, each with a different required showing. Furthermore, each tier distinguishes between "natural persons" and "other persons," i.e., corporations.

All violations are subject to first-tier penalties. *See* 15 U.S.C. §§ 77t(d), 78u(d). Second-tier penalties are warranted when violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. Third-tier penalties are appropriate for violations that involve fraud and "result[ ] in substantial losses or create[ ] a significant risk of substantial losses to other persons." *Id*. Under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the maximum penalty is $7,500 for a first-tier penalty, $75,000 for a second-tier penalty, and $150,000 for a third-tier penalty. *See* 17 C.F.R. § 201.1001. The maximum penalty the Court may award is the greater of the gross amount of pecuniary gain or the amount set by statute, i.e., set by the applicable tier. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).

Although the maximum penalty is determined by statute, the amount imposed is left to the Court's discretion. *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). In determining the amount, courts consider the same factors used to analyze the appropriateness of injunctive relief. *See SEC v. Coplan*, No. 13-62127-CIV, 2014 WL 695393 at *9 (S.D. Fla. Feb. 24, 2014) ("Because civil

penalties, like a permanent injunction, are imposed in part to deter the wrongdoer from similar conduct in the future, courts apply the same factors for determining injunctive relief in assessing civil penalties." (internal quotation marks omitted) (quoting *SEC v. Gane*, No. 03-61553-CIV-SEITZ, 2005 WL 90154, at *20 (S.D. Fla. Jan. 4, 2005)); *see Helms*, 2015 WL 5010298, at *21 ("To determine civil penalties, a court considers the following factors: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.") (quoting *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012)). The Court already discussed these factors in analyzing the propriety of injunctive relief and incorporates that analysis into this section to avoid repetition. One additional factor courts consider is the financial condition of the defendant. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

The SEC argues that the factors weigh heavily in favor of a substantial third-tier civil penalty. The SEC then calculates the range of penalties for each tier, based on a scheme of three violations, grouped into three very broad categories of misstatements or omissions: "(1) omitting any mention of the Server's 32-bit chip from investors, including misleadingly comparing the Server to 64-bit machines; (2) falsely inflating the number of orders and pre-orders during the WFG raise; and (3) misrepresenting the characteristics of the Server as described by Charles Marler." (Dkt. #191 at p. 18 n.6).

Mapp asserts that civil penalties are not appropriate based on his arguments regarding egregiousness and lack of scienter. Further, Mapp argues that the SEC has presented no evidence that Servergy investors suffered substantial loss as a result of Mapp's conduct. Finally, Mapp

argues that his financial condition makes it impossible for Mapp to pay an order of disgorgement, let alone a civil penalty.

The Court is unpersuaded that second- or third-tier penalties should apply because there is no evidence that Servergy or Servergy investors suffered substantial losses as a result of Mapp's conduct. In contrast, Mapp has presented evidence that Servergy is still in business and licensing its technology for cyber security applications. However, the jury still found that Mapp violated federal security law, even if only negligently.

Although the Court has awarded remedies sought by the SEC in other cases, the Court rejects these awards in this case. In light of the evidence, the Court finds that Mapp should be assessed the maximum civil penalty for three, first-tier violations. Mapp's violations did not involve fraud and deceit and also did not result in substantial losses to others.

Turning to the penalty amount, the Court has discretion to determine the amount in light of the facts and circumstances. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3); *see also SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) ("The statutes leave the [penalty] amount to be imposed to the discretion of the district judge."). "Considering the discretionary nature of the civil penalty framework, prior decisions and consent decrees are of little comparative value for any individual matter." *SEC v. Moran*, 944 F. Supp. 286, 296–97 (S.D.N.Y. 1996). Mapp's violations occurred, at least in part, after March 5, 2013. Therefore, the relevant adjustment of civil monetary penalties is the adjustment issued in 2013. 17 C.F.R. § 201.1005. Under the 2013 adjustment, a maximum first-tier penalty for a natural person is $7,500.

After considering the record, a $7,500 penalty per statutory violation is appropriate, for a total of $22,500. *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1345 (N.D. Ga. 2010) ("Because the relevant statutes authorize penalties for 'each violation,' courts are empowered to multiply the

17

statutory penalty amount by the number of statutes the defendant violated, and many do."). The Court views this as a mild penalty. The jury has spoken and it is time to close the final chapter of this case.

## CONCLUSION

It is therefore **ORDERED** that the Securities and Exchange Commission's Motion for Remedies and to Enter Final Judgment against Defendant William E. Mapp, III (Dkt. #191) is hereby **GRANTED in part**. The SEC's requests for an injunction, disgorgement, and pre-judgement interest are **DENIED**.

It is further **ORDERED** that William E. Mapp, III, pay a civil penalty of $22,500.

**SIGNED this 25th day of July, 2018.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE